James Acres
1106 2nd #123
Encinitas, CA 92024
james@acresbonusing.com
james@kosumi.com
541 760 7503 (mobile)

*In Pro Per*

FILED

MAR 09 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY


# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO

'16 CV 0598 H    BLM

| | |
|---|---|
| **JAMES ACRES**, a natural person,<br><br>Plaintiff,<br><br>vs.<br><br>**BLUE LAKE RANCHERIA TRIBAL COURT**, the court of a Federally Recognized Tribe; **LESTER J. MARSTON**; in his official capacity as CHIEF JUDGE OF THE BLUE LAKE RANCHERIA TRIBAL COURT; **ANITA HUFF**, in her official capacity as CLERK OF THE BLUE LAKE RANCHERIA TRIBAL COURT; and **BLUE LAKE CASINO AND HOTEL**, a tribally owned entity of the Federally Recognized tribe the BLUE LAKE RANCHERIA,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR PRE-EMPTIVE DECLATORY AND INJUCTIVE RELIEF FROM IMPROPER ASSERTION OF TRIBAL JURISDICTION |

1.  Plaintiff James Acres alleges and states as follows:

# Table of Contents

I: Executive Summary ........................................... 3

II: Jurisdiction, Venue and Parties ........................... 4

III: General Allegations ...................................... 6

    *Underlying Tribal Action* ........................................ 6

    *Agreement from which Underlying Tribal Action Springs* .............. 6

    *Performance of the iSlot Agreement* ................................ 8

    *Procedural History of the Underlying Tribal Action* ................ 10

    *Tribal Court not Independent of Tribal Executive Branch* ........... 15

    *About the Tribe's Lack of Jurisdiction Under Montana* .............. 20

    *Tribal Exhaustion not Required* ................................... 22

IV: CLAIMS .................................................... 24

    *Count 1: Declaratory Relief Denying Tribal Jurisdiction* ........... 24

    *Count 2: Declaratory Relief Finding No Due Process in Tribal Court.* 25

    *Count 3: Declaratory Relief Against Defendant Anita Huff* .......... 26

    *Count 4: Declaratory Relief Against Defendant Lester J. Marsten* .... 26

    *Count 5: Declaratory Relief Against Defendant Blue Lake Casino* ..... 27

    *Count 6: Injunctive Relief Against All Defendants* ................. 27

    *Other Relief Necessary or Proper* ................................. 28

V: PRAYER FOR RELEIF .......................................... 29

# I: Executive Summary

On January 17, 2016 James Acres was Summoned to answer a Complaint filed in the Blue Lake Tribal Court. He was summoned both in his capacity as a natural person and in his capacity as an employee of Acres Bonusing, Inc. (ABI).

The Summons *demanded answer within five days* under pain of default judgment.

The Underlying Tribal Action revolves around an agreement from the year 2010 between ABI and Blue Lake Casino and Hotel. This agreement provided for ABI to distribute the iSlot System, a novel casino gaming platform, to the Casino.

ABI never granted the Tribe Adjudicatorial Jurisdiction. James Acres *made no agreements with the Tribe* as a natural person.

Plaintiff asks that this Court declare that the Tribal Court lacks jurisdiction over Plaintiff and ABI, and to enjoin all Defendants from taking action against Plaintiff in the Tribal Court.

Under *Montana* and its progeny it is proper to grant relief to Plaintiff because:
  i)    No consent for Adjudicatorial Jurisdiction was given the Tribe,
  ii)   None of the conduct alleged in the Underlying Tribal Action took place within Indian Country, and
  iii)  None of Plaintiff's conduct mortally threatened the Tribe.

Tribal Exhaustion is not required because:
  i)    The Tribal Proceeding is being conducted in Bad-Faith,
  ii)   The Tribal Court is the direct servant of the Tribe's executive governing body, making defense in Tribal Court Futile,
  iii)  Requiring action in Tribal Court would only serve to cause delay, as all conduct in question took place outside of Indian Country, and "the jurisdiction of tribal courts does not extend beyond tribal boundaries."

# II: Jurisdiction, Venue and Parties

2.   **Jurisdiction.**  This court has jurisdiction under 25 U.S.C. 1331 as an action arising under the laws and treaties of the United States as issues of tribal sovereignty and jurisdiction are matters of Federal Indian Law.

3.   **Venue.** The Southern California District Court in San Diego County is proper because the cause of action was a Summons served on Plaintiff by Defendants at his home in San Diego County.

4.   Plaintiff James Acres is an adult residing in San Diego County, California.  James Acres, in his capacity as a natural person, is a Defendant in the Underlying Tribal Action.  Acres Bonusing, Inc. (ABI) is also a Defendant in the Underlying Tribal Action, and James Acres is an employee of ABI.[1]

5.   Defendant Blue Lake Rancheria Tribal Court ("Tribal Court") is the tribal court of the Blue Lake Rancheria, a federally recognized tribe, and is the court where the Underlying Tribal Action is taking place.  The Blue Lake Rancheria comprises approximately 91

---

[1] James Acres is the President of ABI.

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE                **4**

acres of land and 53 tribal members in Humboldt County, California along Highway 299, near its junction with Highway 101. (**Exhibit 1** *"Facts About Blue Lake"*)

6.   Defendant Lester J. Marsten ("Judge Marsten") is the Chief Judge of the Tribal Court as well as the judge in the Underlying Tribal Action, and is sued here in his official capacity only. (**Exhibit 2** *"List of Tribal and State Judges"* p. 1)

7.   Defendant Anita Huff is the Clerk of the Tribal Court and is sued here in her official capacity only.  (**Exhibit 3** *"Linkedin Page of Anita Huff,"* p. 2 - 3)

8.   Defendant Blue Lake Casino and Hotel ("Blue Lake Casino") is a division of the Blue Lake Rancheria Economic Development Corporation, and is wholly owned by the Blue Lake Rancheria. (**Exhibit 4** *"Business Team: Executive Operations"* @ Tom Frank on p. 2)

# III: General Allegations

### *Underlying Tribal Action*

9.   There is currently a Case Number C-15-1215LJM in the Blue Lake Rancheria Tribal Court.  In this "Underlying Tribal Action" ABI and James Acres are the Defendants and the Blue Lake Casino is the Plaintiff. (Attached as **Exhibit 5** *"Summons and Complaint in Underlying Tribal Action"*)

10. The Underlying Tribal Action arose from the "iSlot Agreement" between ABI and Blue Lake Casino that was entered into in July of 2010. (**Exhibit 6** *"iSlot Agreement"*)

### *Agreement from which Underlying Tribal Action Springs*

11. The purpose of the iSlot Agreement was to provide Blue Lake Casino with the iSlot Platform.  The iSlot Platform was a novel casino gaming platform developed by a third party, Talo, Inc. (**Exhibit 6** *"iSlot Agreement,"* p. 1, "Parties and Purpose")

12. Under the iSlot Agreement, ABI was to act as the California distributor for Talo, Inc. (**Exhibit 6** *"iSlot Agreement,"* p. 1, "Parties and Purpose.")

13. The iSlot Platform was still under development when the iSlot Agreement was executed, and therefore the agreement was not to take effect until the agreement was executed by both parties and payment was accepted by ABI. (**Exhibit 6** *"iSlot Agreement,"* p. 4, "Execution")

14. ABI received payment from Blue Lake Casino via three separate wire transfers totaling $250,000. (**Exhibit 7** *"Bank Record of iSlot Deposits,"* Other Deposits)

15. ABI indicated that it was executing the agreement at its address in San Diego County, California. (**Exhibit 6** *"iSlot Agreement,"* p. 5)

16. ABI accepted payment via its bank account located in San Diego County, California. (**Exhibit 7** *"Bank Record of iSlot Payment,"* address bar in top center margin of p. 1)

17. ABI has never maintained a business location or business presence within the confines of the Blue Lake Rancheria.

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE          7

18. Plaintiff James Acres was not a party to the iSlot Agreement as a natural person and has no significant ties to the Blue Lake Rancheria.

19. Nothing in the iSlot Agreement or the performance thereof established or described a consensual agreement granting Adjudicatorial Jurisdiction to the Blue Lake Rancheria over either Plaintiff James Acres or ABI.

## *Performance of the iSlot Agreement*

20. On or about September 3ʳᵈ, 2010, representatives of the Blue Lake Tribal Gaming Commission traveled to Clark County, Nevada to retrieve the iSlot Server and transport it back to the Blue Lake Casino in a vehicle belonging to the Blue Lake Tribal Gaming Commission. (**Exhibit 8** *"iSlot Transportation Permit"*)

21. On the morning of September 25ᵗʰ, 2010, Robert Pollard, in his capacity as IT Director at Blue Lake Casino, successfully brought the iSlot Platform[2] (called "A4" in the Exhibit email) online,

---

[2] Ultimately the iSlot Platform became known by various trade names such as the "A4 Platform" or "iSino." "A4" or "A4 Platform" was the white-label name applied to the technology itself, and end-customers used names such as "iSlot" or "iSino."

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE       8

and iSlot was to be first offered to customers at Blue Lake Casino on or about October 4ᵗʰ, 2010. (**Exhibit 9** *"iSlot Installation Email"*)

22. Beginning October 4ᵗʰ 2010, Blue Lake Casino allowed patrons to play the iSlot Platform from time to time. Availability was initially limited to the Blue Lake Casino bingo room on evenings when bingo was available, and then around December 31ˢᵗ, 2010 moved to a specific lounge created for iSlot play, where it was made available to patrons only during those days and times when the lounge was staffed by Blue Lake Casino employees. (Direct Personal Knowledge of James Acres)

23. From December 21ˢᵗ, 2010 to September 11ᵗʰ 2012, ABI made shipments of software updates for the iSlot Platform from locations in Clark County, Nevada and San Diego, California. (**Exhibit 10** *"iSlot Software Shipment Notices"*)

24. The iSlot Agreement provided that the $250,000 paid by Blue Lake Casino to ABI was to be returned by ABI "if and only if" ABI failed to meet certain criteria by October 1ˢᵗ, 2010. ABI met these criteria, and Blue Lake Casino has never claimed otherwise. (**Exhibit 6,** p. 4, "Advanced Deposit")

## Procedural History of the Underlying Tribal Action

25. On January 17th, 2016 Plaintiff was served at his home in San Diego County, California with the Summons and Complaint in the Underlying Tribal Action attached as **Exhibit 5.**

26. The Summons demanded a response within "five (5) days after service" under pain of Default Judgment. (**Exhibit 5** *"Tribal Summons,"* p. 1 - 2)

27.  Rule 15 of the "Rules of Pleading, Practice and Procedure" for the Tribal Court (Tribal Court Procedural Rules) provide that "Any party served with a complaint … shall have … thirty (30) days … to file a written answer thereto." (**Exhibit 11** *"Tribal Court Procedural Rules,"* p. 6, Rule 15)

28. Fearing default judgment, on January 22, 2016, Plaintiff James Acres rushed to make a Special Appearance in Tribal Court to establish that the Tribal Court lacked jurisdiction over him.  ABI made a similar appearance at the same time to establish the Tribal

Court had no jurisdiction over it.[3] (**Exhibit 12** *"First Special Appearance"*)

29. On January 25, 2016 Defendant Anita Huff notified Plaintiff James Acres via email that his Special Appearance had been rejected because it was not in compliance with the Tribal Court Procedural Rules.[4] (**Exhibit 13** *"First Special Appearance Rejection"*)

30. On January 26, 2016 ABI and Plaintiff James Acres, both now under threat of imminent default judgment in the Tribal Action, resubmitted their Special Appearances. The only change to the Special Appearances was the addition of phone numbers to the signature boxes, which was the only significant non-conformity Plaintiff or ABI could find given the intense time-pressure.[5] (**Exhibit 14** *"Plaintiff's Second Special Appearance"*)

---

[3] ABI's Special Appearance differed materially only in recognizing that ABI was a direct party to the iSlot Agreement with the Casino. ABI's Special Appearance is therefore not Exhibited.

[4] A substantially identical email was sent to ABI, and is not included as an exhibit.

[5] Again, ABI's substantially similar Special Appearance in Tribal Court is not submitted as an exhibit.

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE    **11**

31. As part of these January 26th attempts, both James Acres and ABI asked Defendant Anita Huff to explain why she used her discretion as Clerk of the Court to issue five day summonses in contravention of the Tribal Court Procedural Rules, but at the same time refused to accept the Special Appearances made by Plaintiff or ABI. These questions were not answered. (**Exhibit 14** p. 1)

32. From January 26th until February 16th the Tribal Court made no formal acknowledgment of receiving either second attempts at making Special Appearances. The only contact Plaintiff or ABI had with the Tribal Court between the dates above was a brief phone call with Defendant Anita Huff on February 8th, in which Anita Huff stated that the filings had been received and accepted, but that "the Judge had been in and out of the office for the past two weeks and [hadn't had a chance] to direct [her] on how to proceed." ABI sent Defendant Huff an email shortly after this phone call asking her to confirm the contents of the conversation in writing. (**Exhibit 15** *"Summary of Conversation Between Plaintiff Acres and Defendant Huff"*) No confirmation was ever received.

33. On February 16th Defendant Huff emailed Plaintiff and ABI an Order from Defendant Judge Marsten (**Exhibit 16** *"Judge Marsten Feb 16 Order"*) rejecting their renewed Special Appearances because they did not conform to Tribal Court Rule 12. (**Exhibit 11** *"Tribal Court Procedural Rules,"* p. 3 - 4) The February 16 Order also threatened Plaintiff and ABI with sanctions "should Mr. Acres continue to flout this Court's rules" (**Exhibit 16** *"… Feb 16 Order,"* p. 6, lines 16-17) and ordering that, Pursuant to Rule 30 of the Tribal Court Procedural Rules, Special Appearances or Responsive Pleadings must be made with the Tribal Court by March 18th, 2016. (**Exhibit 16** *"… Feb 16 Order,"* p. 6, lines 18-21)

34. Tribal Court Rule 30 is titled "Dismissal of Actions" and pertains to dismissals from plaintiff stipulation or lack of prosecution. It is unclear what the relationship between Tribal Court Procedural Rule 30 and a Special Appearance contesting jurisdiction or a Responsive Pleading to a complaint might be. (**Exhibit 11** *"Tribal Court Procedural Rules,"* p. 12)

35. "To Flout" is commonly defined as "to openly disregard a rule, law or convention."[6] This more aptly describes the Tribal Court's behavior towards its own rules (and the traditions of due process) in issuing a five-day Summons than it describes Plaintiff's conduct in attempting to make an expeditiously timely answer thereto.

36. On February 26, 2016 Defendant Huff issued an Order from Defendant Judge Marsten dated February 24th requiring the parties in the Underlying Tribal Action to submit a joint case management statement by March 18th, 2016. (**Exhibit 17** *"Judge Marsten Feb 24 Order"*) March 18th 2016 is the same deadline given to ABI and James Acres by Judge Marsten in his Order of February 16th.

37. A joint case management statement would only be relevant were the Tribal Court to find it had jurisdiction over Plaintiff.

38. Should Plaintiff avail himself of all allotted time before making a third attempted Special Appearance to contest jurisdiction,

---

[6] As returned by the search term "Flout Definition" at google.com on March 5th 2016 at 14:45.

then Defendant Judge Marsten is positioning himself to instantly decide on the merits of that Special Appearance, and is strongly implying that the decision will be one that is adverse to Plaintiff.

39. The only communication between ABI or Plaintiff James Acres and the Tribal Court in the days between Judge Marsten's two Orders concerned requests for a copy of the Docket in the Underlying Tribal Action.

40. On February 23rd 2016, Defendant Anita Huff provided ABI with an uncertified and undated copy of the Docket. If this Docket is accurate, then Defendant Huff issued the Summons in the Underlying Tribal Action on January 12th 2016, before then filing the Complaint on January 13th, 2016. (**Exhibit 18** *"Feb 23 Docket in Underlying Tribal Action"*)

## Tribal Court not Independent of Tribal Executive Branch

41. Under the Blue Lake Rancheria Constitution all enrolled tribal members over the age of 18 and resident on the reservation make up the General Council of the Blue Lake Rancheria. (**Exhibit 19** *"Blue Lake Constitution,"* p. 7, Article V, Section 1)

42. The Blue Lake Constitution provides that the General Council shall elect the Business Council of the Tribe (**Exhibit 19,** p. 10, Article VI, Section 1) and further provides that the Business Council shall be the governing body of the Tribe. (**Exhibit 19,** p. 8, Article V, Section 4)

43. The Blue Lake Constitution empowers the Business Council to "charter and regulate corporations." (**Exhibit 19,** p. 9, Article V, Section 6(h)) This includes the Blue Lake Rancheria Economic Development Corporation, which oversees the activities of the Blue Lake Casino. (**Exhibit 4** *"Business Team: Executive Operations"* @ Tom Frank on p. 2)

44. The Blue Lake Constitution empowers the Business Council to "establish tribal courts and ... provide for the court or courts jurisdiction, procedures, and a method for the selection of judges." (**Exhibit 19,** p. 9, Article V, Section(n))

45. Blue Lake's Tribal Court Ordinance provides that the Chief Judge and other Judges shall be hired by the Business Council. (**Exhibit 20** *"Tribal Ordinance,"* p. 8, 11.1.1.040 (B))

46. Blue Lake's Tribal Court Ordinance provides that the Chief Judge shall develop rules of procedure and evidence for the Tribal Court "subject to the approval of the Business Council." (**Exhibit 20** *"Tribal Ordinance,"* p. 8, 11.1.1.040 (C)1(a))

47. Judge Marsten stated in his Order of February 16th that "[Judge Marsten] in consultation with the Business Council . . . promulgated the Court's Rules of Evidence which shall govern ... all proceedings of [the Tribal Court]." (**Exhibit 16** *"... Feb 16 Order,"* p. 5, lines 8-10)

48. Blue Lake's Tribal Court Ordinance provides that the Business Council may remove the Chief Judge and other Judges of the Tribal Court. (**Exhibit 20** *"Tribal Ordinance,"* p. 9, 11.1.1.040 (D))

49. The Tribal Court is not independent from the Tribal Business Council. The Tribal Court is the direct servant of the Tribal Business Council.

50. It is not possible for the Tribal Court to provide due process to non-Member parties such as James Acres or ABI under the "probability of bias" standard established in *Caperton v Massey* 566

U.S. 868 (2009). Because the Tribal Court answers to the Business Council, and the Business Council derives significant revenue for the Tribe from Blue Lake Casino, it is unreasonable to expect the Tribal Court to be an impartial arbiter in a dispute between Blue Lake Casino and Plaintiff or ABI.

51. Since 2008, and concurrent with her role as Clerk of the Tribal Court, Defendant Anita Huff also serves as the "Grants and Contracts Manager" for the Tribe, where, among other duties she "Assist[s] in the initiation, completion, and submittal of grant applications and contract proposals." (**Exhibit 3** *"Exhibit 3 Linkedin Page of Anita Huff,"* p. 2)  In this Grants and Contracts Manager role she explicitly assists in generating income for the Tribe through obtaining grants.

52. On October 28th, 2011, Defendant Huff, in her role as Tribal Court Clerk, issued a Clerk's Default in Tribal Court Case C-09-0612LJM against United Contractors Insurance Company (UCIC). (**Exhibit 21** *"Clerk's Default Against UCIC"*) Defendant Huff entered this Clerk's Default even though C-09-01612LJM was an action that began only seven weeks earlier on September 7th 2011 (**Exhibit 22**

*"Tribal Complaint Against UCIC,"* p. 1) and demanded in excess of $1,800,000 from UCIC (**Exhibit 22**, p. 5), and even though UCIC attempted to Specially Appear to contest Tribal Jurisdiction on October 26th, 2011. (**Exhibit 23** *"UCIC's Special Appearance in Tribal Court"*)

53. Under *Caperton's* "probability of bias" standard Defendant Huff's "Grants and Contracts Manager" role for the tribe is incompatible with the impartial execution of her duties as Court Clerk in cases like the Underlying Tribal Action where one party is a Tribal Entity or Member seeking a monetary award from a non-Tribal party.

54. Executive Oversight of both the Tribal Court and Blue Lake Casino is unified in a single individual, Vice-Chairperson Arla Ramsey, whose duties include "oversight of the Business Council and the Blue Lake Economic Development Corporation." (**Exhibit 4** *"Business Team: Executive Operations"* @ Arla Ramsey on p. 1)

55. In the organizational chart of the Blue Lake Rancheria, the relationship between the Tribal Court and the Casino is akin to that of an Uncle to his Nephew. (**Exhibit 24** *"Blue Lake Org Chart"*)

56. It takes three-minutes to walk from the Tribal Court to the Blue Lake Casino. The walk skirts the Blue Lake Casino parking lot, along a street called "Casino Way." (**Exhibit 25** *"Tribal Court Map"*)

57. The Tribal Court Ordinance of the Blue Lake Rancheria establishes the limits of Tribal Jurisdiction as understood by the Blue Lake Rancheria. By the Tribe's own rules, Plaintiff James Acres is clearly not subject to the Tribe's jurisdiction because he has never done business within the Tribal Court's territorial jurisdiction as a natural person. (**Exhibit 20** *"Tribal Court Ordinance,"* 11.1.1.030(3)e on p. 5)

## About the Tribe's Lack of Jurisdiction Under Montana

58. *Montana v United States* 450 U.S. 544 (1979) and its progeny provides a framework for analyzing whether an exercise of tribal jurisdiction is proper. (*Philip Morris v King Mountain Tobacco,* No. 06-36066 (9th Cir. 2009))

59. The *Montana* doctrine provides that tribes may only exercise civil jurisdiction over the conduct of non-Members occurring

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE   **20**

within a reservation in those cases where there is a consensual relationship in which the non-Member makes a specific grant of adjudicatorial jurisdiction to the tribe, or when the non-Member's on reservation conduct mortally threatens the tribe's political integrity, economic security, or health and welfare. (*Philip Morris v King Tobacco* at p. 729)

60. Plaintiff's alleged conduct in the Underlying Tribal Action does not mortally threaten the viability of the Blue Lake Rancheria.

61. Plaintiff never consented to the Adjudicatorial Jurisdiction of Blue Lake Rancheria.

62. The Underlying Tribal Action is founded upon the iSlot Agreement between ABI and the Blue Lake Casino.  The performance of the iSlot Agreement by ABI took place outside the physical confines of the Blue Lake Rancheria. (*¶ 13-20 and ¶ 21 above*)

63. The Tribal Court does not have jurisdiction over Plaintiff under *Montana*.

## *Tribal Exhaustion not Required*

64. *Montana* usually requires that tribal courts be given first chance at ruling on their own jurisdiction. This "Tribal Exhaustion" is not required in cases where the Tribal Court itself has acted in bad faith, where pursuing relief in tribal court would be futile, or where the merits of the case are so obvious that requiring tribal exhaustion would only cause delay. (*Nevada v Hicks,* 533 U.S. (2001) p. 15-16)

65. The Tribal Court initiated the Underlying Tribal Action in bad faith by issuing a Summons requiring an answer from Plaintiff within "five (5) days" (**Exhibit 5,** p. 1-2), contrary to Rule (**Exhibit 11,** p. 6, Rule 15), and before a Complaint was filed against him. (**Exhibit 18,** p. 1)

66. The Tribal Court continues to prosecute the Underlying Tribal Action in bad faith by requiring Plaintiff, a non-lawyer, to adhere to a higher standard of compliance to Tribal Court Rules than it requires of the Clerk (e.g., *five-day Summons,* ¶ 25 - 27), the Judge (e.g., *issuing Orders that can't be complied with,* ¶ 33 - 34), or the attorneys for Blue Lake Casino (e.g. *five-day Summons,* ¶ 25 - 27).

67. It is futile for Plaintiff to ask the Tribal Court to find it does not have jurisdiction.  Plaintiff has already made strenuous good-faith efforts to make Special Appearances (*see ¶ 28-31 above*) in the Tribal Court, and the Tribal Court expended considerable effort in its refusal to accept them (**Exhibit 16**, *six-page Order considering and rejecting Special Appearances*).  There is no reason to believe that further efforts will lead to an impartial consideration of the jurisdictional issues on their merits.

68. Action within the Tribal Court is also futile because Judge Marsten's Orders range from the unintelligible (*requiring defendant make special appearance pursuant to rule about plaintiff dismissals, ¶ 33-34 above*) to the predeterminatory (*demanding joint CMC statement be submitted concurrent with special appearance, ¶ 36-38 above*).

69. The Tribal Court is incapable of providing due process under *Caperton's* "probability of bias" standard (*no independence from political authority, ¶ 41-49 above*), and has acted in bad faith towards Plaintiff (*five-day summons, etc.*).  On the face of it, the pursuit of a

claim against the teeth of a biased court that is acting in bad faith and without due process is a pursuit in futility.

70. Finally, Tribal Exhaustion is not required as resort to the Tribal Court could only serve the cause of delay since the lack of tribal jurisdiction is obvious (*grounds for jurisdiction utterly lacking, ¶ 59-62 above*).

# IV: CLAIMS

## *Count 1: Declaratory Relief Denying Tribal Jurisdiction*

71. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

72. Under 28 U.S.C. § 2201 this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

73. Plaintiff asks for a ruling finding that nothing in the iSlot Agreement attached as **Exhibit 6,** or in the performance thereof, could establish tribal civil jurisdiction over any non-Member of the Tribe.

74. Plaintiff alternatively asks for a ruling finding that no tribal jurisdiction exists over Plaintiff because he has never entered into any agreement with the Tribe as a natural person and because Plaintiff does not endanger the viability of the Tribe.

**_Count 2: Declaratory Relief Finding No Due Process in Tribal Court_**

75. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

76. Plaintiff asks for a ruling finding that the Tribal Court is so constituted that it is not able to provide due process to Defendants in actions where the Plaintiff is an organization of the Tribe or a Tribal Member and the Defendant is not. This ruling can be strictly limited in application to the concepts of due process as understood and applied in Federal and State judicial systems, while remaining mute as to their application or meaning in the judicial systems of Indian Country.

*Count 3: Declaratory Relief Against Defendant Anita Huff*

77. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

78. Plaintiff asks for a ruling finding that Defendant Anita Huff exceeded her authority as Court Clerk in issuing a Summons demanding an answer within "five (5) days" and in violation Rule 15 of the Tribal Court Procedural Rules.

*Count 4: Declaratory Relief Against Defendant Lester J. Marsten*

79. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

80. Plaintiff asks for a ruling finding that Defendant Lester J. Marsten exceeded his authority as Chief Judge in issuing his second Order of February 24th to Plaintiff, demanding a General Appearance, when Plaintiff is not included within Tribal Jurisdiction under the Tribal Court Ordinance.

## Count 5: Declaratory Relief Against Defendant Blue Lake Casino.

81. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

82. Plaintiff asks for a ruling finding that Defendant Blue Lake Casino and Hotel went outside the bounds of Tribal Law both in serving a upon Plaintiff a Summons demanding an answer within "five (5) days," and by bringing suit against Plaintiff in the Tribal Court, when Plaintiff is not included within Tribal Jurisdiction under the Tribal Court Ordinance.

## Count 6: Injunctive Relief Against All Defendants

83. Plaintiff realleges and incorporates by reference all of the preceding paragraphs.

84. If necessary[7], Plaintiff shall ask for temporary, preliminary and permanent injunctive relief against all defendants from continuing prosecution in the Underlying Tribal Action, or

---

[7] Plaintiff hopes Defendants will voluntarily give binding assurances that the Underlying Tribal Action will not be advanced in any way until this Court has had a chance to rule on the jurisdictional issues, thus removing the need for temporary or preliminary relief.

COMPLAINT FOR DECLARTORY AND INJUNCTIVE RELIEF AGAINST TRIBE   27

taking any action in any other court founded upon a ruling or judgment from the Tribal Court, until after this Court has made a final ruling in this case permitting such actions.

### *Other Relief Necessary or Proper*

85. Plaintiff additionally or alternatively asks for any further relief this Court deems "necessary or proper" under 28 U.S.C. § 2202 for the Plaintiff or the Public Good, both as relates to Counts 1 – 6 above, or as relates to other additional Claims thought fitting by the Court.

# V: PRAYER FOR RELEIF

Wherefore, Plaintiff prays that after due proceedings be had, the Court provide him with the declaratory relief described above, any necessary temporary, preliminary or permanent injunctive relief described above, and any other relief deemed necessary or proper for the Plaintiff or for the Public Good.

Respectfully Submitted March 9th, 2016

James Acres
1106 2nd #123
Encinitas, CA 92024

# Table of Exhibits

Exhibit 1: Facts About Blue Lake

Exhibit 2: List of Tribal and State Judges

Exhibit 3: LinkedIn Page of Anita Huff

Exhibit 4: Business Team and Executive Operations

Exhibit 5: Tribal Summons and Complaint

Exhibit 6: iSlot Agreement

Exhibit 7: Bank Record of iSlot Payment

Exhibit 8: iSlot Transportation Permit

Exhibit 9: iSlot Installation Email

Exhibit 10: iSlot Software Shipment Notices

Exhibit 11: Tribal Court Procedural Rules

Exhibit 12: First Special Appearance

Exhibit 13: First Special Appearance Rejection

Exhibit 14: Second Special Appearance

Exhibit 15: Summary of Conversation Between Acres and Huff

Exhibit 16: Judge Marsten Feb 16 Order

Exhibit 17: Judge Marsten Feb 24 Order

Exhibit 18: Feb 23 Docket in Underlying Tribal Action

Exhibit 19: Blue Lake Constitution

Exhibit 20: Tribal Court Ordinance

Exhibit 21: Clerk's Default Against UCIC

Exhibit 22: Tribal Complaint Against UCIC

Exhibit 23: UCIC Special Appearance in Tribal Court

Exhibit 24: Blue Lake Org Chart

Exhibit 25: Tribal Court Map

Exhibit 26: Blue Lake Elected Officials

# Exhibit 1

*Blue Lake Tribal Facts Page*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/facts.html

as retrieved on January 19, 2016.

There are two pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 1 - Title Page*



## BLUE LAKE RANCHERIA

HOME | FACTS | GOVERNMENT & LAW | PROGRAMS | BUSINESS OPERATIONS | GIVING & COMMUNITY | TRIBAL MEMBERSHIP | CONTACT US
FACTS >

### FACTS :

FACTS
Land
History
Culture
Did You Know?

GOVERNMENT & LAW

PROGRAMS

BUSINESS OPERATIONS

GIVING & COMMUNITY

TRIBAL MEMBERSHIP

CONTACT US



"Education, begun early and continued throughout life, is one of the Blue Lake Rancheria Tribe's top priorities."

-Claudia Brundin, Chairperson, Blue Lake Rancheria Tribe

GENERAL INQUIRIES
[T] 707-668-5101
[F] 707-668-4272
**Email for Info**

PRESS INQUIRIES
**Email for Press**

| | |
|---|---|
| Culture: | Aboriginal Wiyot |
| Culture Diversity | Membership: | Wiyot, Yurok, Tolowa, Cherokee |
| Language: | Algonquian, Athab(p)ascan, Cherokee |
| Chairperson: | **Claudia Brundin** |
| Vice-Chairperson | **Arla Ramsey** |
| Secretary | Treasurer: | **Art Ramsey** |
| Member-At-Large: | **Diane Holliday** |
| Member-At-Large: | **Dorothy McKinnon** |
| Status: | **Federally-recognized** |
| Membership: | 53 |
| Constitution: | The Blue Lake Tribe is organized under an **IRA Constitution** Approved by the secretary of the interior March 22, 1989 |
| Location: | The Blue Lake Rancheria consists of approximately 91 acres near the picturesque City of Blue Lake, California, 17 miles north of Eureka and 5 miles east of Arcata, in Humboldt County – largely rural terrain between the Northern California coastal mountains and the Pacific Ocean, bordered by (still) great forests and the majestic California Redwood trees. |

*Exhibit 1 — Page 1 of 2*

Copyright © 2007 Blue Lake Rancheria. All Rights Reserved. | Privacy & Security Policy | Site Map

*Exhibit 1 — Page 2 of 2*

# Exhibit 2

*Tribal Court State Court Forum Roster*

This is a true and complete copy of

http://www.courts.ca.gov/documents/Roster-TribalStateCourtMembers.pdf

as retrieved on March 6, 2016.

There are two pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 2 - Title Page*

## Tribal Court–State Court Forum Roster
### (As of October 29, 2015)

**Hon. Abby Abinanti, Cochair**
(Yurok)
Chief Judge of the Yurok Tribal Court

**Hon. Dennis M. Perluss, Cochair**
Presiding Justice of the Court of Appeal,
    Second Appellate District, Division Seven

**Hon. April E. Attebury**
(Karuk)
Judge and Court Administrator of the
    Karuk Tribal Court

**Ms. Jacqueline Davenport**
Assistant Court Executive Officer
Superior Court of California, County of
    El Dorado

**Hon. Gail Dekreon**
Judge of the Superior Court of California,
    County of San Francisco

**Hon. Leonard P. Edwards (advisory)**
Judge of the Superior Court of California,
    County of Santa Clara (ret.)

**Hon. Kimberly A. Gaab**
Assistant Presiding Judge of the
Superior Court of California, County of Fresno

**Hon. Michael Golden**
Chief Judge of the Morongo Tribal Court

**Hon. Cynthia Gomez (ex officio)**
(Tule River Yokut Tribe)
Tribal Advisor of the Office of Governor
    Edmund G. Brown, Jr.

**Mr. Olin Jones (ex officio)**
(The Chickasaw Nation of Oklahoma)
Director of the Office of Native American
    Affairs, California Attorney General's Office

**Hon. Mark A. Juhas**
Judge of the Superior Court of California,
    County of Los Angeles

**Hon. Suzanne N. Kingsbury**
Presiding Judge of the Superior Court of
    California, County of El Dorado

**Hon. William Kockenmeister**
Chief Judge of the Bishop Paiute Indian
    Tribal Court
Chief Judge of the Washoe Tribal Court

**Hon. Anthony Lee**
(St. Regis Mohawk Tribe)
Chief Judge of the San Manuel Tribal Court

**Hon. John L. Madigan**
Chief Judge of the Intertribal Court of
    Southern California

**Hon. Lester J. Marston**
(Chiricahua and Cahuilla)
Chief Judge of the Blue Lake
    Rancheria Tribal Court

**Hon. David E. Nelson**
Presiding Judge of the Superior Court of
    California, County of Mendocino

**Hon. Mark Radoff**
Chief Judge of the
    Chemehuevi Tribal Court

**Hon. John H. Sugiyama**
Judge of the Superior Court of California,
    County of Contra Costa

**Hon. Allen H. Sumner**
Judge of the Superior Court of California,
    County of Sacramento

1

*Exhibit 2 - page 1 of 2*

## Tribal Court–State Court Forum Roster
### (As of October 29, 2015)

**Hon. Sunshine S. Sykes**
Judge of the Superior Court of California,
   County of Riverside

**Hon. Juan Ulloa**
Judge of the Superior Court of California,
   County of Imperial

**Hon. Claudette C. White**
(Quechan)
Chief Judge of the Quechan Tribal Court

**Hon. Christopher G. Wilson**
Judge of the Superior Court of California,
   County of Humboldt

**Hon. Christine Williams**
(Yurok)
Chief Judge of the Shingle Springs Tribal Court

**Hon. Joseph J. Wiseman**
Chief Judge of the Dry Creek Rancheria Band

**Hon. Sarah S. Works**
Chief Judge of the Trinidad Rancheria
   Tribal Court of Pomo Indians

**Hon. Daniel Zeke Zeidler**
Judge of the Superior Court of California,
   County of Los Angeles

*Exhibit 2 - page 2 of 2*

# Exhibit 3

*Linked in Page of Anita Hufl*

This is a true and complete copy of

https://www.linkedin.com/in/anita-huff-99166522

as retrieved on February 8th, 2016.

There are five pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 3 - Title Page*

What is LinkedIn?   Join Today   Sign In

# Anita Huff

Emergency Preparedness Coordinator at Blue Lake Rancheria

Redding, California Area | Gambling & Casinos

**157**
connections

| | |
|---|---|
| Current | Blue Lake Rancheria, Blue Lake Rancheria Tribal Court, Humboldt County 4-H |
| Previous | Blue Lake Rancheria, USFS Humboldt Nursery |
| Education | Arcata High School |

## Join LinkedIn and access Anita's full profile. It's free!

As a LinkedIn member, you'll join 400 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact Anita directly

[ View Anita's Full Profile ]

## Experience

### Emergency Preparedness Coordinator

Blue Lake Rancheria
September 2014 -- Present (1 year 6 months)

Coordinating and directing planning, organization, control, and implementation of local emergency management activities. Such activities may include but shall not be limited to;
o Terrorist event
o Weather events
o Fire events
o Earthquake
o Flooding
o Pandemic event
Coordinating with Tribal, surrounding community and county officials as necessary to ensure the effective administration of the Emergency Management Program
Establish and maintain agency policies and communication procedures for all jurisdictional employees and volunteers
Coordinates, develops, and implements the Tribal Emergency Operations Plan (TEOP) for this jurisdiction. Updates the TEOP at least annually.
Prepares and submits an annual budget proposal to the Tribal Finance Office
Does necessary grant reports for federal and state grants awarded
Ability to draft and prepare grant applications, or assist in their preparation, to aggressively seek continued funding of the program
Attends trainings, classes, meetings and conferences/workshops necessary for the function of the Blue Lake Rancheria Office of Emergency Services (BLROES), including but not limited to the Humboldt County Emergency Services Coordination Committee, Blue Lake Rancheria Safety Meetings, and on occasion Tribal Business Council meetings.
Prepares and distributes disaster preparedness material to the Tribal Members, residents on the Rancheria and to all Tribal businesses on the Rancheria, with the intent of educating the community as to how they may prepare for and protect themselves from the consequences of dangerous disasters
Coordinates and collaborates on the development and implementation of a Disaster Preparedness and Training Program for jurisdictional employees and volunteers, specifically for the purpose of educating each of their responsibilities during emergency and/or disaster operations
Coordinates the actions and uses of jurisdictional assets during exercises and actual occurrences.

## Find a different Anita Huff

[ First Name ]   [ Last Name ]   🔍

**Example:** Anita Huff


**Anita Embry-Huff**
--
United States


**Anita Moore**
Family Strategist & Optimizer; Documenter-at-large at Much Moore
United States


**Anita Huff**
Closing Coordinator at Pam & Barry's Team @ Re/Max
United States


**Anita Moore**
Business Strategy & Office Operations
United States


**Anita Huff**
--
United States

More professionals named Anita Huff

## People Also Viewed


**Allan Olson**
General Manager at Swinomish Indian Tribe


**Courtney Harper**


**Babbie Peterson**
Medical Clinic Office Manager at Karuk Tribe


**Elizabeth Mares**
Program Manager at Yakama Nation Tribal Transit


**Ron Graham**
President & CEO at Vantage Quarter, LLC.


**Lawrence Bredeman**
Transportation Planner at Bredeman Tribal Transportation Services


**Beverly Harper**
Artist


**Jeigh Hayes**
Behavioral Health Clinical Coordinator at Mashantucket Pequot Tribal Health Services


**Calvin Touchin**
Arizona Native American Tribe Transportation

*Exhibit 3 - Page 1 of 5*



Jennie Rowland
Transportation Manager at Bigs
Woods Transit with Bois Forte Tribal
Government



## Find your next opportunity

Update your profile

## Grants and Contracts Manager

Blue Lake Rancheria

2008 – Present (8 years)

· Responsible for the maintenance of Tribal documents, records and files, including archival related to Grants & Contracts. Tribal database management for reporting on Grants & Contracts
· Writes Resolutions for the Tribal Business Council as they pertain to grants & contracts
· Responsible for researching grant opportunities for the benefit of Tribal Members and the Tribe in general
· Assists Tribal Program Directors to ensure that grants and contracts are managed in compliance with Tribal, Federal, State and local regulations, to complete program plans and to assist with required grant reporting
· Assist in the initiation, completion and submittal of grant applications and contract proposals.
· Works closely with the funding agencies to negotiate changes in grants and contracts where appropriate.
· Updates and maintains all grant and contract files through coordination with the Tribal Controller/Tribal Accounting Manager
· Works with Tribal Controller/Tribal Accounting Manager to maintain a working budget for all programs as they pertain to grants and contracts.
· Assists with creating policies and procedures, forms and other documents for grant compliance
· Assists Tribal Administrator with duties including but not limited to;
  Human Resources,
  Grant and program management
  Contract management
  General planning documents in coordination with Program Directors and Tribal Administrator
· Attends meetings/trainings pertaining to grant, contract and/or Tribal Programs administration as directed by Tribal Administrator
· Assists Tribal Business Council, Tribal Administrator, Tribal Programs Directors, Executive Secretary, receptionist with their duties as needed

## Transportation Coordinator

Blue Lake Rancheria

2008 – Present (8 years)

Ensure that customer service assistance is applied to all passengers
Ensure transit/paratransit on schedule.
Coordinate transport of passengers on chartered trips or sightseeing tours.
Handle written and verbal complaints regarding Blue Lake Rancheria Transit System (BLRTS)
Collect fares for bus passes and issue change at the Tribal Office.
Answer questions about schedules, routes, and transfer points.
Take and give reports of accidents, traffic disruptions/delays to drivers and advise on alternate route.
Ensure that procedures are followed for operational pre/post checks of vehicles.
Keep count of passengers, fuel, miles on vehicles daily, monthly, annually.
Compile monthly report for billing purposes of Finance Department
Supervise transit/paratransit drivers
Comply with Department of Transportation (DOT) and Federal Transit Administration(FTA) rules and regulations.
Schedule and attend California Highway Patrol Inspection of Terminal/Records and vehicles.
Coordinate and attend meetings of the Regional Transportation Planning Agency and the Northern California Tribal Transportation Commission (NCTTC).
Identify transportation priorities
Develop forms and tracking systems for the transit authority
Develop and document transportation planning process/procedures
Perform a transportation needs assessment as required by Regional Planning Agency
Update Tribal Transportation Plan as needed
Update the Tribal Transportation Policy's and Procedures as needed
Monitor implementation and funding agreements
Supervise the use of transit vehicles and ensure maintenance requirements are met

## Tribal Court Clerk

Blue Lake Rancheria Tribal Court

2008 – Present (8 years)

*Exhibit 3 - Page 2 of 5*

• In accordance with court rules and applicable ordinances of the Tribe;
File all documents presented to the Court for filing
Maintain court records
Attend all sessions of the Tribal Court
Keep a record of all proceedings of the Tribal Court (including recorded and written)
Administer oath to witnesses
Collect all fines and deposit them
Pay out all fees ordered and accounted for
Account for all monies handled through the Tribal Court
Shall act as the Clerk of the Court of Appeals
Work closely with the Chief Judge on court matters
Work closely with the Tribal Council on court matters
Work closely with the Tribal Administrator on court matters
Other duties as assigned by; Tribal Business Council, Chief Judge and/or Tribal Administrator

## Administrative Assistant
Blue Lake Rancheria
1996 – Present (20 years)

## All Star Advisor, Animal Sciences Committee Chairperson and Community Leader for Arcata Bottom 4-H
Humboldt County 4-H
September 1985 – Present (30 years 6 months)

Works with county All Star Team to coordinate support for County 4-H, Community Service Opportunities, and assist youth to meet their goals within 4-H while striving to empower youth to succeed.

Oversees county Animal Sciences education and events for County 4-H, with the assistance of a 50/50 Committee of youth and adult volunteers.

Community Club Leader collaborates with the Club Officer Team to coordinate the day to day functions of the Arcata Bottom 4-H Club (the first club in the State of California and the first club established in Humboldt County, California ~ 1913)

## Title VI and Nutrition Director
Blue Lake Rancheria
June 1998 – 2008 (10 years)

• Responsible for overall coordination of Nutrition Programs, including but not limited to;
Blue Lake Rancheria Elders Programs
Blue Lake Rancheria School Meals Program
Blue Lake Rancheria Summer Food Service and Afterschool Snack Program
• Responsible for, but not limited to;
Food preparation for entire Nutrition Program
Cleaning of all food preparation, storage, meal packaging and laundry areas.
Menu planning and nutrition analysis of all food programs
Maintaining and tracking grocery, commodities and paper goods inventory and usage
Preparing budgets for all above programs
Supervise Utility Technician/Nutrition Program Assistant in weekly delivery of meals and day to day functions of food program
Collaborate and coordinate with the local Area 1 Agency on Aging Title III Program
Collaborate and coordinate with other Title VI Programs as needed
Attend all pertinent meetings and trainings
Performing all other duties as assigned by Tribal Administrator
Assisting the elderly with various needs by telephone, in person and email
Assisting families of elder with various needs by telephone, in person and email

## Agriculture Worker
Blue Lake Rancheria
June 1996 – May 1998 (2 years)

*Exhibit 3 - Page 3 of 5*

- Planning, preparation, planting and maintenance of vegetable and herb garden on a daily basis, including but not limited to;
  Selecting and ordering seeds
  Ground preparation, which may need use of tractor
  Weeding gardens
  Harvesting vegetables
  Picking vegetables and herbs
  Distributing produce to tribal elders, members
  Preparation of fallow garden area for winter lay over
  Other duties as assigned by Tribal Administrator
  Operating Tractor as needed

**Heavy Equipment Operator**

USFS Humboldt Nursery

1986 – June 1996 (10 years)

Operated Agricultural Tractors harvesting Conifer Seedlings to be planted elsewhere on USFS Lands.

Volunteer Experience & Causes

**Volunteer Leader**

4-H

January 1984 – Present (32 years 2 months)

Working with youth collaboratively to obtain their goals and to assist them in "Learning by Doing" while "Making the Best Better".

**Causes Anita cares about:**

Animal Welfare
Children
Civil Rights and Social Action
Economic Empowerment
Education
Health
Human Rights
Disaster and Humanitarian Relief
Poverty Alleviation
Science and Technology

**Organizations Anita supports:**

National 4-H Council
National FFA Organization

Skills

| Casino | Executive Management | Customer Service | Business Strategy |

| Public Speaking | Budgets | Strategic Planning | Policy | Fundraising |

| Event Planning | Grants | Nonprofits | Community Outreach | Leadership |

| Public Relations | See 14+ |

*Exhibit 3 - Page 4 of 5*

Education

**Arcata High School**
1978 – 1981

Interests

Ranching/Farming - Dairy/Meat Goats and Sheep Youth Groups (4-H Volunteer Leader 30+ Years) Volunteering

Groups



4-H Youth Developm...



Commercial Meat Go...



The Dairy Goat Forum

# View Anita's full profile to...

· See who you know in common
· Get introduced
· Contact **Anita** directly

| View Anita's Full Profile |

Not the Anita you're looking for? View more

© 2016  |  User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Unsubscribe

*Exhibit 3 - Page 5 of 5*

# Exhibit 4

*Blue Lake Business Operations: Executive Team Page*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/boExeTeam.html

as retrieved on January 19, 2016.

There are three pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 4 - Title Page*

 

# BLUE LAKE RANCHERIA

HOME | FACTS | GOVERNMENT & LAW | PROGRAMS | BUSINESS OPERATIONS | GIVING & COMMUNITY | TRIBAL MEMBERSHIP | CONTACT US
BUSINESS OPERATIONS > EXECUTIVE TEAM

FACTS

GOVERNMENT & LAW

PROGRAMS

BUSINESS OPERATIONS
    Executive Team
    Blue Lake Casino
    The Play Station 777
    Meals Programs
    Transit Systems

GIVING & COMMUNITY

TRIBAL MEMBERSHIP

CONTACT US

# BUSINESS OPERATIONS: EXECUTIVE TEAM



GENERAL INQUIRIES
[T] 707-668-5101
[F] 707-668-4272
Email for Info

PRESS INQUIRIES
Email for Press



**Arla Ramsey**
**Eric Ramos**
**Thomas Frank**
**Philip Acock**

**Arla Ramsey | Vice Chairperson | Blue Lake Rancheria**

Arla Ramsey currently serves the Blue Lake Rancheria Tribe as its Vice-Chairperson and Tribal Administrator. Her duties include oversight of the Business Council and the Blue Lake Rancheria Economic Development Corporation. Prior to assuming Tribal Government work full-time, Arla worked for the U.S. Forest Service for over nine years as a nature guide, fire-fighter and heavy-equipment operator, among other responsibilities. Before entering the Forest Service, Arla spent several years reorganizing the Tribe and serving as HUD Grant Coordinator following the Tribe's federal reinstatement. And prior to this reorganization work, for eight years Arla owned and operated a children's daycare business for Tribal and Blue Lake community residents. In addition to these positions, Arla and former Chairperson Sylvia Daniels led the twenty-five year political and legal fight for successful reinstatement in 1983 of Blue Lake Rancheria as a federally-recognized Tribe.

Arla has lived on the Blue Lake Rancheria since 1958. She attended Blue Lake schools, Arcata High and Humboldt State University. Arla holds a variety of professional certifications, including: Pepperdine University, The Graziadio School of Business and Management: Transit/Paratransit Management Program; College of the Redwoods Center: Penal 832 / Firearms, and Tribal Court Law and Justice; The Falmouth Institute: Contracting Officer's Representative, Record Management, Tribal Self-Governance, Law for the Tribal Council, NAHASDA Training; Council Lodge Institute: Basic Indian Law; Training Services Association: Housing Construction Inspection and Cost Estimating; National Environmental Training Center for Small Communities: Assessing Wastewater Options; Bill Helmich Associates: Grants and Contracts Law and Management, Drug and Alcohol Testing, OMB Circulars: A-102, A-87, A133, Environmental Law for Tribes, Employee Rights and Labor Laws; Three Feathers Associates: Title VI Training and Technical Assistance, Management, Nutrition, Supportive Services; California Rural Indian Health Board, Inc.: Final rules for P.L. 93-638; California Specialized Training Institute: Hazardous Materials Course, First Responder Awareness; Rural Community Assistance Corp.: Creative Solutions: Moving Rural Communities into the 21st Century; Johnson Associates: Design and Development of Indirect Cost Proposals for Tribal Organizations; Pesticide Applicators Assoc.: Pesticide Applications; I.H.A. Management Systems: NAHASDA Grant Implementation (HUD); Development Consultants: Tribal Environment, Health, Safety & Natural Resources' Damages Issues; ICF Consulting, Sponsored by HUD: (Office of Native American Programs Training Institute Course) Native Economic Development Guidance and Empowerment. Arla is also a certified Tribal Judge, and experienced in mediation, arbitration, and interpretation of Tribal laws, contracts, ordinances and resolutions. In 2005, Arla's name was added to the Wall of Tolerance by the National Campaign for Tolerance, chaired by the inestimable Rosa Parks and Morris Dees. The listing honors "…those who are taking a personal, public stand against hate, injustice and intolerance, and who are leading the way toward a more just America."

*Exhibit 4 - Page 1 of 3*

instrumental in promoting Indian Country improvements through her involvement with regional and national Tribal committees, Arla has also worked steadily to improve the lives of children and underserved adults in the greater community. Arla has held a seat on the Humboldt County Workforce Investment Board and supports the Council on Adoptable Children. Having lived for several years overseas in Germany and other countries, Arla has studied other cultures and societal structures first-hand. With a unique combination of practical experience, diplomacy and compassion, Arla has helped the Tribe reorganize and build steadily toward economic stability. Her good will has made possible the productive community and government-to-government relationships the Tribe enjoys today.

**Eric Ramos | President, Business Operations | Blue Lake Rancheria**

Eric Ramos is currently President of Business Operations for the Blue Lake Rancheria Tribe, where he develops and manages the Tribe's many diverse enterprises. Prior to working on Tribal interests full time, Eric held the position of Treasury Manager at Turnstone Systems, a large post-IPO start-up company, where he actively managed a cash and investment portfolio in excess of $270 million, international investments and transactions in dozens of foreign currencies. Before Turnstone, Eric was an auditor for KPMG in the Silicon Valley, where his client list included a number of high-profile public and private companies such as Adobe Systems, Apple Computer and Daimler Chrysler Research & Development. Eric has been instrumental in channeling the success of the Blue Lake Rancheria's economic enterprises into widespread community involvement and investment. Most notably he has steered the Tribe's giving budgets into areas of education, community infrastructure improvements and public health and safety services. Eric represents Blue Lake Rancheria as the California Nations Indian Gaming Association (CNIGA) Tribal delegate, Executive Committee Secretary and Legislative Committee Chair, where he works with other Tribes across California on legal, operational and planning issues affecting Indian Country. Eric earned his B.A. in Business Administration at Humboldt State University (HSU). For his leadership, significant accomplishments and contributions to the community, in 2006 Eric was recognized with a Distinguished Alumni Award from HSU.

**Thomas Frank | Vice-President | Blue Lake Rancheria Economic Development Corporation (BLREDC)**

With over fifteen years of gaming experience in several areas of departmental specialization, Tom is both a Native gaming industry generalist and an expert. As Vice President of the BLREDC, Tom manages all gaming-related initiatives including casino operations and casino development and management projects. He manages day-to-day activities of currently operating gaming facilities, initiates business growth with new opportunities in emerging markets, and directs development processes of all new gaming projects. He also collaborates with all Blue Lake Rancheria business management teams. Prior to his position with Blue Lake Rancheria, Tom held similarly high-profile positions for other gaming companies, including Pacific Coast Gaming – Corning, LLC, Sodak Gaming International, the Dakotah Sioux Casino, among others. Tom's extensive business achievements include directing the development, restructuring and opening of multiple new casino, hotel, restaurant and card room properties, successfully completing Fee-to-Trust transfer processes, for a total of over 2,000 acres of land placed into Trust. Tom's project management has included international sites, including Rio de Janeiro, Brazil. He has also worked to develop educational programs in casino operations and financing to increase Indian Country expertise.

**Philip Aycock | Chief Financial Officer | Blue Lake Rancheria Tribe**

Philip R. Aycock, CPA, began his career in finance as an auditor for the U.S. Government. For over fourteen years Philip managed auditing of a wide variety of governmental entities and government contractors at various locations in the United States and Europe. Prior to leaving the government for private practice in 1986, Mr. Aycock was the audit manager responsible for commercial activities operated by the U.S. Department of Defense in an eight-state region in the Southeastern United States. In 1988, Philip founded Aycock and Edgmon CPAs and serves as the firm's senior partner. Aycock and Edgmon provides tax, accounting and auditing services to governmental, nonprofit and commercial entities in Northern California. Philip is a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants and is a graduate of Jacksonville

*Exhibit 4 - Page 2 of 3*

Copyright © 2007 Blue Lake Rancheria. All Rights Reserved. | Privacy & Security Policy | Site Map

*Exhibit 4 - Page 3 of 3*

# Exhibit 5

*Summons and Complaint in Underlying Tribal Action*

This is a true and complete copy of

The Summons and Complaint in the Underlying Tribal Action

as served on January 17, 2016.

There are 18 pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 5 - Title Page*

## BLUE LAKE RANCHERIA TRIBAL COURT

BLUE LAKE CASINO & HOTEL,
a tribally owned entity of Blue Lake Rancheria,
a federally recognized Indian tribe
        Plaintiff,

        v.

ACRES BONUSING, INC.,
a Nevada Corporation; and
JAMES ACRES, an individual,
        Defendants.

**SUMMONS IN A CIVIL CASE**

Case Number: C-15-1215LJM

TO:    ACRES BONUSING, INC., a Nevada Corporation;
       and JAMES ACRES, an individual

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY(S) (name and address)

    Daniel S. Stouder
    Amy L. O'Neill
    Boutin Jones Inc.
    555 Capitol Mall, Suite 1500
    Sacramento, CA 95814-4603

An answer to the complaint which is herewith served upon you, within five (5) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of the Court within a reasonable period of time after service.

Anita M. Huff, Clerk of the Court

Date  January 12, 2016



SUMMONS IN A CIVIL CASE

*Exhibit 5 - Page 1 of 18*

## BLUE LAKE RANCHERIA TRIBAL COURT

BLUE LAKE CASINO & HOTEL,
a tribally owned entity of Blue Lake Rancheria,
a federally recognized Indian tribe
                    Plaintiff,                    **SUMMONS IN A CIVIL CASE**

                    v.                    Case Number: C-15-1215LJM

ACRES BONUSING, INC.,
a Nevada Corporation; and
JAMES ACRES, an individual,
                    Defendants.

TO:    ACRES BONUSING, INC., a Nevada Corporation;
       and JAMES ACRES, an individual

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S
ATTORNEY(S) (name and address)

       Daniel S. Stouder
       Amy L. O'Neill
       Boutin Jones Inc.
       555 Capitol Mall, Suite 1500
       Sacramento, CA 95814-4603

An answer to the complaint which is herewith served upon you, within five (5) days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.
You must also file your answer with the Clerk of the Court within a reasonable period of
time after service.

_____          _____
Anita M. Huff, Clerk of the Court          Date          January 13, 2016



SEAL

                                        SUMMONS IN A CIVIL CASE

*Exhibit 5 - Page 2 of 18*

1   BOUTIN JONES INC.
2   Daniel S. Stouder, SBN 226753; Admitted to Tribal Court on November 19, 2015
    dstouder@boutinjones.com
3   Amy L. O'Neill, SBN 294458; Admitted to Tribal Court on November 19, 2015
    aoneill@boutinjones.com
4   555 Capitol Mall, Suite 1500
    Sacramento, CA 95814-4603
5   Telephone: (916) 321-4444
    Facsimile: (916) 441-7597
6   Attorneys for Blue Lake Casino & Hotel

**ENDORSED-FILED**

JAN 12 2016

CLERK OF
BLUE LAKE RANCHERIA

7

8                    **TRIBAL COURT OF THE TRIBE BLUE LAKE RANCHERIA**

9   BLUE LAKE CASINO & HOTEL, a tribally          )   Case No.:
    owned entity of Blue Lake Rancheria, a federally )
10  recognized Indian tribe,                         )   **COMPLAINT FOR BREACH OF**
                                                     )   **CONTRACT; TORTIOUS BREACH**
11                          Plaintiff,               )   **OF IMPLIED COVENANT OF GOOD**
                                                     )   **FAITH AND FAIR DEALING;**
12           vs.                                     )   **UNJUST ENRICHMENT; MONEY**
                                                     )   **HAD AND RECEIVED;**
13  ACRES BONUSING, INC., a Nevada                   )   **FRAUDULENT INDUCEMENT**
    Corporation; and JAMES ACRES, an individual,     )
14                                                   )
                            Defendants.              )
15                                                   )

16          Plaintiff BLUE LAKE CASINO AND HOTEL alleges:

17                              **JURISDICTION AND VENUE**

18          1.      Plaintiff BLUE LAKE CASINO AND HOTEL ("BLC&H") is a tribally owned

19  entity of Blue Lake Rancheria, a federally recognized Indian tribe with its principal place of

20  business in the County of Humboldt, California.

21          2.      On information and belief, defendant ACRES BONUSING, INC. ("ABI") is a

22  corporation organized under the laws of the State of Nevada with its principal place of business

23  in Carson City, Nevada.

24          3.      On information and belief, defendant JAMES ACRES ("Acres") is an individual

25  residing in Carson City, Nevada.

26          4.      This Court has jurisdiction over this action because the contract upon which the

27  dispute is founded was signed on Blue Lake Rancheria tribal property; was to be performed on

28

*Exhibit 5 - Page 3 of 18*

747604.2
1
COMPLAINT AGAINST ACRES BONUSING, INC. AND JAMES ACRES

1  Blue Lake Rancheria tribal property; and at least one party to the contract is an entity owned by

2  Blue Lake Rancheria, a federally recognized Indian tribe.

3       5.     The amount in controversy in this matter is more than $75,000.00 exclusive of

4  interest and fees.

5  **GENERAL ALLEGATIONS**

6       6.     On or about July 7, 2010, BLC&H and ABI entered into an iSLOT Lease

7  Agreement (the "Agreement") whereby ABI would develop gaming software for online gaming

8  that BLC&H could use at its casino. A true and correct copy of the Agreement is attached

9  hereto as **Exhibit A** and incorporated herein by reference. During the term of the Agreement,

10  ABI was required to service, support, maintain, and upgrade the iSlot gaming system. In fact,

11  Acres promised, and the Agreement specifically provides the following:

12            a.     "The lease fee includes all server hardware and spare components and all

13                software updates." (Agreement, p. 2.)

14            b.     "[ABI] and TAL shall work to improve the iSlot System and [ABI] shall

15                provide such improvements to BLC&H at no additional cost."

16                (Agreement, Exhibit A, p.1.)

17            c.     The initial installation of the iSlot System, or a future upgrade of the

18                iSlot System shall incorporate basic W-2G compliance functionality."

19                (Agreement, Exhibit A, p.2.)

20       7.     BLC&H agreed to pay ABI an initial $250,000.00 advance deposit, which ABI

21  would pay back to BLC&H over time through reduced lease payments as calculated per the

22  Agreement based on receipts from use of the iSlot games provided by ABI ("the royalty

23  payment scheme"). Once the software was installed, BLC&H would forfeit the deposit only if

24  it failed to install the iSlot devices, or failed to maintain the requisite number of gaming

25  devices. The iSlot system was installed and maintained on more than 20 devices throughout the

26  period of the Agreement.

27

28  *Exhibit 5 - Page 4 of 18*

2

8.      The iSlot system provided by ABI was a failure, and the iSlot gaming devices generated virtually no income. Operating costs incurred by BLC&H outweighed any income generated by the iSlot System and devices.

9.      BLC&H is informed and believes that ABI and Acres knew the iSlot System would fail and that the deposit amount would never actually be paid back through the royalty payment scheme as contemplated under the Agreement because the system could never satisfactorily perform.

10.     Rather than upgrade and improve the iSlot system or provide upgraded and/or new, more successful games to BLC&H as required by the Agreement and as promised by Acres (and as was needed so that the deposit could be repaid through the royalty payment scheme as contemplated by the Agreement), ABI and Acres focused their attention on other projects, including the development of a new gaming system, V2.0, which BLC&H could not use. V2.0 was a "wide area" server-based system hosted on an out-of-state server in Nevada, and was not formally approved and authorized by Indian Gaming Regulatory Act or the National Indian Gaming Commission. Use of an unauthorized system could put BLC&H's entire casino and gaming operations at risk; a fact which BLC&H discussed with ABI and Acres on numerous occasions.

11.     At the earliest opportunity, and after failing and refusing to provide BLC&H with an adequate system that would allow it to recover its advanced deposit as contemplated by the Agreement, ABI terminated the Agreement. ABI then refused, and continues to refuse, to return the advance deposit which was not recovered or recoverable through the royalty payment scheme.

12.     During the life of the Agreement, only $750 of the $250,000.00 advance was ever repaid to BLC&H by ABI by way of the royalty payment scheme. Therefore, exclusive any interest which has accrued in connection with the amount owed, ABI is liable to BLC&H in an amount not less than $249,250.00.

*Exhibit 5 - Page 5 of 18*

3

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – Against Defendant ABI)

13. BLC&H repeats and realleges all allegations as if fully set forth herein.

14. BLC&H and ABI entered into an Agreement whereby ABI would develop gaming software for online gaming that BLC&H could use at its casino. During the term of the Agreement, ABI would service, support, maintain, and upgrade the iSlot gaming system.

15. BLC&H paid ABI a $250,000.00 deposit as required by the Agreement, installed the software developed by ABI within the requisite time period, and maintained the software on at least 20 gaming machines at all times.

16. All conditions required by the contract for ABI's performance of the contract occurred.

17. Within the last four years, ABI failed and refused to provide upgrades and improvements to the system sufficient to make the system successful. Instead, ABI dedicated its time and attention to a system which was not usable by BLC&H.

18. BLC&H was harmed by ABI's failure to perform its duties as required by the Agreement, which, among other consequences, prevented BLC&H from earning down the advanced royalty payments. Further, ABI never returned the deposit following its termination of the Agreement. Therefore, BLC&H was harmed in an amount to be proven at trial, but in no event less than $249,250.00.

## SECOND CLAIM FOR RELIEF

### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Defendant ABI)

19. BLC&H repeats and realleges all allegations as if fully set forth herein.

20. ABI's conduct as described above was unreasonable, including, but not limited to, failing and refusing to upgrade or improve the iSlot system provided to BLC&H so that repayment of the deposit as anticipated by the Agreement could occur; dedicating its resources to an alternative system it knew BLC&H could not use; and then failing to return the advance

*Exhibit 5 - Page 6 of 18*

1  deposit when it terminated the Agreement, thereby preventing any future prospect of upgrading

2  the system and repaying the deposit by way of the royalty repayment scheme.

3      21.   Implied in the every contract is a covenant of good faith and fair dealing

4  pursuant to which, among other things, each party is required to deal fairly, in good faith, and

5  openly with each other. By engaging in the conduct described herein, ABI unfairly interfered

6  with BLC&H's right to receive the benefits of the contract and in doing so, ABI breached the

7  duty of good faith and fair dealing.

8      22.   BLC&H was harmed by ABI's breach of the implied covenant of good faith and

9  fair dealing and is entitled to recover all damages proximately caused by such breach, which is

10  equal to an amount to be proven at trial, but in no event less than $249,250.00.

11  **THIRD CLAIM FOR RELIEF**

12  **(Unjust Enrichment – Against Defendant ABI)**

13      23.   BLC&H repeats and realleges all allegations as if fully set forth herein.

14      24.   Defendants received from BLC&H a $250,000.00 advance deposit which the

15  parties agreed would be paid back by way of the royalty payment scheme from money

16  generated by use of the iSlot machines provided by Defendants.

17      25.   During the initial term of the Agreement, the iSlot machines generated such

18  miniscule revenue so as to preclude repayment of the advance deposit. Defendants then

19  terminated the Agreement at the earliest opportunity so as to prevent any future possibility of

20  repayment of the advance deposit by way of the royalty payment scheme. Defendants then

21  failed and refused to return the advance deposit which had not been repaid.

22      26.   Defendants have wrongfully maintained and benefited from the advance deposit

23  which was not returned to BLC&H after termination of the Agreement and which was not

24  repaid (e.g. earned) by way of the royalty payment scheme prior to the termination of the

25  Agreement.

26      27.   Defendants' failure to return the unearned advanced deposit after termination of

27  the Agreement injured BLC&H. Defendants have been unjustly enriched in an amount not less

28  than $249,250.00, exclusive of interest.

*Exhibit 5 - Page 7 of 18*

5

## FOURTH CLAIM FOR RELIEF

### (Money Had and Received – Against Defendant ABI)

28.   BLC&H repeats and realleges all allegations as if fully set forth herein.

29.   Defendants received a $250,000.00 advance deposit from BLC&H that was intended by the Parties to be repaid to BLC&H through a royalty payment scheme.

30.   The advance deposit was not used the for the benefit of BLC&H.

31.   Defendants did not repay the advance deposit as anticipated and have failed and refused to return the remainder of the advance deposit since terminating the Agreement, despite BLC&H's demands that they do so.

32.   Defendants' failure to repay or return the advanced deposit injured BLC&H by an amount not less than $249,250.00, exclusive of interest and fees.

## FIFTH CLAIM FOR RELIEF

### (Fraudulent Inducement against Defendant Acres)

33.   BLC&H repeats and realleges all allegations as if fully set forth herein.

34.   Defendant Acres represented to BLC&H at the time the Agreement was entered into that ABI would improve and provide upgrades to the iSlot system. Acres also represented that the advanced deposit would be repaid to BLC&H by way of the royalty payment scheme.

35.   At the time Acres made these representations, Acres did not intend for ABI to provide the upgrades and maintenance necessary to make the iSlot system successful. Moreover, Acres did not intend for the advanced deposit to be repaid to BLC&H by way of the royalty payment scheme.

36.   Acres intended for BLC&H to rely on his promises that ABI would maintain and upgrade the iSlot system and that ABI would repay the advanced deposit by way of the royalty payment scheme.

37.   BLC&H reasonably relied on these promises when entering into the Agreement and paying Defendants a $250,000.00 advanced deposit for the iSlot system.

38.   ABI did not provide upgrades to the iSlot system as promised by Acres and did not repay the advanced deposit by way of the royalty payment scheme.

*Exhibit 5 - Page 8 of 18*

6

39.   BLC&H was harmed by Acre's failure to have ABI perform as promised because the system was never improved as anticipated and therefore did not become successful. Also, because the system was a failure the advanced deposit was never repaid by way of the royalty payment scheme as promised.

40.   BLC&H's reliance on Acre's promise to have ABI maintain and upgrade the iSlot system, and to repay the advanced deposit, were substantial factors in BLC&H's harm because BLC&H would not have entered into the Agreement had it known that Acres would not have ABI perform as promised.

41.   BLC&H was prevented from knowing Acre's true intentions at the time of entering into the Agreement and could not have discovered these facts until the termination of the Agreement.

42.   Acre's fraudulent inducement injured BLC&H by an amount to be proven at trial, but not less than $249,250.00, exclusive of interest and fees.

43.   The aforementioned acts of Acre were intentional and were intended to deprive BLC&H of property and otherwise cause injury. Acre's acts were despicable conduct that subjected BLC&H to unjust hardship in conscious disregard of its rights, so as to justify an award of exemplary and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, BLC&H prays relief against Defendants as follows:

A.   For compensatory damages in the sum of at least $249,250.00;

B.   For prejudgment interest in an amount to be proven at trial;

C.   For exemplary and punitive damages according to proof;

C.   Costs of suit herein; and

D.   For such other relief as the Court may deem just and proper.

Dated: December 15, 2015

BOUTIN JONES, INC.

By: _____
Daniel S. Stouder
Amy L. O'Neill
Attorneys for Blue Lake Casino & Hotel

*Exhibit 5 - Page 9 of 18*

7

# Exhibit A

*Exhibit 5 - Page 10 of 18*

# iSLOT LEASE AGREEMENT

## Parties and Purpose

This agreement is between Acres Bonusing, Inc. (ABI), a Nevada Corporation and Blue Lake Casino & Hotel (BLC&H), a tribally owned entity of the Blue Lake Rancheria. This agreement describes the operation of the iSlot System at BLC&H. The iSlot System is developed by Talo, Inc. (TAL), a Nevada Corporation. TAL retains all intellectual property rights in the iSlot System. ABI is the licensed representative of TAL in California.

## iSlot System Components

The iSlot System consists of five components:

i)      a central server or servers which can host multiple simultaneous slot machines or gaming devices (Server);

ii)     several patron terminals which can connect to the Server (Terminals);

iii)    various gaming and non-gaming programs that can be used by patrons on the Terminals (Applications);

iv)     a secure wireless network connecting the Server with the Terminals (Network);

v)      a system of electronic kiosks provided by third-party suppliers used by players to add and remove funds from their accounts (Kiosks).

## How the iSlot System Functions

In order to play the iSlot System, patrons will need to register for an iSlot account. This allows the casino to ensure only patrons of legal age may play on the iSlot System.

Once a patron is registered with an iSlot account, he may check out a Terminal. When a patron checks out a Terminal, that specific Terminal is linked to a specific virtual slot machine and the patron's iSlot account on the Server. The patron may then use Applications on the Terminal to play the linked gaming device on the Server. The Terminal connects to the Server via the Network, which is constructed such that the Network is not available outside of the casino. When the patron is finished with the Terminal, he checks the Terminal back in.

*Exhibit 5 - Page 11 of 18*

Patrons will be able to cash-in and cash-out through interactions with BLC&H staff, or alternatively, through the use of Kiosks linked to the iSlot System.

The foregoing is a simplified version of how the iSlot System will approximately function. BLC&H shall be responsible for determining exact procedures for checking-in and checking-out Terminals, as well as cash-in and cash-out. ABI shall assist in developing these procedures at BLC&H's request.

**iSlot System Standard Lease Terms**

*Server*

The lease fee includes all server hardware and spare components and all software updates.

BLC&H shall provide weekly remote access to the server for the purpose of retrieving accounting data, including net-win for each game. Such access shall be compliant with BLC&H MICS.

BLC&H understands that a greater level of system access may be necessary to perform system upgrades and maintenance. All such access shall be negotiated by the parties over time, and shall be compliant with BLC&H MICS.

BLC&H is responsible for performing maintenance tasks such as replacing failed cards.

BLC&H understands that the ability to perform remote maintenance and monitoring is dependant on the level of remote access permissible under the MICS.

*Applications*

The lease fee includes the entire Class II and Class III library of iSlot games.

The lease fee also includes certain standard Non-Gaming Applications that are common to many casinos. If BLC&H requests a special Application be developed for its exclusive use, additional fees may apply.

*Network*

BLC&H shall purchase and maintain all Network hardware. ABI and TAL shall provide advice on the Network's construction and maintenance, however responsibility for the Network's operation and maintenance shall lie with BLC&H.

*Terminals*

*Exhibit 5 - Page 12 of 18*

BLC&H shall purchase and maintain all Terminals — currently WiFi enabled iPod Touches and iPads.

*Kiosks*

BLC&H shall be responsible for purchasing and maintaining third-party kiosks compatible with the iSlot System.

*Monthly Lease Fee*

BLC&H shall pay ABI a monthly lease-fee equal to the lesser of 15% of Theoretical Net Win of all play on the iSlot System for the month or the Maximum Monthly Fee.

The Maximum Monthly Fee under the lease shall be computed as follows:

    i)    taking the greatest number of gaming devices available on the iSlot System during any day of the month as "Max Games";

    ii)    multiplying Max Games by the number of days in the month to obtain "Game Days";

    iii)    multiplying Game Days by the Maximum Daily Fee to yield the Maximum Monthly Fee.

The Maximum Daily Fee shall be equal to $60 in constant, July 1st, 2010 dollars. ABI, TAL or BLC&H may require at any time the Maximum Daily Fee be adjusted to account for inflation or deflation since July 1st, 2010.

BLC&H shall pay ABI the lease fee monthly, net 30 days.

*Number of Gaming Devices Deployed*

BLC&H may use the iSlot System to deploy any number of simultaneous Gaming Devices it desires.

*Term*

BLC&H shall have the right to lease the iSlot System on these terms for two years from the date of installation, so long as BLC&H remains current in all payments and BLC&H uses the system to deploy at least twenty simultaneous gaming devices. BLC&H's right to lease the iSlot System shall be binding on all successors to ABI and TAL.

At the end of the first term, and for each term thereafter, the agreement shall automatically be extended for one year unless either party notifies the other of their desire to terminate the agreement. Notification to terminate the agreement must be given at least three months before the beginning of the new term.

*Exhibit 5 - Page 13 of 18*

## Regulatory Compliance

All equipment and software leased under this agreement shall pass all applicable GLI standards, and conform to all tribal, local, state, and federal laws and regulations.

## Advanced Deposit

In order to cover localization costs of the iSlot System, BLC&H shall pay ABI an advanced deposit against royalties of $250,000.

Once the iSlot System is installed one-half of each month's lease fee shall be applied against the advanced deposit until it is extinguished.

The deposit shall be refunded if, and only if, ABI does not make an iSlot System available to BLC&H for installation by October 1st, 2010 which:

   i)    Has received GLI certification;

   ii)   Has been approved by at least one tribal gaming authority in California;

   iii)  Allows BLC&H to credit points to player-club accounts for coin-in played on the iSlot System (though BLC&H understands this may be a manual process performed daily by their staff).

In the event that ABI provides the iSlot System in at timely fashion and BLC&H elects not to install the iSlot System, or elects to use the iSlot System to serve fewer than twenty simultaneous gaming devices, then any remaining advance fees shall be forfeit.

## Hotel Rooms and Reasonable Meals

BLC&H shall provide hotel rooms and reasonable meals for ABI and TAL staff visiting BLC&H on business matters related to this lease.

## Inclusion of "Exhibit A" in Agreement

The contents of Exhibit A below shall be included in this agreement.

## Execution

This is a time sensitive project, and ABI's ability to deliver the iSlot System in a timely fashion may be dependant on when BLC&H accepts this agreement.

Therefore, this agreement shall not be valid until executed by both parties and ABI accepts BLC&H's payment of advanced royalties.

*Exhibit 5 - Page 14 of 18*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement.

**Acres Bonusing, Inc**
1106 2nd St #104
Encinitas, CA 92024

Blue Lake Casino and Hotel

| | | | | |
|---|---|---|---|---|
| By: | | By: | | |
| Name: | James Acres | Name | Steve Salatti | |
| Title: | President | Title: | CFO | |
| Date: | 7/7/2010 | Date: | 7/7/2010 | |

*Exhibit 5 - Page 15 of 18*

# EXHIBIT A

### Purpose of Exhibit A

This exhibit clarifies points of discussion between ABI and BLC&H. Items are placed in this exhibit purely to facilitate ease of review by the parties and should not be considered to be more or less important than items in the main body of the agreement.

### Limited Exclusivity

BLC&H shall enjoy a limited exclusivity to the iSlot System until either the end of the term of this agreement, or until all advanced royalties have been earned out.

BLC&H may, at its election, purchase an additional term of exclusivity for an additional $250,000 advance on royalties. This additional deposit must be received in the month that the exclusivity expires.

The additional term of exclusivity shall last either for one year, or until all additional advanced royalties have been earned out.

This exclusivity shall extend to Bear River Casino and Cher-Ae Heights Casino.

### Minimum Functionality of Initial Delivery

It is understood by all parties that the iSlot System shall be delivered in a minimally functional state in order to meet the October 1st deadline.

ABI and TAL shall work to improve the iSlot System and ABI shall provide such improvements to BLC&H at no additional cost. However, should BLC&H request that special work be done on its behalf, applicable only to BLC&H, then additional fees may apply.

### System Integration

ABI and TAL shall use their best commercially reasonable efforts to integrate iSlot Accounting with BLC&H's current accounting system, and to maintain that integration.

BLC&H shall use their best commercially reasonable efforts to assist ABI and TAL in this integration, including obtaining communications protocols and table structures from their system vendor and keeping ABI and TAL apprised of changes to their back-end system.

*Exhibit 5 - Page 16 of 18*

ABI and TAL shall provide BLC&H documentation on and access to all data tables in the iSlot System to allow BLC&H to reconcile player-tracking and accounting databases until such a time as automated integration is possible.

## Manual Cash-In and Cash-Out

ABI shall provide a methodology for cage or floor staff to add or remove credits from patron iSlot accounts. This shall be provided at no additional charge.

## Kiosks

The iSlot System contemplates the use of Kiosks for player cash-in and cash-out. ABI and TAL shall work with BLC&H's kiosk vendor to provide compatibility between that vendor's kiosks and the iSlot System.

ABI and TAL shall do this work at no additional charge to BLC&H. However, ABI and TAL can not be responsible for any fees charged to BLC&H by their kiosk vendor.

## W-2G Compliance

The initial installation of the iSlot System, or a future upgrade of the iSlot System shall incorporate basic W-2G compliance functionality. This functionality shall be provided at no additional charge.

## System Maintenance

BLC&H shall not incur any additional fees for standard maintenance performed by ABI or TAL under this agreement. However, nothing in this provision absolves BLC&H of their responsibilities for maintenance described in the main agreement above.

## Refund of Deposit in the Event of the Dissolution of ABI

It is understood that BLC&H's deposit may be used by ABI and TAL to fund their operations, and that there is no specific collateral securing the deposit and guaranteeing its refund.

That said, the Acres Family has a long history in the Gaming Industry, and is very aware that the failure to return the deposit in the event it is owed will be damaging to their reputation. Therefore, in the unlikely and unfortunate event that ABI cannot deliver the iSlot System, then some Acres Family controlled entity shall make strenuous efforts to refund the deposit, or make some other restitution to the satisfaction of BLC&H.

*Exhibit 5 - Page 17 of 18*

Nothing in this provision is intended as or should be interpreted as a personal guarantee of any sort, or as a withdrawal or lessening of ABI's Corporate Veil.

*Exhibit 5 - Page 18 of 18*

# Exhibit 6

*iSlot Agreement*

This is a true and complete copy of

the iSlot Agreement between Acres Bonusing Inc and Blue Lake Casino

There are eight pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 6 - Title Page*

# iSLOT LEASE AGREEMENT

## Parties and Purpose

This agreement is between Acres Bonusing, Inc. (ABI), a Nevada Corporation and Blue Lake Casino & Hotel (BLC&H), a tribally owned entity of the Blue Lake Rancheria. This agreement describes the operation of the iSlot System at BLC&H. The iSlot System is developed by Talo, Inc. (TAL), a Nevada Corporation. TAL retains all intellectual property rights in the iSlot System. ABI is the licensed representative of TAL in California.

## iSlot System Components

The iSlot System consists of five components:

i) a central server or servers which can host multiple simultaneous slot machines or gaming devices (Server);

ii) several patron terminals which can connect to the Server (Terminals);

iii) various gaming and non-gaming programs that can be used by patrons on the Terminals (Applications);

iv) a secure wireless network connecting the Server with the Terminals (Network);

v) a system of electronic kiosks provided by third-party suppliers used by players to add and remove funds from their accounts (Kiosks).

## How the iSlot System Functions

In order to play the iSlot System, patrons will need to register for an iSlot account. This allows the casino to ensure only patrons of legal age may play on the iSlot System.

Once a patron is registered with an iSlot account, he may check out a Terminal. When a patron checks out a Terminal, that specific Terminal is linked to a specific virtual slot machine and the patron's iSlot account on the Server. The patron may then use Applications on the Terminal to play the linked gaming device on the Server. The Terminal connects to the Server via the Network, which is constructed such that the Network is not available outside of the casino. When the patron is finished with the Terminal, he checks the Terminal back in.

*Exhibit 6 - Page 1 of 8*

Patrons will be able to cash-in and cash-out through interactions with BLC&H staff, or alternatively, through the use of Kiosks linked to the iSlot System.

The foregoing is a simplified version of how the iSlot System will approximately function. BLC&H shall be responsible for determining exact procedures for checking-in and checking-out Terminals, as well as cash-in and cash-out. ABI shall assist in developing these procedures at BLC&H's request.

**iSlot System Standard Lease Terms**

*Server*

The lease fee includes all server hardware and spare components and all software updates.

BLC&H shall provide weekly remote access to the server for the purpose of retrieving accounting data, including net-win for each game. Such access shall be compliant with BLC&H MICS.

BLC&H understands that a greater level of system access may be necessary to perform system upgrades and maintenance. All such access shall be negotiated by the parties over time, and shall be compliant with BLC&H MICS.

BLC&H is responsible for performing maintenance tasks such as replacing failed cards.

BLC&H understands that the ability to perform remote maintenance and monitoring is dependant on the level of remote access permissible under the MICS.

*Applications*

The lease fee includes the entire Class II and Class III library of iSlot games.

The lease fee also includes certain standard Non-Gaming Applications that are common to many casinos. If BLC&H requests a special Application be developed for its exclusive use, additional fees may apply.

*Network*

BLC&H shall purchase and maintain all Network hardware. ABI and TAL shall provide advice on the Network's construction and maintenance, however responsibility for the Network's operation and maintenance shall lie with BLC&H.

*Terminals*

*Exhibit 6 - Page 2 of 8*

BLC&H shall purchase and maintain all Terminals -- currently WiFi enabled iPod Touches and iPads.

*Kiosks*

BLC&H shall be responsible for purchasing and maintaining third-party kiosks compatible with the iSlot System.

*Monthly Lease Fee*

BLC&H shall pay ABI a monthly lease-fee equal to the lesser of 15% of Theoretical Net Win of all play on the iSlot System for the month or the Maximum Monthly Fee.

The Maximum Monthly Fee under the lease shall be computed as follows:

    i)    taking the greatest number of gaming devices available on the iSlot System during any day of the month as "Max Games";

    ii)    multiplying Max Games by the number of days in the month to obtain "Game Days";

    iii)    multiplying Game Days by the Maximum Daily Fee to yield the Maximum Monthly Fee.

The Maximum Daily Fee shall be equal to $60 in constant, July 1st, 2010 dollars. ABI, TAL or BLC&H may require at any time the Maximum Daily Fee be adjusted to account for inflation or deflation since July 1st, 2010.

BLC&H shall pay ABI the lease fee monthly, net 30 days.

*Number of Gaming Devices Deployed*

BLC&H may use the iSlot System to deploy any number of simultaneous Gaming Devices it desires.

*Term*

BLC&H shall have the right to lease the iSlot System on these terms for two years from the date of installation, so long as BLC&H remains current in all payments and BLC&H uses the system to deploy at least twenty simultaneous gaming devices. BLC&H's right to lease the iSlot System shall be binding on all successors to ABI and TAL.

At the end of the first term, and for each term thereafter, the agreement shall automatically be extended for one year unless either party notifies the other of their desire to terminate the agreement. Notification to terminate the agreement must be given at least three months before the beginning of the new term.

*Exhibit 6 - Page 3 of 8*

## Regulatory Compliance

All equipment and software leased under this agreement shall pass all applicable GLI standards, and conform to all tribal, local, state, and federal laws and regulations.

## Advanced Deposit

In order to cover localization costs of the iSlot System, BLC&H shall pay ABI an advanced deposit against royalties of $250,000.

Once the iSlot System is installed one-half of each month's lease fee shall be applied against the advanced deposit until it is extinguished.

The deposit shall be refunded if, and only if, ABI does not make an iSlot System available to BLC&H for installation by October 1st, 2010 which:

    i)      Has received GLI certification;

    ii)     Has been approved by at least one tribal gaming authority in California;

    iii)    Allows BLC&H to credit points to player-club accounts for coin-in played on the iSlot System (though BLC&H understands this may be a manual process performed daily by their staff).

In the event that ABI provides the iSlot System in at timely fashion and BLC&H elects not to install the iSlot System, or elects to use the iSlot System to serve fewer than twenty simultaneous gaming devices, then any remaining advance fees shall be forfeit.

## Hotel Rooms and Reasonable Meals

BLC&H shall provide hotel rooms and reasonable meals for ABI and TAL staff visiting BLC&H on business matters related to this lease.

## Inclusion of "Exhibit A" in Agreement

The contents of Exhibit A below shall be included in this agreement.

## Execution

This is a time sensitive project, and ABI's ability to deliver the iSlot System in a timely fashion may be dependant on when BLC&H accepts this agreement.

Therefore, this agreement shall not be valid until executed by both parties and ABI accepts BLC&H's payment of advanced royalties.

*Exhibit 6 - Page 4 of 8*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement.

**Acres Bonusing, Inc**                              Blue Lake Casino and Hotel
1106 2nd St #104
Encinitas, CA 92024

By: _____              By: _____

Name:    James Acres                      Name    Steve Salatti

Title:    President                       Title:    CFO

Date:    7/7/2010                         Date:    7/7/2010

*Exhibit 6 - Page 5 of 8*

# EXHIBIT A

**Purpose of Exhibit A**

This exhibit clarifies points of discussion between ABI and BLC&H. Items are placed in this exhibit purely to facilitate ease of review by the parties and should not be considered to be more or less important than items in the main body of the agreement.

**Limited Exclusivity**

BLC&H shall enjoy a limited exclusivity to the iSlot System until either the end of the term of this agreement, or until all advanced royalties have been earned out.

BLC&H may, at its election, purchase an additional term of exclusivity for an additional $250,000 advance on royalties. This additional deposit must be received in the month that the exclusivity expires.

The additional term of exclusivity shall last either for one year, or until all additional advanced royalties have been earned out.

This exclusivity shall extend to Bear River Casino and Cher-Ae Heights Casino.

**Minimum Functionality of Initial Delivery**

It is understood by all parties that the iSlot System shall be delivered in a minimally functional state in order to meet the October 1st deadline.

ABI and TAL shall work to improve the iSlot System and ABI shall provide such improvements to BLC&H at no additional cost. However, should BLC&H request that special work be done on its behalf, applicable only to BLC&H, then additional fees may apply.

**System Integration**

ABI and TAL shall use their best commercially reasonable efforts to integrate iSlot Accounting with BLC&H's current accounting system, and to maintain that integration.

BLC&H shall use their best commercially reasonable efforts to assist ABI and TAL in this integration, including obtaining communications protocols and table structures from their system vendor and keeping ABI and TAL apprised of changes to their back-end system.

*Exhibit 6 - Page 6 of 8*



ABI and TAL shall provide BLC&H documentation on and access to all data tables in the iSlot System to allow BLC&H to reconcile player-tracking and accounting databases until such a time as automated integration is possible.

## Manual Cash-In and Cash-Out

ABI shall provide a methodology for cage or floor staff to add or remove credits from patron iSlot accounts. This shall be provided at no additional charge.

## Kiosks

The iSlot System contemplates the use of Kiosks for player cash-in and cash-out. ABI and TAL shall work with BLC&H's kiosk vendor to provide compatibility between that vendor's kiosks and the iSlot System.

ABI and TAL shall do this work at no additional charge to BLC&H. However, ABI and TAL can not be responsible for any fees charged to BLC&H by their kiosk vendor.

## W-2G Compliance

The initial installation of the iSlot System, or a future upgrade of the iSlot System shall incorporate basic W-2G compliance functionality. This functionality shall be provided at no additional charge.

## System Maintenance

BLC&H shall not incur any additional fees for standard maintenance performed by ABI or TAL under this agreement. However, nothing in this provision absolves BLC&H of their responsibilities for maintenance described in the main agreement above.

## Refund of Deposit in the Event of the Dissolution of ABI

It is understood that BLC&H's deposit may be used by ABI and TAL to fund their operations, and that there is no specific collateral securing the deposit and guaranteeing its refund.

That said, the Acres Family has a long history in the Gaming Industry, and is very aware that the failure to return the deposit in the event it is owed will be damaging to their reputation. Therefore, in the unlikely and unfortunate event that ABI cannot deliver the iSlot System, then some Acres Family controlled entity shall make strenuous efforts to refund the deposit, or make some other restitution to the satisfaction of BLC&H.

*Exhibit 6 - Page 7 of 8*

# Exhibit 7

*Bank Record of iSlot Payment*

This is a redacted copy of page 2 of

The July 2010 US Bank Checking Account Statement for Acres Bonusing Inc

There is one page in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 7 - Title Page*



**U.S. bank**

ACRES BONUSING,INC
1106 2ND ST STE 104
ENCINITAS  CA 92024-5008

**Business Statement**

Account Number:
▓▓▓▓▓▓▓▓

Statement Period:
Jul. 1 , 2010
through
Jul. 31, 2010

Page 2 of 4



---

**FREE SMALL BUSINESS CHECKING**                                                              **(CONTINUED)**
U.S. Bank National Association                                    Account Number ▓▓▓▓▓▓▓▓

## Reward Program Summary

All Rewards shown are as of Jul. 31, 2010

*FlexPerks* Business Cash Rewards          Check Card Number: *4281          **Flex Perks**

| Reward Enrollment Date | Rewards Earned Program to Date | Rewards Redeemed Program to Date | Current Rewards Balance | Rewards Available to Redeem |
|---|---|---|---|---|
| 01/30/2007 | $      0.00 | $      0.00 | $      0.00 | $      0.00 |

**Customer Deposits**

| Number | Date | Ref Number | Amount |
|---|---|---|---|
| | | | ▓▓▓▓▓▓▓ |

Total Customer Deposits ▓▓▓▓▓▓▓▓

**Other Deposits**

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Jul.  7 | Wire Credit REF008813          BK AMER NYC | | ▓▓▓▓ | $     50,000.00 |
| | ORG=BLUE LAKE CASINO          CONCENTRATION ACCOUNT | | | |
| Jul.  7 | Wire Credit REF008571          BK AMER NYC | | ▓▓▓▓▓ | 100,000.00 |
| | ORG=BLUE LAKE CASINO          CONCENTRATION ACCOUNT | | | |
| Jul.  7 | Wire Credit REF008836          BK AMER NYC | | ▓▓▓▓▓ | 100,000.00 |
| | ORG=BLUE LAKE CASINO          CONCENTRATION ACCOUNT | | | |

Total Other Deposits   $   250,000.00

**Other Withdrawals**

| Date | Description of Transaction | Ref Number | Amount |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | |
| REF=10197008317789 Y          5911111111WEB PYMT  479853120809276 | | | |

**Checks Presented**

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

* Gap in check sequence                          Conventional Checks Paid ▓▓▓▓▓▓▓

*Exhibit 7 - Page 1 of 1*

# Exhibit 8

*iSlot Transportation Permit*

This is a true and complete copy of

iSlot Transportation Permit

issued by the Blue Lake Tribal Gaming Commission in September of 2010

There are six pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 8 - Title Page*



# BLUE LAKE TRIBAL GAMING COMMISSION
### 428 CHARTIN ROAD • P.O. BOX 798
### BLUE LAKE, CA. 95525
### 707.668.5300 • FAX 707.668.5500
#### www.bluelakecasino.com



## Facsimile Transmittal Sheet

| Date:   Wednesday, August 25, 2010 | Subject:  Slot Machine Transportation Permit |
|---|---|
| Time:    10:30 AM | Total Pages: 6 |

| To:  Karen Taff | Dept. Gambling Control Commission | Fax:  (916) 920-3498 |
|---|---|---|
| Company: State of California | | Phone:  (916) 263-0459 |

| From:  Greg Perry | Dept. Compliance | Fax: (707) 668-5500 |
|---|---|---|
| Title:    Compliance Manager | | Phone: (707) 668-5300 |

Notes:    **CONFIDENTIAL**

**Confidential Information:**

This facsimile message contains information, which may be privileged and confidential and is only intended for the use of the named individual or entity, unless otherwise stated. Any distribution or copying of this communication is prohibited by anyone who is not the named recipient, or an employee or agent responsible for delivering the facsimile to the named recipient. If this communication is received in error, please forward the original message to us at the address above via the US Postal Service. Thank You.

*Exhibit 8 - Page 1 of 6*



# BLUE LAKE TRIBAL GAMING COMMISSION

428 CHARTIN ROAD • P.O. BOX 798
BLUE LAKE, CA. 95525
707.668.5300 • FAX 707.668.5500
www.bluelakecasino.com

To:     <u>Acres Bonusing, Inc</u>
From:   **BLUE LAKE TRIBAL GAMING COMMISSION**

## Transportation Permit
Delivery Date of September 4, 2010

The Blue Lake Rancheria is a federally recognized Tribe of Indians, which has been authorized by an approved Tribal-State Compact with the State of California to ship and operate gaming devices.

You are hereby authorized to ship the gaming devices listed on the attached manufactures/sellers list.

Shipping From:     **<u>Acres Bonusing, Inc</u>**
                   **<u>6415 S. Tenaya Way Suite 110, Las Vegas, NV 89113</u>**

Destination:       **Blue Lake Casino,**
                   **777 Casino Way,**
                   Blue Lake CA, 95525

You must transport the gaming devices in the following manner:

1.  The gaming devices must be transported in conveyance which is regularly operated and engaged in interstate commerce, in foreign commerce or in shipping to and from the Tribe's land;
2.  The gaming devices must be located in a locked compartment or sealed container within the conveyance while being transported;
3.  The gaming devices must not be accessible for use while being transported;
4.  The gaming devices must not be operated except on the Tribe's lands; and
5.  The carrier must have in its possession at all times a copy of this transportation permit while transporting gaming devices.

Dated:   <u>August 25, 2010</u>

_____
*Jody Brundin Executive Director, Tribal Gaming Commission*

*Exhibit 8 - Page 2 of 6*




# BLUE LAKE TRIBAL GAMING COMMISSION
## 428 CHARTIN ROAD • P.O. BOX 798
## BLUE LAKE, CA. 95525
### 707.668.5300 • FAX 707.668.5500
#### www.bluelakecasino.com

## SHIPMENT NOTICE

Seller: **Acres Bonusing, Inc**

Address   **6415 S. Tenaya Way Suite 110, Las Vegas, NV 89113**

Telephone Number: **(541) 760 7503**

Point of Origin

**6415 S. Tenaya Way Suite 110,**
**Las Vegas, NV 89113**

Point of Destination

**Blue Lake Casino**
**777 Casino Way**
**Blue Lake, CA 95525**
**(707)668-5300**

Shipment Date(s): September 3-4, 2010

Carrier:   Blue Lake Tribal Gaming Commission.
           428 Chartin Road,
           Blue Lake, CA 95525

Number of Devices:  1
Truck seal Number(s):  063163 (PRIMARY), 063169 (SECONDARY), 0001782 (backup)

Notification provided to Humboldt County Sheriff's Department:        August 25, 2010
State of California Gambling Control Commission:                      August 25, 2010

See Transportation List (Attachment)
**Feel free to contact my office if there are any questions-**

_____   Date   August 25, 2010
*Jody Brupdin, Executive Director, Tribal Gaming Commission*

*Exhibit 8 - Page 3 of 6*



# BLUE LAKE TRIBAL GAMING COMMISSION
### 428 CHARTIN ROAD • P.O. BOX 798
### BLUE LAKE, CA. 95525
### 707.668.5300 • FAX 707.668.5500
#### www.bluelakecasino.com



Gary Philp, Sheriff
Humboldt County Sheriff's Department
826 4th Street
Eureka, CA 95501

Please accept this as our "Notice of Movement of Gaming Machines", pursuant to Section 7.4.5 of the Tribal/State Compact between the Blue Lake Rancheria and the State of California. The details of that shipment are as follows:

---

**SHIPPING INFORMATION**

CARRIER: Blue Lake Tribal Gaming Commission.    PHONE: **(707)-668-5300**
**428 Chartin Road, Blue Lake Ca 95525**    Contact: Greg Perry

POINT OF ORIGIN                      DELIVERY DATE
**6415 S. Tenaya Way Suite 110,**        **September 4, 2010**
**Las Vegas, NV 89113**

DESTINATION:
**Blue Lake Casino, 777 Casino Way, Blue Lake CA, 95525**

---

SELLER                       SEAL NUMBER
**Acres Bonusing, Inc**    063163 (PRIMARY), 063169 (SECONDARY), 0001782 (backup)

ADDRESS                        PHONE
**6415 S. Tenaya Way Suite 110,**        **(541)-760-7503**
**Las Vegas, NV 89113**        Contact: **James Acres**

MACHINE INFORMATION
**SEE ATTACHED LIST**

---

CONTACT PERSON                  PHONE
**Greg Perry**    **Office # 707.668.5300; Cell Phone # 707.845.5826**

Notification made:        Title        Date/Time

*Greg Perry*    *COMPLIANCE MANAGER*    *8/28/2010 1430*

Received by: *Margaret Gunderson*    Title *LWA II*    Date/Time
*8/25/10 1430*

---

*Exhibit 8 - Page 4 of 6*

Attached Gaming Machine List

Licensed distributor; Acres Bonusing, Inc.

The manufacturer; Acres 4.0, Inc.

Server, Acres 4.0, Serial 003

Gaming Device Serial Numbers,

| | | | |
|---|---|---|---|
| 374 | 388 | 402 | 416 |
| 375 | 389 | 403 | 417 |
| 376 | 390 | 404 | 418 |
| 377 | 391 | 405 | 419 |
| 378 | 392 | 406 | 420 |
| 379 | 393 | 407 | 421 |
| 380 | 394 | 408 | 422 |
| 381 | 395 | 409 | 423 |
| 382 | 396 | 410 | 424 |
| 383 | 397 | 411 | 425 |
| 384 | 398 | 412 | 426 |
| 385 | 399 | 413 | 427 |
| 386 | 400 | 414 | 428 |
| 387 | 401 | 415 | 429 |

*Exhibit 8 - Page 5 of 6*



# BLUE LAKE TRIBAL GAMING COMMISSION
### 428 CHARTIN ROAD • P.O. BOX 798
### BLUE LAKE, CA. 95525
### 707.668.5300 • FAX 707.668.5500
#### www.bluelakecasino.com



August 25, 2010

Karen Taff,
Department of Justice
Gambling Control Commission
2399 Gateway Oaks Drive, Suite 100
Sacramento, CA   95833-4231


Jody Brundin
Executive Director
Blue Lake Tribal Gaming Commission
P.O. Box 798
Blue Lake, CA   95525


Karen Taff,

Please find enclosed our shipment notice for one (1) gaming controller for 56 server based server games from Acres Bonusing, Inc. Attached you will find the server and device controlled inventory list and a transportation permit. This information has already been provided to the Humboldt County Sheriff's Department.

Thank you for your continued support of the Blue Lake Tribal Gaming Commission.

Sincerely,

Jody Brundin

Exhibit 8 - Page 6 of 6

# Exhibit 9

*iSlot Installation Email*

This is a true and complete copy of

an email from James Acres to various Blue Lake Executives on September
25th, 2010 and confirming the successful installation of iSlot

There is one page in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 9 - Title Page*



**From:** **James Acres** james@acresbonusing.com
**Subject:** A4 Install Complete and Next Steps
**Date:** September 25, 2010 at Sep 25 11:12
**To:** Robert Pollard rpollard@bluelakecasino.com, Steve Salatti ssalatti@bluelakecasino.com, Lorenzo Merlin lmerlin@bluelakecasino.com
**Cc:** Greg Perry gperry@bluelakecasino.com

Hi Guys,

Robert's really awesome and got A4 running in The Palace this morning! w00t! :-)

I understand that you guys are planning to open on Monday, October 4th. Therefore, Robert says he thinks there is no value in my coming over on Tuesday/Wednesday this week. Please let me know Monday eve if you change your mind - otherwise I fly home Tuesday morn.

CGCC is auditing Colusa on Oct 4th, so I've got to be there for that. I intend to come back to you on the evening of Monday October 4th, and if nothing really terrible happens with the audit should be back in time to catch a good chunk of your opening. And then I'll be around Tuesday as well if you need me for help with the first day audit, and then to watch a full day in the Palace.

We should also be able to deliver your cabinet during the week of Oct 4th. At that time I'll also invoice you $7900. This is $7500 for the cabinet plus $400 for shipping.

After that we'll work with Robert and Lorenzo to just make A4 as awesome as possible to drive revenue!

-james

James Acres
President, Acres Bonusing, Inc

541 760 7503
james@acresbonusing.com

1106 2nd St, #104
Encinitas, CA  92024

*Exhibit 9 - Page 1 of 1*

# Exhibit 10

*iSlot Software Shipment Notices*

This is a true and complete copy of

twelve software iSlot shipment notices from
Acres Bonusing Inc to Blue Lake Casino

There are twelve pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 10 - Title Page*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System V1.02a

To Whom It May Concern

Please consider this as a shipment lading noticing you of our intent to send updated software for the Acres 4.0 A4 system.

Manufacturer:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Distributor:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Software:
    A4 System V1.02a Rev 4765
        2 CDROMS with system software A4 (prod) version: 01.02a 4765
        6 Boot Roms (VB1.02a 4765)
        1 shipment lading

Ship From:
    Acres Bonusing, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Ship To:
    Blue Lake Tribal Gaming Commission
    428 Chartin Road
    Blue Lake, CA  95525
    ATTN: Compliance Department

Ship Date:
    2010-12-21

Ship Via:
    UPS

*Exhibit 10 - Page 1 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System TRIAD_USER 01.02b

To Whom It May Concern

Please consider this as a shipment lading noticing you of our intent to send updated software for the Acres 4.0 A4 system.

Manufacturer:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Distributor:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Software:
    A4 System TRIAD_USER 01.02b
        2 CDROMS (identical – one is sent as a backup)

Ship From:
    Acres Bonusing, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Ship To:
    Blue Lake Tribal Gaming Commission
    428 Chartin Road
    Blue Lake, CA  95525
    ATTN: Compliance Department

Ship Date:
    2011-02-01

Ship Via:
    UPS

*Exhibit 10 - Page 2 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send updated software for the
Acres 4.0 A4 system.

Manufacturer:
     Acres 4.0, Inc
     6515 S. Teneya Way Suite #110
     Las Vegas, NV  89118

Distributor:
     Acres Bonusing, Inc
     1106 2nd #104
     Encinitas, CA 92024

Software:
     **ISLOT-IPAD V01.03b**
     2 CDROMS (identical -- one is sent as a backup)

Ship From:
     Acres Bonusing, Inc
     6515 S. Teneya Way Suite #110
     Las Vegas, NV  89118

Ship To:
     Blue Lake Tribal Gaming Commission
     428 Chartin Road
     Blue Lake, CA  95525
     ATTN: Compliance Department

Ship Date:
     2011-05-20

Ship Via:
     USPS

*Exhibit 10 - Page 3 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send updated software for the
Acres 4.0 A4 system.

Manufacturer:
        Acres 4.0, Inc
        6515 S. Teneya Way Suite #110
        Las Vegas, NV  89118

Distributor:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Software:
        ISLOT-IPAD V01.03b
        2 CDROMS (identical – one is sent as a backup)

Ship From:
        Acres Bonusing, Inc
        6515 S. Teneya Way Suite #110
        Las Vegas, NV  89118

Ship To:
        Blue Lake Tribal Gaming Commission
        428 Chartin Road
        Blue Lake, CA  95525
        ATTN: Compliance Department

Ship Date:
        2011-06-15

Ship Via:
        USPS

*Exhibit 10 - Page 4 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send updated software for the Acres 4.0 A4 system.

Manufacturer:
        Acres 4.0, Inc
        6515 S. Teneya Way Suite #110
        Las Vegas, NV  89118

Distributor:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Software:
        A4 V01.03c
        2 CDROMS (identical – one is sent as a backup)

Ship From:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Ship To:
        Blue Lake Tribal Gaming Commission
        428 Chartin Road
        Blue Lake, CA  95525
        ATTN: Compliance Department

Ship Date:
        2011-07-20

Ship Via:
        UPS

*Exhibit 10 - Page 5 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send updated software for the
Acres 4.0 A4 system.

Manufacturer:
        Acres 4.0, Inc
        6515 S. Teneya Way Suite #110
        Las Vegas, NV  89118

Distributor:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Software:
        A4 V01.03d
        2 CDROMS (identical – one is sent as a backup)

Ship From:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Ship To:
        Blue Lake Tribal Gaming Commission
        428 Chartin Road
        Blue Lake, CA  95525
        ATTN: Compliance Department

Ship Date:
        2011-08-22

Ship Via:
        FedEx

*Exhibit 10 - Page 6 of 12*

Blue Lake Tribal Gaming Commission
428 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send updated software for the
Acres 4.0 A4 system.

Manufacturer:
        Acres 4.0, Inc
        6515 S. Teneya Way Suite #110
        Las Vegas, NV  89118

Distributor:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Software:
        A4 Cashier V01.03a 5912 Acres.ipa
        2 CDROMS (identical – one is sent as a backup)

Ship From:
        Acres Bonusing, Inc
        1106 2nd #104
        Encinitas, CA 92024

Ship To:
        Blue Lake Tribal Gaming Commission
        428 Chartin Road
        Blue Lake, CA  95525
        ATTN: Compliance Department

Ship Date:
        2011-09-02

Ship Via:
        FedEx

*Exhibit 10 - Page 7 of 12*

Blue Lake Tribal Gaming Commission
428 and 1/2 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send you a back-up A4 Platform
for your own testing purposes as well as an updated license file to authorize you to operate your live
A4 Platform with 88 licenses.

Manufacturer:
     Acres 4.0, Inc
     6515 S. Teneya Way Suite #110
     Las Vegas, NV  89118

Distributor:
     Acres Bonusing, Inc
     1106 2nd #104
     Encinitas, CA 92024

Software:
     TRIAD_BOOT v1.02a on an SPI Flash Chip
     All server software preinstalled
     License file to enable 88 games on CD

Ship From:
     Acres 4.0, Inc
     6515 S. Teneya Way Suite #110
     Las Vegas, NV  89118

Ship To:
     Blue Lake Tribal Gaming Commission
     428 and 1/2 Chartin Road
     Blue Lake, CA  95525
     ATTN: Compliance Department

Ship Date:
     2011-09-20

Ship Via:
     UPS

*Exhibit 10 - Page 8 of 12*

Blue Lake Tribal Gaming Commission
428 and 1/2 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send you new software and
hardware to upgrade your A4 Gaming Platform.

Manufacturer:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Distributor:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Software:
1 Triad Board
2 5 Plug Power Supplies
6 B104b 7444 boot proms
1 DVD:
    -A4 1.05a Directory
    -1.05a mysql scripts and model file
    -v105a 8325 Cashier
    -v105a 8325 iSlot HD
    -Casino Specific License file

Ship From:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Ship To:
    Blue Lake Tribal Gaming Commission
    428 and 1/2 Chartin Road
    Blue Lake, CA  95525
    ATTN: Compliance Department

Ship Date:
    2012-02-02

Ship Via:
    UPS or FedEx

*Exhibit 10 - Page 9 of 12*

Blue Lake Tribal Gaming Commission
428 and 1/2 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send you materials for an upgrade for your A4 Gaming Platform.

Manufacturer:
      Acres 4.0, Inc
      6515 S. Teneya Way Suite #110
      Las Vegas, NV  89118

Distributor:
      Acres Bonusing, Inc
      1106 2nd #104
      Encinitas, CA 92024

Software:
Two CDs containing v1.05a iOS software

Ship From:
      Acres 4.0, Inc
      6515 S. Teneya Way Suite #110
      Las Vegas, NV  89118

Ship To:
      Blue Lake Tribal Gaming Commission
      428 and 1/2 Chartin Road
      Blue Lake, CA  95525
      ATTN: Compliance Department

Ship Date:
      2012-02-27

Ship Via:
      UPS or FedEx

*Exhibit 10 - Page 10 of 12*

Blue Lake Tribal Gaming Commission
428 and 1/2 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send you materials for an update for your A4 Gaming Platform.

Manufacturer:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Distributor:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Software:
Two CDs containing v1.05 iOS software

Ship From:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Ship To:
    Blue Lake Tribal Gaming Commission
    428 and 1/2 Chartin Road
    Blue Lake, CA  95525
    ATTN: Compliance Department

Ship Date:
    2012-07-25

Ship Via:
    UPS or FedEx

*Exhibit 10 - Page 11 of 12*

Blue Lake Tribal Gaming Commission
428 and 1/2 Chartin Road
Blue Lake, CA  95525
ATTN: Compliance Department

Re: Shipment lading, A4 System
To Whom It May Concern

Please consider this as a shipment lading notifying you of our intent to send you materials for an update for your A4 Gaming Platform.

Manufacturer:
    Acres 4.0, Inc
    6515 S. Teneya Way Suite #110
    Las Vegas, NV  89118

Distributor:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Software:
Two CDs containing v1.05d software

Ship From:
    Acres Bonusing, Inc
    1106 2nd #104
    Encinitas, CA 92024

Ship To:
    Blue Lake Tribal Gaming Commission
    428 and 1/2 Chartin Road
    Blue Lake, CA  95525
    ATTN: Compliance Department

Ship Date:
    2012-09-11

Ship Via:
    UPS or FedEx

*Exhibit 10 - Page 12 of 12*

# Exhibit 11

*Blue Lake Tribal Court Procedural Rules*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/
BLR_Tribal_Court_Rules_of_Pleading_Practice_and_Procedure.pdf

as retrieved on January 19, 2016.

There are 24 pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 11 - Title Page*



# RULES OF PLEADING, PRACTICE AND PROCEDURE
## FOR THE BLUE LAKE RANCHERIA TRIBAL COURT

Section 11.1.1.030 of the Tribal Court Ordinance of the Blue Lake Rancheria authorizes the Chief Judge, of the Tribal Court of the Blue Lake Rancheria ("Tribe"), in consultation with the Business Council of the Tribe ("Tribal Council"), to "promulgate rules of pleading, practice and procedure applicable to any and all proceedings of the Tribal Court." The following rules are adopted to govern civil proceedings initiated in the Tribal Court of the Tribe.

These rules shall govern all proceedings or actions filed in the Tribal Court of the Tribe, except to the extent these rules are inconsistent with any rules promulgated by Chief Judge of the Tribe to govern special proceedings before the Tribal Court, including but not limited to juvenile proceedings, family law matters, the issuance of restraining orders to enjoin domestic violence and/or civil harassment and small claims proceedings.

**CHAPTERS:**

01    Court and Clerk
02    Commencement of Action; Service of Process; Pleadings; Motions and Orders
03    Temporary Restraining Orders and Preliminary Injunctions
04    Depositions and Discovery
05    Pretrial and Trials
06    Jurors and Juries

### Chapter 1

### Court and Clerk

**Rule:**

01    Name of Court
02    Citation of Rules and Cases
03    Court Hours
04    Judicial Power
05    Assignment of Cases
06    Trials and Hearings
07    Clerk's Office
08    Fee Schedule
09    Scheduling Courtrooms
10    Case Management
11    Books and Records Kept by the Clerk
12    Form, Size and Duplication of all Papers

**Rule 1. Name of Court.** The name of the Court for bringing all civil actions arising under the Constitution, laws or ordinances of the Tribe or brought by or against any members of the Tribe shall be the Tribal Court of the Tribe ("Court").

**Rule 2. Citation of Rules and Cases.** These rules shall be cited as the "Civil Rules of Procedure for the Tribal

*Exhibit 11 - Page 1 of 24*

Court of the Tribe ("Tribal Court"). Decisions of the Court which have been certified for publication by the Chief Judge of the Court may be cited as statements of substantive law applicable to all subsequent civil actions brought in the Court.

**Rule 3.  Court Hours.**  The Court shall always be open for the purpose of filing any pleading or other proper paper.  The office of the Clerk of the Court shall be open on such days and at such times as shall be established by the Chief Judge of the Court by Court order.  A night box shall be established by the Office of the Clerk for the receiving of all filings on those days and at those times when the Clerk's office is closed.  The night box shall be established at the Tribal Courthouse dedicated by the Tribal Council for that purpose.  Papers filed in the night box shall be considered filed on the next business day of the Court. Counsel may telephone the Clerk's office by 9:30 a.m. of the next business to verify the receipt of any pleadings filed in the night box of the office of the Clerk.

**Rule 4.  Judicial Power.**  The judicial power of the Court with respect to any civil action shall be exercised by the Chief Judge and such Associate Judges as the Chief Judge may appoint to hear cases before the Court.  The Chief Judge or Associate Judge may preside alone and hold a regular or special session of the court, as the Chief Judge or Assigned Judge, in consultation with the Clerk of the Court ("Clerk"), shall from time to time set.   In all cases not provided for by rule, the Chief Judge or any Assigned Judge may regulate the applicable practice before the Court in any manner not inconsistent with these rules.

**Rule 5.  Assignment of Cases.**  (A) After the complaint has been filed, the Clerk shall assign the case to the Chief Judge, who shall determine whether the case shall be assigned to an Associate Judge, except that related cases shall be assigned to the judge who has been assigned the earlier filed case.  (B) At the time an action is filed, the party or attorney filing the action shall file with the Court and serve on all parties to the action a "Notice of Related Cases".  The Notice shall state whether any pending action and the action being filed: (1) arise from the same or substantially identical transactions, happenings or events; (2) call for a determination of the same or substantially identical questions or (3) for some other reason involves substantial duplication of labor if heard by a different judge.

**Rule 6.  Trials and Hearings.**  Except as provided elsewhere in these rules, or such other rules promulgated by the Chief Judge governing special proceedings, all trials and hearings shall be conducted in open court.  All other acts or proceedings may be done or conducted by a judge in chambers.

**Rule 7.  Clerks Office.**  All papers presented for filing with the Court, shall be filed with the Clerk.  The Clerk shall file all papers presented for filing upon payment of the appropriate fee, if any.  All pleadings presented for filing with the Court that do not conform to these rules shall be returned by the Clerk to the party requesting the filing, bringing the non-compliance to his/her attention.  All files of the Court shall remain in the custody of the Clerk.  The Clerk shall, upon the payment of all appropriate fees, provide endorsed or certified copies of all pleadings filed with the Court to any party requesting the same.

**Rule 8.  Fee Schedule.**  Fees for services rendered by the Clerk of the Court are payable in advance; all checks are to be made payable to the "Clerk of the Tribal Court of the Tribe".  Fees shall be established by resolution of the Tribal Council for the Tribe for all services provided by the Court including but not limited to the following: (1) Admission to practice and issuance of a certificate thereof; (2) Certificate of Good Standing; (3) Filing of Complaint; (4) Filing of Answer; (5) Certifying any document or paper; (6) Reproducing any record, entry or other paper; (7) Filing a Notice of Appeal and (8) Such other fees authorized by the Court.

**Rule 9.  Scheduling Courtrooms.**  The Clerk shall be responsible for scheduling the use of courtrooms and shall be responsible for all arrangements for courtrooms and other facilities for the Court's business.

*Exhibit 11 - Page 2 of 24*

**Rule 10. Case Management.**

(a)       Case management shall be the responsibility of the Chief Judge or the judge to whom the case is assigned, with the assistance of the Clerk, where appropriate.   The Chief Judge or assigned judge shall manage assigned cases so as to provide for the prompt dispatch of business.   The judge may determine motions and cases on the merits without oral argument upon written statements of reasons in support and opposition.   In the absence of the judge to whom a case is assigned, a delegate of the assigned judge, selected by the Clerk and approved by the Chief Judge, may act on behalf of the assigned judge.

(b)       Scheduling.

(1)       All conferences, oral argument, trials, and other appearances shall be scheduled by the Chief Judge or assigned judge by order filed with the clerk.   In an emergency, the Chief judge may schedule conferences with counsel for the parties by such informal directions as may be appropriate.

(2)       Each judge may establish regular times and places at intervals sufficiently frequent for the prompt dispatch of business, at which motions requiring notice and hearing may be heard and disposed of; but each judge at any time or place and on such notice, if any, as any judge considers reasonable may make orders for the advancement, conduct, and hearing of actions.

**Rule 11. Books and Records Kept By the Clerk.**   The Clerk shall keep a book known as a "docket" in such form and style as the Clerk shall determine and shall enter therein each action to which these rules are made applicable.   Actions shall be assigned consecutive file numbers.   The file number of each action shall be noted on the folio of the docket whereon the first entry of the action is made.   All papers filed with the Clerk, all process issued and returns made thereon, all appearances, orders, and judgments shall be entered chronologically in the docket on the folio assigned to the action and shall be marked with its file number.   The entries shall be brief but shall show the nature of each paper or writ issued and the substance of each order or judgment of the court and of the returns showing execution for process.   The entry of an order or judgment shall show the date the entry is made.   The Clerk shall also keep, in such form and manner as the Clerk shall determine, a correct copy of every order, and judgment, whether appealable or not, issued or entered by the Court.   The Clerk shall also keep such other books and records as may be required from time to time by the court or as the Clerk shall in its own discretion determine is necessary for the orderly operation of the Court.   The Clerk, as authorized by the Chief Judge and upon the payment of the appropriate fees therefore , will arrange for reporting services for all trial proceedings, and any other proceedings that require a verbatim transcript, held by the Court.   The parties may obtain copies of the transcript from the reporter at prices fixed by the Court in conformity with any contract between the reporter and the Court.

**Rule 12. Form, Size and Duplication of All Papers.**

(a)       General.   All papers to be filed with the clerk shall be duplicated and filed in conformity with these rules as to methods of duplication, form, size, and number of copies.   The clerk shall refuse to file any paper which is not in substantial conformity with this rule or not in clear type.

(b)       Duplication.   All requirements of duplication may be satisfied by the use of any photocopy method capable of producing a clear black image on white paper, but not including ordinary carbon copy, provided, that in each instance the duplication shall conform to the requirements of subdivision (c) of this rule as to paper, size, form, and pagination.

*Exhibit 11 - Page 3 of 24*

(c)      Form and Size.  All papers pursuant to the provisions of this rule shall be duplicated on pages not exceeding 8 2 by 11 inches, with type matter not exceeding 6 2 by 8 2 inches.  Papers duplicated shall be double spaced (except that quoted and indented material and footnotes may be single spaced), and, if covering both sides of the sheet, shall be duplicated on paper of sufficient quality that the duplication process does not bleed through the sheet; shall be bound or attached on the left margin and unfolded, in book form; and shall have legible margins when bound or attached.  Such pages need not be justified on the right margin.   The first page of each separate document shall be numbered 1.  Page numbers shall be in large, distinct type and shall appear in the bottom center margin of the page.

(d)      Caption and Title.   The first page of each separate document shall contain: (1) the title of the Court, (2) the title of the action or proceeding, (3) the file number of the action or proceeding followed by the initials of the judge to whom it is currently assigned and (4) the title of the document (e.g.  "Complaint", "Defendants Motion for Summary Judgment", etc.).

(e)      Date.  Each paper shall bear the date it is signed on the signature page.

(f)      Paragraphs; Separate Statements.  All allegations of a claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings.  Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

(g)      Adoption by Reference; Exhibits.  Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes unless otherwise indicated, but the adverse party shall not be deemed to have admitted the truth of the allegations in such exhibit merely because he/she has filed to deny them explicitly.

(h)      Address and Telephone Number.  The address and telephone number of the attorney of record or if the party is not represented by an attorney, then the address and telephone number or the person signing the pleading must appear beneath the signature line of every pleading or other paper.

(i)      Copies.  An original and two (2) copies of all pleadings shall be filed with the Clerk.  All copies shall be identical, or otherwise conformed to the original.

## Chapter 2

### Commencement of Action; Service of Process, Pleadings, Motions And Orders

Rule:

| | |
|---|---|
| 13 | Commencement of Action |
| 14 | Process |
| 15 | Answer |
| 16 | Counterclaims |
| 17 | Amendment to Pleadings |
| 18 | Motion Practice |

*Exhibit 11 - Page 4 of 24*

**Rule 13.  Commencement of Action.**  A civil action in the Court shall be commenced by filing a complaint with the Clerk of the Court.   The complaint or any other pleading which sets forth a claim for relief, whether an original complaint, counterclaim or third-party complaint, shall contain a short and plain statement of the claim supported by sufficient facts showing that the pleader is entitled to relief, and a demand for judgment in which the pleader states the relief he/she wants from the Court.

**Rule 14.  Process.**

(a)     Summons Issuance.  Upon the filing of the complaint the clerk shall forthwith issue a summons and mail the summons to the plaintiff or its attorney, who shall be responsible for prompt service of the summons and complaint upon each defendant.

(b)     Form of Summons.   The summons shall contain the name of the Court, the names of the parties, and shall be signed by the Clerk.   The summons shall direct the defendant or defendants to answer the complaint within the time provided for in these rules and shall notify the defendant(s) that if the defendant(s) fails to answer the complaint, judgment by default will be entered by the Court against the defendant(s) for the relief demanded in the complaint.

(c)     Service.  The summons and complaint shall be served by any person 18 years of age or older and not a party to the suit.  The summons and complaint shall be served together.  Service shall be made by delivering a copy of the summons and complaint to the defendant personally or by leaving copies thereof at the individual's dwelling house or usual place of residency with a person 18 years of age or older residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.  If service must be made off of tribal trust land, and service cannot be accomplished as provided for herein, service shall be made in accordance with the laws of the State in which the defendant to be served resides.

(d)     Proof of Service.  Whenever any pleading or other paper presented for filing is required or permitted by any rule to be served upon any party or person, it shall bear or have attached to it either an acknowledgment of service by the person served, or proof of service and the names of the persons served, certified by the person who made service.   The proof of service shall also contain the day and manner of service, and the method of service employed.   Failure to comply with this rule shall not be a ground for a refusal to file a paper or pleading but shall be cured promptly after filing.   Every pleading subsequent to the original complaint and answer, unless the court orders otherwise, shall be served by first class mail upon each party by mailing it to the attorney of record or party at the attorney's or party's last known address.

(e)     Computation of Time.  In computing any period of time prescribed or  allowed by these rules, by order of court, or by any applicable statute, the day of the  act, event, or default from which the designated period of time  begins to run shall not be included.  The last day of the period so  computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper  in court, a day on which weather or other conditions have made the  office of the clerk of the court inaccessible, in which  event the period runs until the end of the next day which is  not  one of the aforementioned days. When the period of time prescribed  or allowed is less than 11 days, intermediate Saturdays, Sundays,  and legal holidays shall be excluded in the computation. As used  in this rule, "legal holiday" includes New Year's Day, President's Day, Martin Luther King's Birthday, Memorial Day, July 4, Labor Day, Veteran's Day, California Indian Day, American Indian Day, Thanksgiving Day, the Day after Thanksgiving, Christmas Day and any other day appointed as a holiday by the Tribal Council.

*Exhibit 11 - Page 5 of 24*

an act is required or allowed to be done at or within a specified time, the court, for cause shown, may, at any time, in its discretion: (1) with or without motion or notice, order the period enlarged, if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order; or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect; but it may not extend the time for taking any action under Rules 38(b) and 49, except to the extent and under the conditions stated in them.

   (2) **For Motions - Affidavits.** A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than 5 days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court. Such an order may for cause shown be made on ex parte application. When a motion is supported by affidavit, the affidavit shall be served with the motion; and opposing affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time.

   (3) **Additional Time After Service by Mail.** Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period.

**Rule 15. Answer.** Any party served with a complaint, cross-claim or counterclaim shall have the right within thirty (30) days from the date of service of the complaint or other pleading to file a written answer thereto. The answer shall admit or deny the allegations or facts set forth in the complaint or other pleading and shall state in short plain terms the party's defenses to each claim asserted. If a party is without knowledge or information sufficient to form a belief as to the truth of an allegation, the party shall so state and this has the effect of a denial. When a party intends in good faith to deny only a part of an allegation, the party shall specify so much of the allegation as is true and material and shall only deny the remainder. All allegations in a pleading which are not denied in the answer or other responsive pleading within the time provided in these rules shall be deemed admitted and true by the court in all subsequent proceedings in the case.

**Rule 16. Counterclaim.** At the time of serving the answer, the defendant shall state as a counterclaim any claim that the defendant has against any plaintiff, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its determination the presence of third parties over whom the court cannot acquire jurisdiction. A claim which either arose or was acquired by the defendant after serving its pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading. After service of an answer containing a counterclaim, plaintiff shall have 20 days within which to file a reply or answer to the counterclaim.

**Rule 17. Amendment to Pleadings.** A party may without leave of court amend its pleadings once as a matter of course at any time prior to a response being served. Otherwise a party may amend his/her pleading only by leave of court or by written consent of the adverse party. Whenever the claim or defense asserted in the amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

**Rule 18. Motion Practice.**

*Exhibit 11 - Page 6 of 24*

(a)     To Whom Made.   An application to the Court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds thereof, shall set forth the relief or order sought.   All motions will be determined by the Chief Judge or the judge to whom the action or case is assigned, except as may be otherwise ordered by the judge.   A motion may be determined, in the judge's discretion, or upon request by counsel and with the judge's approval, without oral argument, or by conference telephone call.   In the event of an emergency requiring prompt action, if the Chief Judge is unavailable, the motion may be heard by another judge assigned to hear the motion by the Clerk from a list of Associate Judges approved by the Chief Judge for that purpose.

(b)     <u>Notice and Supporting Papers.</u>   Except as otherwise ordered by a judge, all motions, except those made in the course of a trial or hearing, shall be noticed in writing on the motion calendar of the assigned judge for hearing not less than 28 days after service.   The noticed hearing date and time shall appear on the cover page of each motion, and of any opposition and reply, in the space opposite the caption below the file number.   Each notice of motion shall be accompanied by affidavits or declarations under penalty of perjury sufficient to support any material factual contentions, by an appropriate memorandum or brief and by a copy of a proposed form of order.   Affidavits, declarations, and forms of orders shall not be physically attached to the notice, brief, or memorandum and shall be separately captioned.

(c)     <u>Opposition And Reply.</u>   Any opposition to the motion shall be served and filed not less than 14 days prior to the noticed date of the hearing, and shall consist of affidavits or declarations where appropriate, a memorandum or brief, and a copy of a proposed form of order, separately captioned and not physically attached.   A party not opposing a motion shall instead file a statement of no opposition within the time provided herein.   Any reply to the opposition shall be served and filed by the moving party not less than 7 days prior to the noticed date of hearing.

(d)     <u>Briefs and Memorandum.</u>   Briefs and memorandum shall contain an accurate statement of the questions to be decided, set forth concisely the relevant facts and the argument of the party with citation to relevant legal authorities, and not exceed 25 pages in length.   Any brief or memorandum exceeding 10 pages shall have a table of contents, legal authorities cited and a brief statement of the issues to be decided.

(e)     <u>Affidavits and Declarations.</u>   Factual contentions in support of or in opposition to any motion shall be supported by affidavits or declarations and appropriate references to the record.   Affidavits and declarations shall contain only facts.   Affidavits and declarations not in compliance with these rules shall be subject to being stricken in whole or in part.

**Chapter 3**

**Temporary Restraining Orders and
Preliminary Injunctions**

Rule:

19     Procedure
20     Temporary Restraining Orders and Preliminary Injunctions
21     Security

<u>**Rule 19. Procedure.**</u>   An application for a temporary restraining order and/or preliminary injunction shall be filed

*Exhibit 11 - Page 7 of 24*

with the clerk along with the complaint, unless the complaint has been filed previously. The application shall be accompanied by the proposed order, affidavits, supporting memoranda, and other documents upon which plaintiff intends to reply.

**Rule 20. Temporary Restraining Orders and Preliminary Injunctions.**  A temporary restraining order may be granted without written or oral notice to the adverse party or his/her attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his/her attorney can be heard in opposition, and (2) the applicant or his/her attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his/her claim that notice should not be required.  Every temporary restraining order granted without notice shall be endorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered or recorded; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 15 days, as the court fixes unless within the time so fixed, the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.  The reasons for the extension shall be entered in the record.  In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence over all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if he/she does so, the court shall dissolve the temporary restraining order.  On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

No temporary restraining order will be issued except in conjunction with an order to show cause fixing the time for hearing on an application for a preliminary injunction.  Orders under this Rule shall fix the time within which the restraining order and all supporting pleadings and papers shall be served upon the adverse party and the time for serving and filing by the adverse party of any opposing papers.  Unless relieved by order of a judge for good cause shown, counsel applying for a temporary restraining order shall give reasonable advance notice of such application to opposing counsel or party.

All rules pertaining to the filing of motions unless otherwise inconsistent with this Rule 20, shall apply to the filing of motions for temporary restraining orders and preliminary injunctions.

**Rule 21. Security.**  No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

### Chapter 4

### Depositions And Discovery

Rule:

| 22 | Methods of Discovery |
| 23 | Incorporation of the Federal Rules of Civil Procedure Pertaining to Discovery |
| 24 | Interrogatories |
| 25 | Requests for Production |

*Exhibit 11 - Page 8 of 24*

**Rule 22. Methods of Discovery.** Parties shall have the right to engage in discovery for the purpose of preparing for a hearing or trial. The methods of discovery available to a party shall be depositions upon oral examination or written questions; written interrogatories; requests for the production of documents or things; requests for admission; permission to enter upon land or other property for inspection and physical and mental examinations.

**Rule 23. Incorporation of the Federal Rules of Civil Procedure Pertaining to Discovery.** Unless otherwise limited by order of the Court or these Rules, the Federal Rules of Civil Procedure, Rules 26 through 37 shall apply and govern all discovery conducted or undertaken by any party in any action, proceeding or case before the Court. If there are any inconsistencies between these Rules and the Federal Rules of Civil Procedure, these Rules shall govern.

**Rule 24. Interrogatories.** Answers and objections to interrogatories shall set forth each question in full before each answer or objection. Each objection shall be followed by a statement of reasons therefor. When objection is made to part of an interrogatory, the remainder of the interrogatory shall be answered at the time the objection is made, or within the period of any extension of time to answer, whichever is later.

**Rule 25. Requests for Production.** Responses to requests made pursuant to Rule 34(a) of the Federal Rules of Civil Procedure, shall set forth each request in full before each response or objection. Each objection shall be followed by a statement of the reasons therefor.

**Rule 26. Requests for Admission.** Responses to requests for admission made pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, shall set forth each request in full before each response or objection. Each objection shall be followed by a statement of the reasons therefor.

## Rule 27. Sanctions for Failure to Comply with Discovery.

(a)    _Conference Required._ The court will entertain no motion pursuant to Rules 26 through 37 of the Federal Rules of Civil Procedure, unless counsel shall have previously conferred concerning all disputed issues. If counsel for the moving party seeks to arrange such a conference and counsel for the party against whom the motion will be made willfully refuses or fails to confer, the judge (in the absence of a prior order dispensing for good cause with such a conference) may order the payment of reasonable expenses, including attorney's fees, pursuant to Rule 37(a)(4) of the Federal Rules of Civil Procedure.

(b)    _Certificate of Compliance._ At the time of filing any motion with respect to Rules 26 through 37 of the Federal Rules of Civil Procedure, counsel for the moving party shall serve and file a certificate of compliance with this Rule.

(c)    _Protective Order._ Any party against whom a motion under Rule 37(a) of the Federal Rules of Civil Procedure, is being made may notice for hearing at the same time a motion for protective order under Rule 26(c)of the Federal Rules of Civil Procedure.

(d)    _Discovery Disputes._ Any party or their attorney of record may request the Clerk of the Court to arrange a time and day when the parties can confer with the assigned Judge in chambers or by telephone conference to respond to any discovery disputes in an expeditious and economical manner.

_Exhibit 11 - Page 9 of 24_

Chapter 5

Pretrial And Trials

Rule:

28   Pretrial Conferences
29   Assignment of Cases for Trial
30   Dismissal of Actions
31   Separate Trials
32   Taking of Testimony
34   Subpoenas
35   Default Judgment
36   Summary Judgment
37   Entry of Judgment
38   New Trials

## Rule 28.  Pretrial Conference.

(a)   Conferences.  In any action, the court in its discretion by appropriate order may direct the attorneys for the parties and any unrepresented parties to confer and/or exchange:

(i)   lists containing the names and addresses of all witnesses they respectively expect to call at trial.

(ii)   lists of the documentary exhibits which they respectively intend to offer at trial.

(iii) written statements of material matters of fact as to which they respectively believe there is no substantial controversy.

(iv)   written statements of issues of fact and law they respectively believe are in dispute, and

(v)   such other matters as may be directed by the court.

(b)   Purposes of Conferences.  In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference, or conferences, before trial or to arrange a telephone conference, or conferences for such purposes as:

(i)   expediting the disposition of the action;

(ii)   establishing early and continuing control so that the case will not be protracted because of lack of management;

(iii) discouraging wasteful pretrial activities;

(iv)   improving the quality of the trial through more thorough preparation;

(v)   facilitating the settlement of the case; and

*Exhibit 11 - Page 10 of 24*

(vi)    such other matters as may aid in the disposition of the action.

Case 1:16-cv-02622-WJG    Document 1    Filed 03/09/16    Page 109 of 271

(c)    <u>Scheduling and Planning.</u>   After the initial status report or conference, the court shall enter a scheduling order that limits the time:

(1) to join other parties and to amend the pleadings;

(2) to file and hear motions; and

(3) to complete discovery.

The scheduling order also may include:

(4) the date or dates for conferences before trial, a final pretrial conference, and trial; and

(5) any other matters appropriate in the circumstances of the case.

(d)    <u>Subjects to be Discussed at Pretrial Conferences.</u>   The participants at any conference under this rule may consider and take action with respect to:

(1)    the formulation and simplification of the issues, including the elimination of frivolous claims or defenses;

(2)    the necessity or desirability of amendments to the pleadings;

(3)    the possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof, stipulations regarding the authenticity of documents, and advance rulings from the court on the admissibility of evidence;

(4)    the avoidance of unnecessary proof and of cumulative evidence;

(5)    the identification of witnesses and documents, the need and schedule for filing and exchanging pretrial briefs, and the date or dates for further conferences and for trial;

(6)    the advisability of referring matters to a master;

(7)    the possibility of settlement or the use of extra judicial procedures to resolve the dispute;

(8)    the form and substance of the pretrial order;

(9)    the disposition of pending motions;

(10)    the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems; and

(11)    such other matters as may aid in the disposition of the action.

*Exhibit 11 - Page 11 of 24*

At least one of the attorneys for each party participating in any conference before trial shall have authority to enter into stipulations and to make admissions regarding all matters that the participants may reasonably anticipate may be discussed.

     (e)    Final Pretrial Conference.  Any final pretrial conference shall be held as close to the time of trial as reasonable under the circumstances.  The participants at any such conference shall formulate a plan for trial, including the program for facilitating the admission of evidence.  The conference shall be attended by at least one of the attorneys who will conduct the trial for each of the parties and by any unrepresented parties.

     (f)    Pretrial Orders.  After any conference held pursuant to this rule, an order shall be entered reciting the action taken, except that after the final pretrial conference the court may recite the contents of its order, other than scheduling matters, on the record.  The pretrial order shall control the subsequent course of the action unless modified by a subsequent order.  The order following a final pretrial conference shall be modified only to prevent manifest injustice.

     (g)    Sanctions.  If a party or party's attorney fails to obey a scheduling or pretrial order, or if no appearance is made on behalf of a party at a scheduling or pretrial conference, or if a party or party's attorney is substantially unprepared to participate in the conference, or if a party or party's attorney fails to participate in good faith, the court, upon motion or its own initiative, may make such orders with regard thereto as are just including the imposition of sanctions.

**Rule 29.  Assignment of Cases for Trial.**  Assignment of cases for trial is the responsibility of the Chief Judge or the judge to whom the case is assigned, and may be made (1) without request of the parties or (2) upon request of a party and notice to the other parties or (3) in such other manner as the court deems expedient.  All trials shall be scheduled by the judge by order filed with the clerk.

**Rule 30.  Dismissal of Actions.**

     (a)    Voluntary Dismissal: Effect Thereof.  (1) By Plaintiff; by Stipulation.  An action may be dismissed by the plaintiff without order of court (A) by filing a notice of dismissal at any time before service of the answer or a response, whichever first occurs, or (B) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in this court or in any court of the United States an action based on or including the same claim.  (2) By Order of court.  Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.

     (b)    Involuntary Dismissal: Effect Thereof.  For failure of the plaintiff to prosecute or to comply with these rules or any order of court, the court may dismiss on its own motion or defendant may move for dismissal of an action or any claim.  After the plaintiff has completed the presentation of his/her evidence, defendant, without waiving its right to offer evidence in the event the motions not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.  The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

**Rule 31.  Separate Trials.**  The court, in furtherance of convenience or to avoid prejudice, or when separate trials

*Exhibit 11 - Page 12 of 24*

will be conducted to expedite the trial of a case, may order a separate trial on any claim, counterclaim, or of any separate issue or of any number of claims, counterclaims, third-party claims or issues.

*Exhibit 11 - Page 13 of 24*

**Rule 32.  Taking of Testimony.**

(a)  <u>Form.</u>  In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provide by order of the Court.

(b)  <u>Affirmation in Lieu of Oath.</u>  Whenever under these rules an oath is required to be taken, a solemn affirmation may be accepted in lieu thereof.

(c)  <u>Evidence on Motions.</u>  When a motion is based on facts not appearing in the record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition.

(d)  <u>Interpreters.</u>  The court may appoint an interpreter of its own selection and may fix  his/her reasonable compensation.  The compensation shall be paid out of funds provided by law or by one or more of the parties as the court may direct and may be awarded ultimately as costs, in the discretion of the court.

**Rule 33.  Subpoenas.**

(a)  <u>For Attendance of Witnesses: Form; Issuance.</u>  Every subpoena shall be issued by the clerk under the seal of the court, and  shall state the name of the court and the title of the action, and shall command each person to whom it is directed to attend and give testimony at a time and place therein specified.   The clerk shall issue a subpoena, or a subpoena for the production of documentary evidence, signed and sealed but otherwise in blank, to a party requesting it, who shall fill it in before service.

(b)  <u>For Production of Documentary Evidence.</u>  A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designate therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.

(c)  <u>Service.</u>  A subpoena shall be served by any person who is not a party and is not less than 18 years of age.   Service of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person and by tendering to him/her the fees for one day's attendance and the mileage as established by the Tribal Council by resolution.

(d)  <u>Subpoena for Taking Depositions; Place of Examination.</u>

(1) Proof of service of a notice to take a deposition as provided in Rules 30(b) and 31(a) of the Federal Rules of Civil Procedure constitutes a sufficient authorization for the issuance by the clerk of subpoenas for the persons named or described therein.   Proof of service may be made by filing with the clerk a copy of the notice together with a statement of the date and manner of service and of the names of the persons served, certified by the person who made service.  The subpoena may command the person to whom it is directed to produce and permit inspection and copying of designated books, papers, documents, or tangible things which constitute or contain matters within the scope of the examination permitted by Rule 26(b) of the Federal Rules of Civil Procedure, but in that event the subpoena will be subject to the provisions of Rule 26(c) and subdivision (b) of that rule.

*Exhibit 11 - Page 14 of 24*

The person to whom the subpoena is directed may, within 10 days after the service thereof or on or before the time specified in the subpoena for compliance if such time is less than 10 days after service, serve upon the attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials except pursuant to an order of the court.  The party serving the subpoena may, if objection has been made, move upon notice to the deponent for an order at any time before or during the taking of the deposition.

(2)      A witness may be required to attend an examination only in the county wherein he/she resides or is employed or transacts his/her business in person or at such other convenient place as is fixed by an order of the court.

(e)      Subpoena for a Hearing or Trial.  (1) At the request of any party, subpoenas for attendance at a hearing or trial shall be issued by the clerk.  A subpoena requiring the attendance of a witness at a hearing or trial may be served at any place that is within 100 miles of the place of the hearing or trial specified in the subpoena or a place within the state where a state statute or rule of court permits service of a subpoena issued by a state court of general jurisdiction sitting in the place where the court is held; but the court upon proper application and good cause shown may authorize the service of a subpoena at any other place.

(f)      Contempt.  Failure by any person without adequate excuse to obey a subpoena served upon him/her may be deemed a contempt of the court.

## Rule 34.  Default Judgment.

(a)      Entry.  When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his/her default.

(b)      Judgment.  Judgment by default may be entered as follows:

(1) By the Clerk.  When the plaintiff's claims against a defendant is for a sum certain or for a sum which can by computation be made certain, the clerk upon request of the plaintiff and upon affidavit of the amount due shall enter judgment for that amount and costs against the defendant, if he/she has been defaulted for failure to appear and if he/she is not an infant or incompetent person.

(2)      By the Court.  In all other cases, the party entitled to a judgment by default shall apply to the court thereof; but no judgment by default shall be entered against an infant or incompetent person unless represented in the action by a general guardian, conservator, or other such representative who has appeared therein.  If the party against whom judgment by default is sought has appeared in the action,  he/she (or if appearing by representative, his/her representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing, if any, on such application.  If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any allegation by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper.

(c)      Setting Aside Default.  For good cause shown by any party the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with these rules.

*Exhibit 11 - Page 15 of 24*

**Rule 35. Summary Judgment.**

(a) <u>For Claimant.</u>   A party seeking to recover upon a claim or counterclaim, or to obtain a declaratory judgment may, at any time after the expiration of 45 days from the commencement of the action in this court or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for summary judgment in his/her favor upon all or any part thereof.

(b) <u>For Defending Party.</u>   A party against whom a claim or counterclaim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his/her favor to all or any part thereof.

(c) <u>Motion and Proceedings Thereon.</u>   The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) <u>Procedures.</u>   The following procedures shall be followed with respect to motions for summary judgment:

(1)   The moving (or cross-moving) party shall file, together with its motion, a separate document titled Proposed Findings of Uncontroverted Fact.   This document shall contain concise, separately numbered paragraphs setting forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute.   Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence (such as affidavits or exhibits) filed with the motion or otherwise part of the record in the case.

(2)   The opposing party shall file, together with its opposition (or cross-motion), a separate document titled Statement of Genuine Issues.   This document shall respond (by reference to specific paragraph numbers) to those Proposed Findings of Uncontroverted Fact as to which it claims there is a genuine dispute.   The party shall state the precise nature of its disagreement and give its version of the events, supported by record citations.   The opposing party may also file Proposed Findings of Uncontroverted Fact as to any relevant matters not covered by the moving party's statement.

(3)   The parties may dispense with the documents called for in subdivision (d)(1)-(2) of this rule if they file, no later than the time of the initial motion, a comprehensive stipulation of all of the material facts upon which they intend to rely.

In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are included in the Statement of Genuine Issues and are controverted by affidavit or other written or oral evidence.

(e) <u>Case Not Fully Adjudicated on Motion.</u>   If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.   It shall

*Exhibit 11 - Page 16 of 24*

thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

**Rule 36. Entry of Judgment.**  In every action or proceeding terminating in a judgment, there shall be filed, separate from any findings of fact, conclusions of law, memorandum, opinion or order, a judgment which shall state concisely the judgment of the court and shall be signed by the judge assigned to the case.   In all actions tried upon the facts, the court shall state the facts it finds to be true specially and separately and any conclusions of law it reached in deciding the case and rendering judgment thereon.   It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court.

**Rule 37. New Trial.**  A motion for a new trial or rehearing shall be filed not later than 10 days after the entry of judgment. The motion shall set forth the grounds or bases for granting the motion.   If the motion is granted, the court shall have the authority to take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.   Not later than 10 days after entry of judgment the court on its own may order a new trial or rehearing for any reason it determines is just.

## Chapter 6

### Jurors And Juries

Rule:

| | |
|---|---|
| 38 | Six-Person Juries |
| 39 | Examination of Jurors |
| 40 | Filing, Service and Form of Proposed Instructions |

**Rule 38. Six-Person Juries**.  In all civil actions in which a party has requested a jury trial, the jury shall consist of six members and such alternatives as the judge may determine.   All plaintiffs shall make their demand for a jury trial at the time of filing the complaint.   All defendants shall make their jury demand at the time of filing their answer.   Unless written demand has been made for a jury trial, the matter shall be tried before the Chief Judge or the judge assigned the case. Any party requesting a jury trial shall at the time of making such request deposit with the Clerk such fees as have been established by the Tribal Council by resolution.

**Rule 39. Examination of Jurors.**  The examination of trial jurors to determine bias or prejudice shall be conducted by the judge.   Each party shall be entitled to 6 automatic or peremptory challenges.

Except where the judge has directed prior to commencement of examination of trial jurors that a different procedure shall be followed, peremptory challenges to which each party may be entitled shall be exercised in the following manner: the first by plaintiff(s), the second by defendant(s), and continuing in alternating fashion until exhausted.

**Rule 40. Filing, Service and Form of Proposed Instructions.**  Unless otherwise ordered, each party shall serve, and file proposed jury instructions and forms of verdict.   The judge may, in his/her discretion, receive additional

*Exhibit 11 - Page 17 of 24*

requests for instructions at any time prior to the commencement of argument to the jury.   Each proposed instruction shall be written in plain language comprehensible to jurors, concise and free from argument, cover only one subject which shall be indicated in the caption, indicate the identity of the party submitting it, be written out in full on a separate page, be consecutively numbered, and set forth citations to the authorities supporting it.   The proposed form of verdict shall not indicate the identity of the submitting party.

The judge shall fix the time, place and procedure for making objections to the judge's charge to the jury. Objections shall be made outside the presence of the jury and shall be reported by the court reporter in the transcript or, in the absence of a transcript, by the clerk in the minutes of the trial.

## Rule 41.  Orders, Judgments, Findings of Fact And Conclusions of Law.

(a)   <u>Orders.</u>  All orders shall be prepared by the attorney directed to do so by the court.  Such orders shall be served and lodged with the Clerk within five (5) court days of the granting thereof.

(b)   <u>Findings of Fact And Conclusions of Law.</u>  In all cases where findings of fact and conclusions of law are required under these rules, the attorney directed to do so by the court shall within five (5) court days of the decision lodge proposed findings of fact which:

       (1)   Are in separately numbered paragraphs;

       (2)   Are in chronological order; and

       (3)   Do not make reference to allegations contained in pleadings.  Conclusions of law shall follow the findings of fact and:

           (i)   Shall be in separately numbered paragraphs, and

           (ii)   May include brief citations of appropriate authority.

(c)   <u>Judgment.</u>  The judgment shall be set forth on a separate document as  required by Rule 36.

(d)   <u>Service of Document.</u>  The attorney whose duty it is to prepare any document required by these rules shall serve a copy on opposing counsel on the same day that the document is lodged with the Court. Alternatively, the attorney preparing the document may present it  to opposing counsel for approval as to form before the document is lodged.

(e)   <u>Separate Objection.</u>  Opposing counsel may, within five (5) court days after service of a copy of a document prepared pursuant to these rules, file and serve objections to the form of the document and the grounds thereof. The failure to file timely objections shall be deemed a waiver of any defects in the form of the document.

(f)   <u>Endorsement of Counsel.</u>  Unless the Court otherwise directs, no  document governed by these rules will be signed by the judge unless either opposing counsel shall have endorsed thereon an approval as to form, or the time for objection has expired.  If it finds the ends of justice so requires, the Court may conduct a hearing on the proper form of the document, or it may sign the document as prepared or as modified.

*Exhibit 11 - Page 18 of 24*

the signatures of counsel, the order shall be set forth in one of the following ways:(a) If at least two lines of the text of the stipulation, and the signature lines of the attorneys, and the signature line for the judge, appear on the same page, then the words "IT IS SO ORDERED", with a space below those words for the date and the signature line for the judge may be used; or,(b) In any other instance, the "IT IS SO ORDERED" format shall not be used, and, instead, the pertinent elements of the order requested in the stipulation shall be set forth immediately above the judge's signature line and the date, and set at least two lines of the text of the order shall appear on the page that has the judge's signature line and the date.

(h)   Approval of Bonds, Undertakings and Stipulations of Security.   The Clerk is authorized to approve on behalf of the Court all bonds, undertakings and stipulations of security given in the form and amount prescribed by statute, order of court or stipulation of counsel, which comply with the requirements of these rules, except where the approval of a judge is specifically required by law.

(i)   Entry of Judgments and Orders.   The entry of judgments and orders by the Clerk through notation in the appropriate civil docket pursuant to Rule 36 shall be made at the earliest practicable time.

(j)   Entry of Judgments: Costs.   Entry of judgment shall not be delayed pending taxation of costs to be included therein.   A blank space shall be left in the form of judgment for insertion of costs by the Clerk after they have been taxed.

(k)   Entry of Judgments and Orders   Clerk's Orders and Judgments.   Orders and judgments signed by the Clerk pursuant to Rule 34(a)  shall be noted in the civil docket.   That notation shall constitute entry of the judgment or order as provided by Rule 36.

(l)   Entry of Judgments and Orders   Settlement of Orders or Judgments.   Entry of judgments or orders shall not be made by the Clerk until the Court has settled the form of judgment or order as provided in Rule 37(f).

(m)   Judgment by Clerk.   Judgments may be entered by the Clerk without further direction from the judge in the following  instances:(a) Judgments on the verdict of a jury as provided in Rule 36 unless the judge directs otherwise;(b) Judgments by default provided in Rule 34(b)(1), provided that no judgment shall be entered without a  declaration that any natural person against whom it is sought is not an infant, incompetent person, or exempted under the Soldiers' and Sailors' Civil Relief Act of 1940; and (c) Judgments or offers of judgment provided in Rule 45  The Clerk may require the party obtaining a judgment or order to prepare and present same.

(n)   Entry of Judgment: Memorandum of Decision, Opinion, Minute Order.   Notation in the civil docket of entry of a memorandum of decision, an opinion of the Court, or a minute order of the Clerk shall not constitute entry of judgment pursuant to Rule 36 unless specifically ordered by the judge.

(o)   Entry of Judgment: Settlement of Interest.   If interest is accruing or will accrue on any judgment, decree or order,  the party preparing the proposed form of judgment, decree or order shall indicate by memorandum attached thereto the applicable interest rate as computed under applicable tribal law or, if no tribal law exists, the rate computed pursuant to the provisions of 28 U.S.C.  Section 1961(a) or 26 U.S.C.  Section 6621 and the amount of interest to be added for each day the document remains unsigned.

(p)   Entry of Judgment: Award: Tax Cases.   In tribal tax cases involving overpayments or deficiencies, and in such other cases as it deems appropriate, the Court may withhold entry of judgment to permit the parties to submit, either separately of jointly by stipulation, the computation of the amount of money to be awarded in accordance with the Court's determination of the issues.

*Exhibit 11 - Page 19 of 24*

(q)  Judgment, Order, Decree While a Party. Duty of Clerk.  When a judgment, order or decree is entered by the Court directing any officer of the Tribe to perform any act, unless such officer is present in Court when the order is made, the Clerk shall forthwith transmit a copy of the judgment, order or decree to the officer ordered to perform the act.

(r)  Default Judgments.  When application is made to the Court for a default judgment, the application shall be accompanied by a declaration in compliance with Rule 34(b)(1) and/or (2) and include the following:(a) when and against what party the default was entered; and(b) the identification of the pleading to which default was entered; and(c) Whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator or other representative;  and (d) that the Soldiers' and Sailors' Civil Relief Act of 1940 (50 App. U.S.C. '520) does not apply; and(e) that notice has been served on the defaulting party, if required by Rule 34(b)(2).

(s)  Default Judgment: Unliquidated Damages.  If the amount claimed in a judgment by default is unliquidated, the applicant may submit evidence of the amount of damages by declarations.  Notice must be given to the defaulting party of the amount requested.  The party against whom judgment is sought may submit declarations in opposition.

(t)  Default Judgment: Other Proceedings.  Other proceedings necessary or appropriate to the entry of a judgment by default will be taken as provided in Rule 34(b)(2).

(u)  Signature Line for Signature of Judge.  At least two lines of the text of any order or judgment shall appear on the page that has the date and the line provided for the signature of the judge.

(v)  Default Judgment: Separate Document.  The proposed default judgment shall be submitted as a separate document in compliance with Rule 34.

## Rule 42.  Relief From Judgment or Order.

(a)  Clerical Mistakes.  Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.  During the pendency of an appeal, should a tribal appellate court be established by the Tribal Council, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

(b)  Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.  On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

(1)  mistake, inadvertence, surprise, or excusable neglect;

(2)  newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 49;

*Exhibit 11 - Page 20 of 24*

fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

        (4)      the judgment is void;

        (5)      the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

        (6)      any other reason justifying relief from the operation of the judgment.

        The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided under these rules, or to set aside a judgment for fraud upon the court.

**Rule 43. Harmless Error.** No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

**Rule 44. Inability of a Judge to Proceed.** If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

**Rule 45. Seizure of Person or Property.** At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the State of California, existing at the time the remedy is sought, subject to the following qualifications:

      (a)      any existing statute of the Tribe or the United States governs to the extent to which it is applicable;

      (b)      the action in which any of the foregoing remedies is used shall be commenced and prosecuted or, if removed from a state court, shall be prosecuted after removal, pursuant to these rules. The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.

**Rule 46. Injunctions.**

      (a)      <u>Preliminary Injunction.</u>

*Exhibit 11 - Page 21 of 24*

(4) Notice. No preliminary injunction shall be issued without notice to the adverse party.

(2)    Consolidation of Hearing With Trial on Merits. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.  Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial.   This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

(b)    Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if:

(1)    it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and

(2)    the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.  Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.  The reasons for the extension shall be entered of record.  In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order.  On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

(c)    Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.  No such security shall be required of the United States or of an officer or agency thereof.   The provisions of Rule 42 apply to a surety upon a bond or undertaking under this rule.

(d)    Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*Exhibit 11 - Page 22 of 24*

**Rule 46.  Security: Proceedings Against Sureties.**  Whenever these rules require or permit the giving of security by a party, and security is given in the form of a bond or stipulation or other undertaking with one or more sureties, each surety submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as the surety's agent upon whom any papers affecting the surety's liability on the bond or undertaking may be served.   The surety's liability may be enforced on motion without the necessity of an independent action.   The motion and such notice of the motion as the court prescribes may be served on the clerk of the court, who shall forthwith mail copies to the sureties if their addresses are known.

**Rule 47.  Receivers Appointed by the Court.**  An action wherein a receiver has been appointed shall not be dismissed except by order of the court.   The practice in the administration of estates by receivers or by other similar officers appointed by the court shall be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the Federal District Courts of the Ninth Circuit, unless the Tribal Council of the Tribe shall provide otherwise by the adoption of an appropriate Ordinance.   In all other respects the action in which the appointment of a receiver is sought or which is brought by or against a receiver is governed by these rules.

**Rule 48.  Deposit in Court.**  In an action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing, whether or not that party claims all or any part of the sum or thing.   The party making the deposit shall serve the order permitting deposit on the clerk of the court.   Money paid into court under this rule shall be deposited and withdrawn in accordance with the provisions of the Administrative Code of the Tribe governing the deposit and receipt of tribal funds.   The funds shall be deposited in an interest-bearing account approved by the court.

**Rule 49.  Offer of Judgment.**  At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued.   If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment.   An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs.   If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.   The fact that an offer is made but not accepted does not preclude a subsequent offer.   When the liability of one party to another has been determined by verdict or order or judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the commencement of hearings to determine the amount or extent of liability.

**Rule 50.  Execution.**  Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise.   The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the State of California, existing at the time the remedy is sought, except that any statute of the Tribe or the United States governs to the extent that it is applicable.   In aid of the judgment or execution, the judgment creditor or a successor in interest when that interest appears of record, may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the State of California.

*Exhibit 11 - Page 23 of 24*

**Rule 51.  Judgment for Specific Acts; Vesting Title.**  If a judgment directs a party to execute a conveyance of land or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party.  On application of the party entitled to performance, the clerk shall issue a writ of attachment or sequestration against the property of the disobedient party to compel obedience to the judgment.  The court may also in proper cases adjudge the party in contempt.  If real or personal property is within the jurisdiction of the court, the court in lieu of directing a conveyance thereof may enter a judgment divesting the title of any party and vesting it in others and such judgment has the effect of a conveyance executed in due form of law.  When any order or judgment is for the delivery of possession, the party in whose favor it is entered is entitled to a writ of execution or assistance upon application to the clerk.

## Rule 52.  Seizure of Persons and Property: Civil Cases.

(a)  Seizure:  Issuance of Writ.  All writs or other process issued for the seizure of persons or property pursuant to these rules shall be issued, attested, signed and sealed as required for writs issued out of this Court.

(b)  Writs or Other Process of Seizure, Civil Cases: Execution and Return.  Any writ or other process for seizure in a civil action shall only be directed to, executed and returned by any federal, state or tribal law enforcement officer authorized by applicable law or a private person specially appointed by the Court for that purpose.

(c)  Process Requiring Entry upon Premises.  An order of Court requiring entry upon private premises without notice shall be executed by any federal, state or tribal law enforcement officer, or a private person specially appointed by the Court for that purpose.  If process is to be executed by a private person, the private person shall be accompanied by any federal, state or tribal law enforcement officer, who shall be present upon the premises during the execution of the order.

(d)  Release of Seizure: Examination upon Seizure.  The examination of any person in a proceeding pursuant to these rules, or proceedings for the release or discharge of an attachment or other provisional remedy, shall be before a judge of this Court.

## Rule 53.  Filing of Faxed and Emailed Pleadings.  The Clerk of the Court shall accepted for filing documents, including those requiring signatures, that have been received by the Court by facsimile transmission or electronic mail.  Originals of any pleadings received by the Court by facsimile transmission or electronic mail shall be filed with the Court within seven (7) days of the filing of the faxed or emailed documents.  If the originals of the documents are not received by the Court with seven days, the documents shall be stricken from the Court record.

## ORDER

These Rules shall take effect and govern all proceedings or actions filed in the Tribal Court on or after June 20, 2002.

/s/ Lester J. Marston
Chief Judge of the Tribal Court

ATTESTED:

/s/ Elizabeth J. Jackson
Clerk of the Tribal Court

Mail: PO Box 428, Blue Lake, CA 95525    Tel: 1.707.668.5101    Fax: 1.707.668.4272    Email: courtclerk@bluelakerancheria-nsn.gov

*Exhibit 11 - Page 24 of 24*

# Exhibit 12

*First Special Appearance by James Acres*

This is a true and complete copy of

a SPECIAL APPEARANCE by James Acres in the Blue Lake Tribal Court

as made via email on January 22, 2016.

There are 24 pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 12 - Title Page*

From: **James Acres** james@kosumi.com
Subject: SPECIAL APPEARANCE by James Acres in C-15-1215LJM
Date: January 22, 2016 at Jan 22 17:27
To: dstouder@boutinjones.com, aoneill@boutinjones.com
Cc: courtclerk@bluelakerancheria-nsn.gov

Find attached a SPECIAL APPEARANCE by James Acres in Blue Lake Tribal Court Civil Case C-15-1215LJM.

James Acres is making a SPECIAL APPEARANCE without benefit of counsel due to the arbitrary five day deadline placed upon him in the summons.

James Acres is SPECIALLY APPEARING only to show that the Tribal Court lacks personal jurisdiction over him in this matter, and that the Tribal Court can not guarantee him his rights to due process in this matter.



SPECIAL APPEARANCE
BY JAMES ACRES.pdf

*Exhibit 12 - Page 1 of 24*

# SPECIAL APPEARANCE BY JAMES ACRES

# IN

# BLUE LAKE RANCHERIA TRIBAL COURT

# CASE NUMBER C-15-1215LJM

## TABLE OF CONTENTS

| | |
|---|---|
| *Table of Authorities* | Page i |
| *Motions for Dismissal and Injunction* | Page 1 |
| *Memorandum in Support of Motions* | Pages 2 - 21 |
| *Summary of Argument* | Pages 2 - 3 |
| *Tribal Court Lacks Personal Jurisdiction* | Page 2 |
| *Tribal Court Cannot Reliably Provide Due Process* | Page 3 |
| *Recitation of Facts* | Pages 3 – 7 |
| *Montana Rule and Personal Jurisdiction* | Pages 7 – 11 |
| *Overwhelming Risk of Biased Tribal Judges* | Pages 12 - 15 |
| *Impartial Jury Cannot be Guaranteed* | Pages 15 -16 |
| *Overwhelming Risk of Biased Rules of Court Procedure* | Page 16 |
| *Competent Legal Counsel Cannot be Guaranteed* | Page 17 – 18 |
| *Five-Day Summons Incompatible with Due Process* | Page 19 |
| *Tribal Court Cannot Reliably Adhere to its Court Procedure* | Page 19 |
| *Appearance of Intimacy Between Court and Plaintiff Counsel* | Page 20 |
| *Conclusion* | Page 21 |

*Exhibit 12 - Page 2 of 24*

# TABLE OF AUTHORITIES

## Cases

*Montana v United States,* 450 U.S. 544 (1981)
*Strate v A-1 Contractors,* 520 U.S. 438 (1997)
*Williams* v. *Lee,* 358 U.S. 217, 223 (1959)
*Caperton v Massey* 566 U.S. 868 (2009)
*Disabled Rights Action Comm. V. Las Vegas Events Inc.,* 375 F. 3d 861, 866 n.1 (9ᵗʰ
Cir. 2004)

## State of California

California Code of Civil Procedure 1732(c)
California Secretary of State (Business Search Website at kepler.sos.ca.gov)

## Blue Lake Rancheria

The Official Website of Blue Lake Rancheria (www.bluelakerancheria-nsn.gov)
Tribal Court Ordinance
Tribal Court Rules of Pleading and Procedure
Tribal Court Application for Admission to Practice Law
Tribal Court Oath of Admission
Blue Lake Rancheria Tribal Constitution

## The Summons, Complaint and its Exhibit A in Blue Lake Rancheria Tribal Court Case C-15-1215LJM (Compl.)

*Exhibit 12 - Page 3 of 24*

i

# JAMES ACRES'S MOTION FOR DISMISSAL WITH PREJUDICE AND MOTION FOR INJUNCTION AGAINST FURTHER ACTIONS AGAINST ACRES IN TRIBAL COURT

COMES NOW James Acres (Acres), a natural person maintaining his place of permanent residence in San Diego County, California, to make a SPECIAL APPEARANCE for the sole purposes of:

    i)    asserting that the Blue Lake Rancheria Tribal Court (Tribal Court) has no personal jurisdiction over Acres, and;

    ii)    asserting the impossibility that the Tribal Court can afford Acres his constitutional rights to due process and impartiality, and;

    iii)    making a Motion that the Tribal Court dismiss that action named in its Tribal Court Case Number C-15-1215LJM because of points i) and ii) above, and;

    iv)    making a Motion that the Tribal Court enjoin the Casino or any other entity of the Blue Lake Rancheria from bringing any other action similar to this action against Acres in this Tribal Court because of points i) and ii) above, and;

    v)    providing the attached "Memorandum of Points and Authorities in Support of Acres's Motions For Dismissal and Injunction."

*Exhibit 12 - Page 4 of 24*

1

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JAMES ACRES'S MOTIONS FOR DISMISSIAL AND INJUNCTION

**SUMMARY**

Acres argues that C-15-1215LJM should be dismissed both because the Tribal Court lacks personal jurisdiction over Acres in the matter, and because the Tribal Court cannot be relied upon to provide an impartial proceeding that respects Acres's rights to due process. Both the lack of personal jurisdiction and the unreliability of due process independently provide sufficient reason to necessitate the dismissal of Case Number C-15-1215LJM. Both the lack of personal jurisdiction and the unreliability of due process are in and of themselves permanent disabilities for any action in Tribal Court against Acres similar to the current one, and each ill independently provides sufficient reason to justify an injunction against future actions against Acres in Tribal Court.

*1. The Tribal Court Lacks Personal Jurisdiction Over Acres*

The *Montana* Rule as explicated in *Strate v A-1 Contractors*, 520 U.S. 438 (1997) makes clear that Tribes may assert jurisdiction over non-members and their property only in certain narrow circumstances. The allegations against Acres in Case Number C-15-1215LJM pertain to the conduct and property outside the boundaries of the Rancheria of a person who is neither a member of the Tribe nor alleged to have entered into a consensual relationship with the Tribe. The *Montana* rule does not allow the assertion of personal jurisdiction by a Tribal Court in such cases.

*Exhibit 12 - Page 5 of 24*

2

1

2        *2. The Tribal Court Cannot Be Relied Upon to Provide Acres Due Process*

3     Acres enjoys the right to due process.  The Tribal Court cannot be relied upon to

4     provide Acres due process.  The Tribe has only fifty-three members, and C-15-

5     1215LJM seeks to obtain a minimum of $249,250 from Acres.  Thus each Tribal

6     member has a powerful adverse interest to Acres.  Since the rules and officers of

7     the Tribal Court are determined by Tribal members, this creates a powerful

8     adverse interest against Acres within the Tribal Court itself, as well as making

9     the impaneling of an impartial jury by the Tribal Court impossible.  It is also not

10    clear that Acres can find an Attorney able to represent his interests who is

11    admitted to practice in the Tribal Court.  Finally, the Tribal Court has not been

12    able to insure that it can reliably follow its own Code of Procedure in demanding

13    that Acres respond to C-15-1215LJM within five days or face default judgment,

14    and the very imposition of a five day deadline for an initial response under

15    threat of default judgment is in and of itself incompatible with due process.

16

17    **RECITATION OF JUDICIALY NOTICABLE FACTS**[1]

18    1)   It is commonly acknowledged as fact that the Blue Lake Rancheria (Tribe)

19         is a federally recognized Indian tribe.

20    2)   The Tribe has fifty-three enrolled members.[2]

21    3)   The Tribe is governed by its General Council. [3]

---

[1] Facts on publicly accessible government websites are considered judicially noticeable.  *Disabled Rights Action Comm. V. Las Vegas Events Inc.*, 375 F. 3d 861, 866 n.1 (9ᵗʰ Cir. 2004)
[2] Blue Lake Rancheria, Facts, http://www.bluelakerancheria-nsn.gov/facts.html (last visited Jan 21, 2016)

*Exhibit 12 - Page 6 of 24*

3

1     *4)* The General Council is elected by the Tribe's enrolled members.[4]

2     *5)* The Blue Lake Casino & Hotel (Casino) is a business enterprise of the

3         Tribe.[5]

4     *6)* The Blue Lake Tribal Court (Tribal Court) is a governmental arm of the

5         Tribe.[6]

6     *7)* The Tribal Court is presided over by a Chief Judge.[7]

7     *8)* The Blue Lake Rancheria Business Council (Business Council) is an arm of

8         the Tribe.[8]

9     *9)* Members of the Business Council must be enrolled members of the Tribe

10        who are resident on the Tribe's Rancheria land.[9]

11    *10)* Members of the Business Council must be enrolled members of the Tribe

12        and are chosen by the General Council.[10]

13    *11)* The Business Council is responsible for hiring[11] and firing[12] the Chief

14        Judge and other Judges of the Tribal Court.

---

[3] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 21, 2016)

[4] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016)

[5] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[6] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 3 (last visited Jan 21 2016)

[7] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[8] Constitution of the Blue Lake Rancheria, Article VII Section 2, http://www.bluelakerancheria-nsn.gov/BLR_Constitution.pdf (last visited Jan 22 2016)

[9] Constitution of the Blue Lake Rancheria, Article V Section 4, http://www.bluelakerancheria-nsn.gov/BLR_Constitution.pdf (last visited Jan 22 2016)

[10] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016)

*Exhibit 12 - Page 7 of 24*

1     *12)* Due Process includes the right to an impartial decisionmaker.[13]

2     *13)* The Chief Judge developed the rules of procedure and for the governance

3          of the Tribal Court under the supervision of the Business Council.[14]

4     *14)* Arla Ramsey is a member of the Tribe,[15] the Vice-Chairperson of the

5          General Council, a Tribal Judge, and responsible for oversight of the

6          Business Council.[16]

7     *15)* Eric Ramos is a member of the Tribe[17] and "President of Business

8          Operations for the [Tribe], where he manages and develops the Tribe's

9          many diverse enterprises."[18]

10    *16)* Arla Ramsey is the mother of Eric Ramos.[19]

11    *17)* ABI is a Nevada corporation[20] that is qualified to do business in the state

12         of California and has its principal place of business in San Diego

13         County.[21]

---

[11] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[12] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 9 (last visited Jan 21 2016)

[13] California Code of Civil Procedure 1732(c)

[14] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[15] This is a fact of common knowledge.

[16] Blue Lake Rancheria, Business Operations: Executive Team, http://www.bluelakerancheria-nsn.gov/boExeTeam.html#arla (last visited Jan 21 2016)

[17] This is a fact of common knowledge.

[18] Blue Lake Rancheria, Business Operations: Executive Team, http://www.bluelakerancheria-nsn.gov/boExeTeam.html#eric (last visited Jan 21 2016)

[19] This is a fact of common knowledge.

[20] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

*Exhibit 12 - Page 8 of 24*

1    18) ABI entered into an "iSlot Lease Agreement" (iSlot Agreement) with the

2        Casino as the Distributor in the State of California for a third party, Talo,

3        Inc, a Nevada Corporation.[22]

4    19) Talo, Inc. was named in the iSlot Agreement as the developer for and

5        owner of the iSlot System. [23]

6    20) Talo, Inc. has never had a business presence in the State of California.[24]

7    21) The entirety of the Blue Lake Rancheria is contained within the borders of

8        the State of California.[25]

9    22) Acres is a resident of San Diego County, California.[26]

10   23) Acres is not alleged to have entered into a consensual agreement with

11       Casino.[27]

12   24) Due Process includes the right to be represented by an attorney.[28]

13   25) The Oath of Admission to the Tribal Court requires an applicant swear to

14       support the Tribe's Constitution.[29]

15   26) Due Process includes the right to receive reasonable notice for hearings.[30]

---

[21] California Secretary of State Business Programs Business Search, http://kepler.sos.ca.gov –– Search for Corporation Name "Acres Bonusing, Inc", (last visited Jan 21 2016)

[22] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[23] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[24] California Secretary of State Business Programs Business Search, http://kepler.sos.ca.gov — Search for Corporation Name "Talo, Inc", (last visited Jan 21 2016)

[25] This fact of geography is common knowledge.

[26] Judicially noticeable because Acres was served the summons for C-15-1215LJM at his residence in San Diego County, California.

[27] Compl. For Breach of Contract (Compl.), p 2 Line 6 stipulates that the iSlot Agreement is between Casino and ABI.

[28] California Code of Civil Procedure 1732(c)

[29] Blue Lake Rancheria, Tribal Court Oath of Admission, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Oath_of_Admission.pdf (last visited Jan 21 2016)

*Exhibit 12 - Page 9 of 24*

6

1    *27)* The Tribal Court's rules of procedure provide that parties served with a

2         complaint shall have thirty days to answer that complaint.[31]

3    *28)* Acres was given only five days to respond to the Complaint in Case

4         Number C-15-1215LJM.[32]

5

6    **THE TRIBAL COURT HAS NO PERSONAL JURISDICTION OVER ACRES**
7

8    *Montana v United States,* 450 U.S. 544 (1981) holds that "the inherent sovereign

9    powers of an Indian tribe [do] not extend to the activities of nonmembers of the

10   tribe." Under *Montana,* the Tribe can only exercise jurisdiction over Acres if one

11   of two exceptions to the rule apply.

12

13   The first exception to the *Montana* rule covers "activities of nonmembers who

14   enter consensual relationships with the tribe or its members, through commercial

15   dealing, contracts, leases, or other arrangements." 450 U. S., at 565.   In *Montana,*

16   the Supreme Court listed four cases in support of this exception, and then in

17   *Strate v A-1 Contractors,* 520 U.S. 438 (1997) the Supreme Court further explained

18   the specific types of activities contemplated by these cases.

19

20   Quoting Justice Ginsberg writing for the majority in *Strate,*

21

---

[30] California Code of Civil Procedure 1732(c)

[31] Blue Lake Rancheria, Tribal Court Rules of Pleading and Procedure, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Rules_of_Pleading_Practice_and_Procedure.pdf  Rule 15 (last visited Jan 21 2016)

[32] Summons issued by Anita M. Huff, Clerk of the Tribal Court on January 12, 2016 and served on January 17, 2016.

*Exhibit 12 - Page 10 of 24*

1    *"Montana*'s list of cases fitting within the first exception, see 450 U. S., at

2    565-566, indicates the type of activities the Court had in mind: *Williams* v.

3    *Lee*, <u>358 U.S. 217</u>, 223 (1959) (declaring tribal jurisdiction exclusive over

4    lawsuit arising out of on reservation sales transaction between

5    nonmember plaintiff and member defendants); *Morris* v. *Hitchcock*, <u>194</u>

6    <u>U.S. 384</u> (1904) (upholding tribal permit tax on nonmember owned

7    livestock within boundaries of the Chickasaw Nation); *Buster* v. *Wright,*

8    135 F. 947, 950 (CA8 1905) (upholding Tribe's permit tax on nonmembers

9    for the privilege of conducting business within Tribe's borders; court

10   characterized as "inherent" the Tribe's "authority . . . to prescribe the terms

11   upon which noncitizens may transact business within its borders"); *Colville,*

12   447 U. S., at 152-154 (tribal authority to tax on reservation cigarette sales to

13   nonmembers "is a fundamental attribute of sovereignty which the tribes

14   retain unless divested of it by federal law or necessary implication of their

15   dependent status")."

16

17   Of these four cases, only *Williams* could be read as germane to the current issue

18   with Acres.  However, the specific facts in *Williams* can be summarized as

19   follows:

20

21     i)  a General Store entered into a consensual relationship with the

22        Navajo Nation,

23     ii)  in order to sell goods on the Navajo Reservation, and;

24     iii)  the Operator of the General Store was not an Indian, and;

*Exhibit 12 - Page 11 of 24*

1        iv)      the Operator of the General Store extended goods on credit from

2                   the General Store to Indians resident on the reservation, and;

3        v)       the Operator subsequently sought to collect payment for the goods

4                   through an action in the Superior Court of Arizona.

5

6   The facts underlying *Williams* differ significantly from those in the matter

7 between Acres and the Casino.  In *Williams* a non-Indian in a consensual

8 relationship and transacting business purely on Indian land sought to compel an

9 Indian to conform to Arizona civil law, without respect to the civil laws of the

10 Navajo Nation.  Such an outcome would clearly compromise the rights of the

11 Navajo Nation to regulate and control Navajo Indians and their personal

12 property on Navajo land.  However in the present case, the Casino asks the

13 Tribal Court to extend its jurisdiction over Acres, who is not an Indian, and who

14 is not even alleged to have entered into a consensual relationship with the

15 Tribe[33], for conduct occurring outside the Rancheria territory[34], and over

16 property allegedly possessed by a third party[35] that is not also not within

17 Rancheria territory.[36]

18

---

[33] Paragraph 6 of Plaintiff's Complaint (Compl. P. 2 Beginning at Line 6) alleges that ABI entered into an agreement with Casino.  Plaintiff does not allege that Acres entered into an agreement with Casino.

[34] Paragraph 10 of Plaintiff's Complaint (Compl. P. 3 Beginning at Line 10) contains the heart of the alleged misconduct raised in the Complaint.  Given that Talo, Inc. is a Nevada entity, and ABI's role in the iSlot Agreement was to act as Distributor for Talo, Inc. to the Casino, then the conduct discussed in Paragraph 10 must necessarily have had as its geographic locus within the State of Nevada.

[35] It is never alleged that ABI transferred the money to Acres

[36] The Complaint does not allege that the $249,250 the Casino transferred to ABI is held by ABI within the confines of the Tribe's Rancheria.

*Exhibit 12 - Page 12 of 24*

9

1    Assertion of personal jurisdiction over the conduct or property of one who is not

2    a member of the Tribe, that did not take place within a consensual relationship

3    with the Tribe, and that is also not on the Rancheria does not fall within the first

4    exception created by *Montana*.

5              .

6    The second exception to *Montana*'s general rule concerns conduct that "threatens

7    or has some direct effect on the political integrity, the economic security, or the

8    health or welfare of the tribe." 450 U. S., at 566.

9

10   Justice Ginsburg writing for the majority in *Strate* provided this guidance

11   interpreting this second exception:

12

13          "Read in isolation, the *Montana* rule's second exception can be

14          misperceived. Key to its proper application, however, is the Court's

15          preface: "Indian tribes retain their inherent power [to punish tribal

16          offenders,] to determine tribal membership, to regulate domestic relations

17          among members, and to prescribe rules of inheritance for members. . . .

18          But [a tribe's inherent power does not reach] beyond what is necessary to

19          protect tribal self government or to control internal relations." 450 U. S., at

20          564."

21

22   Personal Jurisdiction over Acres in Case Number C-15-1215LJM, or any other

23   suit arising from the iSlot Agreement, is not required to preserve "the right of

24   reservation Indians to make their own laws and be ruled by them." *Williams*, 358

*Exhibit 12 - Page 13 of 24*

10

1   U. S., at 220. The *Montana* rule, therefore, and not its exceptions, applies to this

2   case and all potential similar cases.

3

4   The lack of Personal Jurisdiction necessitates dismissing the current case, and

5   provides ample reason to issue an Injunction against future litigation arising

6   from the iSlot Agreement.

7

8   Finally, it bears repeating that the lack of a consensual agreement between Acres

9   and the Tribe is fatal to any attempt by the Tribal Court to assert personal

10  jurisdiction over Acres.

11

12  **THE TRIBAL COURT CANNOT PROVIDE ACRES DUE PROCESS**

13              *Summary of Issues Concerning Due Process*

14  The issues discussed below concerning due process can be summarized in six

15  categories:

16      1)  All judges on the Tribal Court have been placed there by persons and

17          processes that have significant interests adverse to those of Acres

18          (**Subsection A, below**), and;

19      2)  The Tribal Court can only provide a jury pool entirely comprised of

20          individuals who have significant interests adverse to those of Acres

21          (**Subsection B, below**), and;

22      3)  the Tribal Court's Code of Procedure was created by persons and

23          processes that have significant interests adverse to those of Acres

24          (**Subsection C, below**), and;

25      4)  the nature of the requirements for an attorney to obtain and retain the

*Exhibit 12 - Page 14 of 24*

1    right to practice within the Tribal Court make it impossible for Acres

2    to find timely and adequate representation there (**Subsection D,**

3    **below**), and;

4    5)  the tribal court has imposed a five-day response against Acres which is in

5        and of itself incompatible with due process, and done so in violation of

6        its rules of procedure (**Subsections E and F, below**), and;

7    6)  there is the appearance that the relationship between the Tribal Court and

8        the Casino's attorney's is not an arms length one (**Subsection G,**

9        **below**).

10

11   A. *It is Probable that Any Judge Provided by the Tribal Court will Be Biased*

12      *Against* **Acres**

13

14   In *Caperton v Massey* 566 U.S. 868 (2009) the court held that the standards for

15   implementing due process do not require proof of actual bias in a judge.

16   Rather the question that must be asked is whether "under a realistic appraisal

17   of psychological tendencies and human weakness [there exists] such a risk of

18   actual bias or prejudgment that the practice must be forbidden if the

19   guarantee of due process is to be adequately implemented."

20

21   In *Caperton*, the Supreme Court found that "There is a serious risk of actual

22   bias when a person with a personal stake in a particular case had a significant

23   and disproportionate influence in placing the judge on the case."

24

25   In *Caperton v Massey,* the majority of the court found that the facts that

*Exhibit 12 - Page 15 of 24*

12

1    Massey i) had a significant financial interest in the outcome of the case, and ii)

2    had provided the bulk of the campaign funds that went towards electing the

3    judge on the case were sufficient in and of themselves to deprive Caperton of

4    due process.

5

6    As described below, the potential for bias against Acres is far worse than the

7    potential for bias which existed in *Caperton*, in that  every person responsible

8    for hiring and firing judges in the Tribal Court has significant financial

9    interests adverse to those of Acres in Case Number C-15-1215LJM or any

10   other suit arising from the iSlot Agreement.

11

12        *1: Every Member of Tribe has a Powerful Interest Contrary to Acres's*

13

14   Since the action in question seeks a minimum judgment of $249,250 from Acres,

15   and since there are approximately fifty enrolled members, this means that every

16   member of the Tribe has a powerful interest in the outcome of this action.  Each

17   member of the Tribe stands to be enriched by a minimum of approximately

18   $5,000 by any adverse judgment against Acres.

19

20   It is not necessary that any adverse judgment collected by the Tribe against Acres

21   be distributed to individual members of the Tribe for this interest to exist.  The

22   very fact that the Tribe is small means that any enrichment of the Tribe translates

*Exhibit 12 - Page 16 of 24*

13

1    into enrichment for individual members of the Tribe.[37]

2

3

4    *2: Judges of Tribal Court Serve at the Pleasure of the Business Council and the Business*

5    *Council has a Powerful Interest Contrary to Acres's*

6

7    The Chief Judge and other Judges of the Tribal Court are hired by the Business

8    Council, and the Business Council may dismiss the Chief Judge and other Judges

9    at any time.  Each member of the Business Council stands to be personally

10   enriched by a judgment against Acres.  This creates a natural motive for the

11   Business Council to exert pressure on Judges of the Tribal Court to rule against

12   Acres.

13

14   *3: Members of the Business Council are elected by the General Council and the General*

15   *Council has a Powerful Interest Contrary to Acres's*

16

17   The Business Council is elected by the General Council, which is also entirely

18   comprised of members of the Tribe.  Each member of the General Council stands

19   to be personally enriched by a judgment against Acres.  This creates a natural

20   motive for the General Council to exert pressure on the Business Council to exert

21   pressure on Judges of the Tribal Court to rule against Acres.

22

---

[37] See Blue Lake Rancheria, Government & Law: Governmental Structure "The governmental structure of the Blue Lake Rancheria Tribe is a true representative Democracy." http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016). The Tribe considers the connection each of Member to Tribe to be "tru[ly]" significant.

*Exhibit 12 - Page 17 of 24*

14

1

2      *4: Members of the General Council are Elected by Members of the Tribe, and Each*

3          *Member of the Tribe has a Powerful Interest Contrary to* Acres's

4

5 The General Council is elected by an electorate composed entirely of members of

6 the Tribe.  Each member of the Tribe stands to be personally enriched by a

7 judgment against Acres.  This creates a natural motive for every member of the

8 Tribe to exert pressure on the General Council to exert pressure on the Business

9 Council to exert pressure on Judges of the Tribal Court to rule against Acres.

10

11      *5: Arla Ramsey is a Powerful member of the Tribe, and has Maternal Interests Contrary*

12          *to Acres's*

13

14 Arla Ramsey is an important member of the General Council and the Business

15 Council.  Arla Ramsey is also a Judge in the Tribal Court.  Her son Eric Ramos is

16 ultimately responsible for the direction of the business enterprises of the Tribe,

17 including the Casino.  And so Eric Ramos is ultimately responsible for directing

18 that this case be brought against Acres.  The status of Arla Ramsey's son as a

19 legal adversary with respect to Acres gives her further inducement to place

20 pressure on Judges of the Tribal Court.

21

22 **B: The Tribal Court Cannot Impanel an Impartial Jury**

23 As described above, every member of the Tribe has a powerful interest in this

24 matter contrary to Acres's.

25

*Exhibit 12 - Page 18 of 24*

1    Under the presumption that the jury is the decider of questions of fact[38] then no

2    Tribal member may be a juror without violating Acres's right to have triers of

3    fact untainted by "the serious risk of bias" as described in *Caperton.*

4

5    Therefore, there is no possible pool of impartial jurors over which the Tribal

6    Court may have jurisdiction from which to impanel a jury.[39]

7

8    **C: The Tribal Court's Code of Procedure was Developed by the Business**

9    **Council**

10

11   As shown above, each member of the Business Council has a financial interest in

12   the outcome of any monetary award against Acres.  This is equally true of any

13   civil action against any non-Tribal entity that involves a monetary award.  Since

14   the Business Council was involved in adopting the Tribal Court's Code of

15   Procedure, the code itself is liable to a serious risk of partiality against the

16   interests of non-Tribal litigants.

17

18

---

[38] Acres was not able to determine what the role of a jury is within the Tribal Court within the five-days provided to it before the Tribal Court's execution of default judgment against it. Should the role of the jury be otherwise within the Tribal Court, Acres asks that the Tribal Court explain the jury's role so that Acres may understand how that role relates to Acres's rights to due process.

[39] Acres was not able to determine within the provided timeline if jurors in Tribal Court must be Tribal Members. However, since the Tribal Court may only compel members of the Tribe to sit on its juries, and since the Tribal Court must guarantee Acres due process, it is not possible for the Tribal Court to guarantee Acres an impartial jury.

*Exhibit 12 - Page 19 of 24*

16

1    **D: Acres has no Practical Ability to be Represented by Attorneys**

2        *1. It is unclear if Acres can find an Attorney admitted to practice by the Tribal*

3                                    *Court to represent him*

4    In order to represent Acres, an attorney must be admitted to practice in the Tribal

5    Court and it is not readily apparent where Acres can find an attorney who has

6    been admitted to practice in the Tribal Court.

7

8    While the Tribal Court does publish an Application to Practice in Tribal Court on

9    its website,[40] It is unclear what grounds the Tribal Court uses in determining

10   whether to accept applications, what the timeline involved for acceptance or

11   denial of applicants is, or even if there exists a directory of attorneys approved to

12   practice.

13

14   These factors would make it difficult for Acres to retain an attorney within a

15   month. They may make it impossible under any timeline. They certainly make it

16   impossible within the five days imposed by the Tribal Court.

17

18       *2. Any admitted attorney Acres found would be intimidated by the probability of*

19                    *retaliation from a court biased against Acres*

20   Since there exists a serious risk that the Tribal Court is not impartial in the matter

21   facing Acres, and since the Tribal Court may revoke an attorney's admission to

---

[40] Blue Lake Rancheria, Tribal Court Application for Admission to Practice Law,
http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Application_to_Practice1.pdf (last visited Jan
22 2016)

*Exhibit 12 - Page 20 of 24*

17

1    practice before it or otherwise sanction that attorney,[41] then Acres would have

2    reason to worry that any attorney Acres retained to defend it in Tribal Court

3    might temper their advocacy on Acres's behalf and against Acres's interest from

4    fear of incurring the wrath of the Tribal Court.

5

6        *3. Attorneys must swear to support the constitution of the Blue Lake Rancheria to be*

7                    *admitted to practice in the Tribal Court*

8

9    Swearing allegiance to a polity is not a trivial matter.

10

11   Acres recognizes that the Tribe and the Tribal Court have a legitimate interest in

12   requiring that the officers of the Tribal Court support the Tribe's constitution.

13

14   However it is not reasonable to expect that many will be willing, upon serious

15   reflection and consideration, to swear to support the constitution of a polity that

16   one cannot become a member of, and in many cases may have interests that are

17   of an adversarial nature with respect to the polities that one is a member of.

18

19   Thus the Tribal Court is not able to guarantee the provision of a pool of attorneys

20   admitted to its bar large enough to ensure that Acres will be able to retain

21   competent council.

22

23

---

[41] Blue Lake Rancheria, Rules of Admission and Professional Conduct, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Attorney_Conduct_Rules01.pdf (last visited Jan 22 2016)

*Exhibit 12 - Page 21 of 24*

1

2   *E: The Tribal Court has Imposed a Timeline that is Incompatible with Due*

3   *Process*

4

5   Acres has been summoned by the court to respond within five days or suffer

6   default judgment against it.  Such a timeline is incompatible with due process in

7   a way that is prejudicial against Acres.

8

9   *F: The Tribal Court Cannot be Relied Upon to Conduct Proceedings according to*

10   *its own Code of Procedure*

11

12   Section 15 of The Tribal Court's Civil Rules of Procedure for the Tribal

13   Court of the Tribe provide that "Any party served with a complaint, cross-claim

14   or counterclaim shall have the right within thirty (30) days from the date of

15   service of the complaint or other pleading to file a written answer thereto. " By

16   issuing a summons with a twice stated five-day deadline the Tribal Court has

17   violated its own Rules of Procedure and shown it cannot be relied upon to

18   conduct regular proceedings according to published rule in a way that protects

19   due process.

20

21

*Exhibit 12 - Page 22 of 24*

19

1   *G: Casino's Attorneys are Acting as an Arm of the Tribal Court*

2

3   Acres has been:

4

5       "Summoned and required to serve upon plaintiff's attorney … an

6       answer to the complaint which is herewith served upon [Acres]

7       within five (5) days after service of this summons upon [Acres],

8       exclusive of the day of service.  If [Acres] fail[s] to do so, judgment

9       by default will be taken against [Acres] for the relief demanded in

10      the complaint.  [Acres] must also file [its] answer with the Clerk of

11      the Court within a reasonable period of time after service."

12

13  Since a five-day response period is patently unreasonable, and since under the

14  language of the summons Acres is only required to file a response with Tribal

15  Courts Clerk within a reasonable time, and under the light of all the risks of

16  partiality described above, the Tribal Court appears to be relying upon plaintiff's

17  attorneys as a primary conduit of receiving information from Acres.  This

18  bespeaks a level of intimacy between the plaintiff's attorneys and the Tribal

19  Court that is incompatible with impartiality.

20

21  It bears repeating that in Tribal Court Civil Case C-15-1215LJM, the Judges

22  appear to work for the mother (Vice-Chairwoman, Member of the Business

23  Council and Tribal Judge Arla Ramsey) while the plaintiff's attorneys appear to

24  work for the son (President of Business Operations for the Tribe Eric Ramos).

25

*Exhibit 12 - Page 23 of 24*

1

2 **CONCLUSION**

3

4 For the foregoing reasons, SPECIALLY APPEARING Acres respectfully requests

5 and makes Motions that this court:

6     1)   immediately dismiss its Civil Case Number C-15-1215LJM, and;

7     2)  enjoin the Casino or any other entity of the Tribe from filing any future

8            complaint against Acres regarding the iSlot Agreement in Tribal Court

9            because of the Tribal Court's lack of personal jurisdiction over Acres in the

10            matter, and because of the Tribal Court's incurable inability in such cases

11            to provide due process to litigants such as Acres whose interests are at

12            odds with the interests of members of the Tribe.

13

14 **RESPECTFULLY SUBMITTED THIS** 22nd day of January 2016 by James Acres,

15 who is SPECIALLY APPEARING without benefit of council as necessitated by

16 the circumstances described above.

17

18 Signed:

19

20 James Acres
21
22
23   344 Sylvia
24   Encinitas, CA 92024
25   james@kosumi.com
26

*Exhibit 12 - Page 24 of 24*

21

# Exhibit 13

*First Special Appearance Rejection*

This is a true and complete copy of

an email rejecting James Acres's first SPECIAL APPEARANCE in Tribal Court

sent by Anita Huff to James Acres on January 25, 2016.

There is one page in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 13 - Title Page*

From: **Anita Huff** AHuff@bluelakerancheria-nsn.gov 📎
Subject: RE: SPECIAL APPEARANCE by James Acres in C-15-1215LJM
Date: January 25, 2016 at Jan 25 15:37
To: James Acres james@kosumi.com



Mr. Acres,
This filing you have sent does not conform to the Rules of Pleading Practice and Procedure in the Blue Lake Rancheria Tribal Court. Specifically Rule 12. Form, Size and Duplication of All Papers, which states;
Rule 12. Form, Size and Duplication of All Papers.
(a)  General.
All papers to be filed with the Clerk shall be duplicated and filed in conformity with these rules as to methods of duplication, form, size, and number of copies. The Clerk shall refuse to file any paper which is not in substantial conformity with this rule or not in clear type.
(b)  Duplication.
All requirements of duplication may be satisfied by the use of any photocopy method capable of producing a clear black image on white paper, but not including ordinary carbon copy, provided, that in each instance the duplication shall conform to the requirements of subdivision (c) of this rule as to paper, size, form and pagination.
(c)  Form and Size.
All papers pursuant to the provisions of this rule shall be duplicated on pages not exceeding 8 ½ x 11 inches, with type matter not exceeding 6 ½ x 8 ½ inches. Papers duplicated shall be double spaced (except that quoted and indented material and footnotes may be single spaced), and, if covering both sides of the sheet, shall be duplicated on paper of sufficient quality that the duplication process does not bleed through the sheet; shall be bound or attached on the left margin and unfolded, in book form; and shall have legible margins when bound or attached. Such pages need not be justified on the right margin. The first page of each separate document shall be numbered 1. Page numbers shall be in large, distinct type and shall appear in the bottom center margin of the page.

(d)  Caption and Title.
The first page of each separate document shall contain:
(1) the title of the Court,
(2) the title of the action or proceeding,
(3) the file number of the action or proceeding followed by the initials of the judge to whom it is
     currently assigned and
(4) the title of the document (e.g. "Complaint", "Defendants Motion for Summary Judgment",
     etc.)

(e)  Date.
Each paper shall bear the date it is signed on the signature page.

(f)  Paragraphs; Separate Statements.
All allegations of a claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

(g)  Adoption by Reference; Exhibits.
Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes unless otherwise indicated, but the adverse party shall not be deemed to have admitted the truth of the allegations in such exhibit merely because he/she has filed to deny them explicitly.

(h)  Address and Telephone Number.
The address and telephone number of the attorney of record or if the party is not represented by an attorney, the address and telephone number or the person signing the pleading must appear beneath the signature line of every pleading or other paper.

(i)  Copies.
An original and two (2) copies of all pleadings shall be filed with the Clerk. All copies shall be identical, or otherwise conformed to the original.

You can find the Rules here: http://www.bluelakerancheria-nsn.gov/govLawTribalCourt.html .
Also, please see attached General Order #3.
Please reply if you should require further information in this regard,

Anita Huff
Tribal Court Clerk
Blue Lake Rancheria Tribal Court
P.O. Box 426
Blue Lake, CA  95525-0426
Phone (707) 668-5101 x 1032
FAX   (707) 668-4272
ahuff@bluelakerancheria-nsn.gov

CONFIDENTIALITY NOTICE: This e-mail and attachment(s), if any, is for the sole use of the intended recipient(s) and may contain confidential business information protected by the trade secret privilege, the Electronic Communications Privacy Act (ECPA), and/or other legal bases as may apply. If you are not an intended recipient, please take notice that disclosure of the information contained herein is inadvertent, expressly lacks the consent of the sender, and your receipt of this e-mail does not constitute a waiver of any applicable privilege(s). In this event, please notify the sender immediately, do not disseminate any of the information contained herein to any third party, and cause all electronic and/or paper copies of this e-mail to be promptly destroyed. Thank you.

-----Original Message-----
From: James Acres [mailto:james@kosumi.com]
Sent: Friday, January 22, 2016 5:28 PM
To: dstouder@boutinjones.com; aoneill@boutinjones.com
Cc: Anita Huff
Subject: SPECIAL APPEARANCE by James Acres in C-15-1215LJM

Find attached a SPECIAL APPEARANCE by James Acres in Blue Lake Tribal Court Civil Case C-15-1215LJM.

James Acres is making a SPECIAL APPEARANCE without benefit of counsel due to the arbitrary five day deadline placed upon him in the summons.

James Acres is SPECIALLY APPEARING only to show that the Tribal Court lacks personal jurisdiction over him in this matter, and that the Tribal Court can not guarantee him his rights to due process in this matter.



*Exhibit 13 - Page 1 of 1*

# Exhibit 14

*Plaintiff's Second Special Appearance*

This is a true and complete copy of

Plaintiff's renewed attempt at making a SPECIAL APPEARANCE in Tribal Court

as made via email on January 26, 2016.

There are 25 pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 14 - Title Page*



From: **James Acres** james@kosumi.com
Subject: Re: SPECIAL APPEARANCE by James Acres in C-15-1215LJM
Date: January 26, 2016 at Jan 26 15:48
To: Anita Huff AHuff@bluelakerancheria-nsn.gov
Cc: dstouder@boutinjones.com, aoneill@boutinjones.com

---

Hi Anita,

I'm sorry you weren't unable to accept the filing made to you last Friday.

Rule 12 seems to only require that you refuse submissions that lack "substantial conformity" to the Rules, and I'm honestly not sure where the substantial non-conformity lies in the filing you rejected yesterday. The best I can figure is that you needed a phone number in the signature block — this has been added and a re-signed document is attached with today's date.

Your Rule 15 provides that any one served with a complaint shall have 30 days in which to respond. Instead, the Summons issued by you in Civil Case C-15-1215LJM provided only five days for response on pain of default judgment. That timeline seems to be not only wholly incompatible with due process, but also a non-conformity with the Rules more substantial than any non-conformities contained in the submission you rejected yesterday.

Never-the-less a good faith attempt is being made to comply with that deadline, and without the benefit of counsel.

If there are any non-conformities remaining in the present filing which prevent acceptance by you, perhaps you could point them out specifically? As well as explain why they are of such a nature so as to render the filing unintelligible, and represent a more significant violation of the Rules than the five day deadline that was imposed, and thus allowed, by you.

Also, a copy was sent you via certified mail of Friday's filing. Let me know if you need a fresh hard copy of the submission attached here today, which again differs only in that it includes a phone number in the signature block.

Thanks,

-james



SPECIAL APPEARANCE
BY JAMES ACRES.pdf
On Jan 25, at Jan 25 15:37, Anita Huff <AHuff@bluelakerancheria-nsn.gov> wrote:

Mr. Acres,
This filing you have sent does not conform to the Rules of Pleading Practice and Procedure in the Blue Lake Rancheria Tribal Court. Specifically Rule 12. Form, Size and Duplication of All Papers, which states;
Rule 12. Form, Size and Duplication of All Papers.
(a) General.
All papers to be filed with the Clerk shall be duplicated and filed in conformity with these rules as to methods of duplication, form, size, and number of copies. The Clerk shall refuse to file any paper which is not in substantial conformity with this rule or not in clear type.
(b) Duplication.
All requirements of duplication may be satisfied by the use of any photocopy method capable of producing a clear black image on white paper, but not including ordinary carbon copy, provided, that in each instance the duplication shall conform to the requirements of subdivision (c) of this rule as to paper, size, form and pagination.
(c) Form and Size.
All papers pursuant to the provisions of this rule shall be duplicated on pages not exceeding 8 ½ x 11 inches, with type matter not exceeding 6 ½ x 8 ½ inches. Papers duplicated shall be double spaced (except that quoted and indented material and footnotes may be single spaced), and, if covering both sides of the sheet, shall be duplicated on paper of sufficient quality that the duplication process does not bleed through the sheet; shall be bound or attached on the left margin and unfolded, in book form; and shall have legible margins when bound or attached. Such pages need not be justified on the right margin. The first page of each separate document shall be numbered 1. Page numbers shall be in large, distinct type and shall appear in the bottom center margin of the page.

(d) Caption and Title.
The first page of each separate document shall contain:
(1) the title of the Court,
(2) the title of the action or proceeding,
(3) the file number of the action or proceeding followed by the initials of the judge to whom it is
   currently assigned and
(4) the title of the document (e.g. "Complaint", "Defendants Motion for Summary Judgment",
   etc.)

(e) Date.
Each paper shall bear the date it is signed on the signature page.

(f) Paragraphs; Separate Statements.
All allegations of a claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

(g) Adoption by Reference; Exhibits.
Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes unless otherwise indicated, but the adverse party shall not be deemed to have admitted the truth of the allegations in such exhibit merely because he/she has filed to deny them explicitly.

(h) Address and Telephone Number.
The address and telephone number of the attorney of record or if the party is not represented by an attorney, the address and telephone number or the person signing the pleading must appear beneath the signature line of every pleading or other paper.

(i) Copies.
An original and two (2) copies of all pleadings shall be filed with the Clerk. All copies shall be identical, or otherwise conformed to the original.

You can find the Rules here: http://www.bluelakerancheria-nsn.gov/govLawTribalCourt.html .
Also, please see attached General Order #3.
Please reply if you should require further information in this regard,

*Exhibit 14 - Page 1 of 25*

Anita Huff
Tribal Court Clerk
Blue Lake Rancheria Tribal Court
P.O. Box 426
Blue Lake, CA 95525-0426
Phone (707) 668-5101 x 1032
FAX (707) 668-4272
ahuff@bluelakerancheria-nsn.gov

CONFIDENTIALITY NOTICE: This e-mail and attachment(s), if any, is for the sole use of the intended recipient(s) and may contain confidential business information protected by the trade secret privilege, the Electronic Communications Privacy Act (ECPA), and/or other legal bases as may apply. If you are not an intended recipient, please take notice that disclosure of the information contained herein is inadvertent, expressly lacks the consent of the sender, and your receipt of this e-mail does not constitute a waiver of any applicable privilege(s). In this event, please notify the sender immediately, do not disseminate any of the information contained herein to any third party, and cause all electronic and/or paper copies of this e-mail to be promptly destroyed. Thank you.

-----Original Message-----
From: James Acres [mailto:james@kosumi.com]
Sent: Friday, January 22, 2016 5:28 PM
To: dstouder@boutinjones.com; aoneill@boutinjones.com
Cc: Anita Huff
Subject: SPECIAL APPEARANCE by James Acres in C-15-1215LJM

Find attached a SPECIAL APPEARANCE by James Acres in Blue Lake Tribal Court Civil Case C-15-1215LJM.

James Acres is making a SPECIAL APPEARANCE without benefit of counsel due to the arbitrary five day deadline placed upon him in the summons.

James Acres is SPECIALLY APPEARING only to show that the Tribal Court lacks personal jurisdiction over him in this matter, and that the Tribal Court can not guarantee him his rights to due process in this matter.

<General Order#3.pdf>

*Exhibit 14 - Page 2 of 25*

# SPECIAL APPEARANCE BY JAMES ACRES

# IN

# BLUE LAKE RANCHERIA TRIBAL COURT

# CASE NUMBER C-15-1215LJM

## TABLE OF CONTENTS

| | |
|---|---|
| *Table of Authorities* | Page i |
| *Motions for Dismissal and Injunction* | Page 1 |
| *Memorandum in Support of Motions* | Pages 2 - 21 |
| *Summary of Argument* | Pages 2 - 3 |
| *Tribal Court Lacks Personal Jurisdiction* | Page 2 |
| *Tribal Court Cannot Reliably Provide Due Process* | Page 3 |
| *Recitation of Facts* | Pages 3 – 7 |
| *Montana Rule and Personal Jurisdiction* | Pages 7 – 11 |
| *Overwhelming Risk of Biased Tribal Judges* | Pages 12 - 15 |
| *Impartial Jury Cannot be Guaranteed* | Pages 15 -16 |
| *Overwhelming Risk of Biased Rules of Court Procedure* | Page 16 |
| *Competent Legal Counsel Cannot be Guaranteed* | Page 17 – 18 |
| *Five-Day Summons Incompatible with Due Process* | Page 19 |
| *Tribal Court Cannot Reliably Adhere to its Court Procedure* | Page 19 |
| *Appearance of Intimacy Between Court and Plaintiff Counsel* | Page 20 |
| *Conclusion* | Page 21 |

*Exhibit 14 - Page 3 of 25*

## TABLE OF AUTHORITIES

**Cases**

*Montana v United States,* 450 U.S. 544 (1981)
*Strate v A-1 Contractors,* 520 U.S. 438 (1997)
*Williams* v. *Lee,* 358 U.S. 217, 223 (1959)
*Caperton v Massey* 566 U.S. 868 (2009)
*Disabled Rights Action Comm. V. Las Vegas Events Inc.,* 375 F. 3d 861, 866 n.1 (9th Cir. 2004)

**State of California**

California Code of Civil Procedure 1732(c)
California Secretary of State (Business Search Website at kepler.sos.ca.gov)

**Blue Lake Rancheria**

The Official Website of Blue Lake Rancheria (www.bluelakerancheria-nsn.gov)
Tribal Court Ordinance
Tribal Court Rules of Pleading and Procedure
Tribal Court Application for Admission to Practice Law
Tribal Court Oath of Admission
Blue Lake Rancheria Tribal Constitution

**The Summons, Complaint and its Exhibit A in Blue Lake Rancheria Tribal Court Case C-15-1215LJM (Compl.)**

*Exhibit 14 - Page 4 of 25*

i

# JAMES ACRES'S MOTION FOR DISMISSAL WITH PREJUDICE AND MOTION FOR INJUNCTION AGAINST FURTHER ACTIONS AGAINST ACRES IN TRIBAL COURT

COMES NOW James Acres (Acres), a natural person maintaining his place of permanent residence in San Diego County, California, to make a SPECIAL APPEARANCE for the sole purposes of:

i) asserting that the Blue Lake Rancheria Tribal Court (Tribal Court) has no personal jurisdiction over Acres, and;

ii) asserting the impossibility that the Tribal Court can afford Acres his constitutional rights to due process and impartiality, and;

iii) making a Motion that the Tribal Court dismiss that action named in its Tribal Court Case Number C-15-1215LJM because of points i) and ii) above, and;

iv) making a Motion that the Tribal Court enjoin the Casino or any other entity of the Blue Lake Rancheria from bringing any other action similar to this action against Acres in this Tribal Court because of points i) and ii) above, and;

v) providing the attached "Memorandum of Points and Authorities in Support of Acres's Motions For Dismissal and Injunction."

*Exhibit 14 - Page 5 of 25*

1

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JAMES ACRES'S MOTIONS FOR DISMISSIAL AND INJUNCTION

## SUMMARY

Acres argues that C-15-1215LJM should be dismissed both because the Tribal Court lacks personal jurisdiction over Acres in the matter, and because the Tribal Court cannot be relied upon to provide an impartial proceeding that respects Acres's rights to due process. Both the lack of personal jurisdiction and the unreliability of due process independently provide sufficient reason to necessitate the dismissal of Case Number C-15-1215LJM. Both the lack of personal jurisdiction and the unreliability of due process are in and of themselves permanent disabilities for any action in Tribal Court against Acres similar to the current one, and each ill independently provides sufficient reason to justify an injunction against future actions against Acres in Tribal Court.

*1.  The Tribal Court Lacks Personal Jurisdiction Over Acres*

The *Montana* Rule as explicated in *Strate v A-1 Contractors,* 520 U.S. 438 (1997) makes clear that Tribes may assert jurisdiction over non-members and their property only in certain narrow circumstances. The allegations against Acres in Case Number C-15-1215LJM pertain to the conduct and property outside the boundaries of the Rancheria of a person who is neither a member of the Tribe nor alleged to have entered into a consensual relationship with the Tribe. The *Montana* rule does not allow the assertion of personal jurisdiction by a Tribal Court in such cases.

*Exhibit 14 - Page 6 of 25*

2

1

2          *2. The Tribal Court Cannot Be Relied Upon to Provide Acres Due Process*

3    Acres enjoys the right to due process.  The Tribal Court cannot be relied upon to

4    provide Acres due process.  The Tribe has only fifty-three members, and C-15-

5    1215LJM seeks to obtain a minimum of $249,250 from Acres.  Thus each Tribal

6    member has a powerful adverse interest to Acres.  Since the rules and officers of

7    the Tribal Court are determined by Tribal members, this creates a powerful

8    adverse interest against Acres within the Tribal Court itself, as well as making

9    the impaneling of an impartial jury by the Tribal Court impossible.  It is also not

10   clear that Acres can find an Attorney able to represent his interests who is

11   admitted to practice in the Tribal Court.  Finally, the Tribal Court has not been

12   able to insure that it can reliably follow its own Code of Procedure in demanding

13   that Acres respond to C-15-1215LJM within five days or face default judgment,

14   and the very imposition of a five day deadline for an initial response under

15   threat of default judgment is in and of itself incompatible with due process.

16

17   **RECITATION OF JUDICIALY NOTICABLE FACTS**[1]

18        *1)* It is commonly acknowledged as fact that the Blue Lake Rancheria (Tribe)

19              is a federally recognized Indian tribe.

20        *2)* The Tribe has fifty-three enrolled members.[2]

21        *3)* The Tribe is governed by its General Council.[3]

---

[1] Facts on publicly accessible government websites are considered judicially noticeable.  *Disabled Rights Action Comm. V. Las Vegas Events Inc.*, 375 F. 3d 861, 866 n.1 (9ᵗʰ Cir. 2004)

[2] Blue Lake Rancheria, Facts, http://www.bluelakerancheria-nsn.gov/facts.html  (last visited Jan 21, 2016)

*Exhibit 14 - Page 7 of 25*

3

1      *4)* The General Council is elected by the Tribe's enrolled members.[4]

2      *5)* The Blue Lake Casino & Hotel (Casino) is a business enterprise of the

3           Tribe.[5]

4      *6)* The Blue Lake Tribal Court (Tribal Court) is a governmental arm of the

5           Tribe.[6]

6      *7)* The Tribal Court is presided over by a Chief Judge.[7]

7      *8)* The Blue Lake Rancheria Business Council (Business Council) is an arm of

8           the Tribe.[8]

9      *9)* Members of the Business Council must be enrolled members of the Tribe

10          who are resident on the Tribe's Rancheria land.[9]

11     *10)* Members of the Business Council must be enrolled members of the Tribe

12          and are chosen by the General Council.[10]

13     *11)* The Business Council is responsible for hiring[11] and firing[12] the Chief

14          Judge and other Judges of the Tribal Court.

---

[3] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 21, 2016)

[4] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016)

[5] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[6] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 3 (last visited Jan 21 2016)

[7] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[8] Constitution of the Blue Lake Rancheria, Article VII Section 2, http://www.bluelakerancheria-nsn.gov/BLR_Constitution.pdf (last visited Jan 22 2016)

[9] Constitution of the Blue Lake Rancheria, Article V Section 4, http://www.bluelakerancheria-nsn.gov/BLR_Constitution.pdf (last visited Jan 22 2016)

[10] Blue Lake Rancheria, Government & Law: Governmental Structure, http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016)

*Exhibit 14 - Page 8 of 25*

4

1      *12)* Due Process includes the right to an impartial decisionmaker.[13]

2      *13)* The Chief Judge developed the rules of procedure and for the governance

3      of the Tribal Court under the supervision of the Business Council.[14]

4      *14)* Arla Ramsey is a member of the Tribe,[15] the Vice-Chairperson of the

5      General Council, a Tribal Judge, and responsible for oversight of the

6      Business Council.[16]

7      *15)* Eric Ramos is a member of the Tribe[17] and "President of Business

8      Operations for the [Tribe], where he manages and develops the Tribe's

9      many diverse enterprises."[18]

10     *16)* Arla Ramsey is the mother of Eric Ramos.[19]

11     *17)* ABI is a Nevada corporation[20] that is qualified to do business in the state

12     of California and has its principal place of business in San Diego

13     County.[21]

---

[11] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[12] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 9 (last visited Jan 21 2016)

[13] California Code of Civil Procedure 1732(c)

[14] Blue Lake Rancheria, Tribal Court Ordinance, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf p. 8 (last visited Jan 21 2016)

[15] This is a fact of common knowledge.

[16] Blue Lake Rancheria, Business Operations: Executive Team, http://www.bluelakerancheria-nsn.gov/boExeTeam.html#arla (last visited Jan 21 2016)

[17] This is a fact of common knowledge.

[18] Blue Lake Rancheria, Business Operations: Executive Team, http://www.bluelakerancheria-nsn.gov/boExeTeam.html#eric (last visited Jan 21 2016)

[19] This is a fact of common knowledge.

[20] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

*Exhibit 14 - Page 9 of 25*

5

1    18) ABI entered into an "iSlot Lease Agreement" (iSlot Agreement) with the

2        Casino as the Distributor in the State of California for a third party, Talo,

3        Inc, a Nevada Corporation.[22]

4    19) Talo, Inc. was named in the iSlot Agreement as the developer for and

5        owner of the iSlot System. [23]

6    20) Talo, Inc. has never had a business presence in the State of California.[24]

7    21) The entirety of the Blue Lake Rancheria is contained within the borders of

8        the State of California.[25]

9    22) Acres is a resident of San Diego County, California.[26]

10   23) Acres is not alleged to have entered into a consensual agreement with

11       Casino.[27]

12   24) Due Process includes the right to be represented by an attorney.[28]

13   25) The Oath of Admission to the Tribal Court requires an applicant swear to

14       support the Tribe's Constitution.[29]

15   26) Due Process includes the right to receive reasonable notice for hearings.[30]

---

[21] California Secretary of State Business Programs Business Search, http://kepler.sos.ca.gov — Search for Corporation Name  "Acres Bonusing, Inc", (last visited Jan 21 2016)

[22] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[23] Compl. For Breach of Contract (Compl.), Ex. A, p. 1

[24] California Secretary of State Business Programs Business Search, http://kepler.sos.ca.gov — Search for Corporation Name  "Talo, Inc", (last visited Jan 21 2016)

[25] This fact of geography is common knowledge.

[26] Judicially noticeable because Acres was served the summons for C-15-1215LJM at his residence in San Diego County, California.

[27] Compl. For Breach of Contract (Compl.), p 2 Line 6 stipulates that the iSlot Agreement is between Casino and ABI.

[28] California Code of Civil Procedure 1732(c)

[29] Blue Lake Rancheria, Tribal Court Oath of Admission, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Oath_of_Admission.pdf (last visited Jan 21 2016)

*Exhibit 14 - Page 10 of 25*

1    *27)* The Tribal Court's rules of procedure provide that parties served with a

2        complaint shall have thirty days to answer that complaint.[31]

3    *28)* Acres was given only five days to respond to the Complaint in Case

4        Number C-15-1215LJM.[32]

5

6    **THE TRIBAL COURT HAS NO PERSONAL JURISDICTION OVER ACRES**
7

8    *Montana v United States,* 450 U.S. 544 (1981) holds that "the inherent sovereign

9    powers of an Indian tribe [do] not extend to the activities of nonmembers of the

10   tribe." Under *Montana,* the Tribe can only exercise jurisdiction over Acres if one

11   of two exceptions to the rule apply.

12

13   The first exception to the *Montana* rule covers "activities of nonmembers who

14   enter consensual relationships with the tribe or its members, through commercial

15   dealing, contracts, leases, or other arrangements." 450 U. S., at 565.   In *Montana,*

16   the Supreme Court listed four cases in support of this exception, and then in

17   *Strate v A-1 Contractors,* 520 U.S. 438 (1997) the Supreme Court further explained

18   the specific types of activities contemplated by these cases.

19

20   Quoting Justice Ginsberg writing for the majority in *Strate,*

21

---

[30] California Code of Civil Procedure 1732(c)

[31] Blue Lake Rancheria, Tribal Court Rules of Pleading and Procedure, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Rules_of_Pleading_Practice_and_Procedure.pdf  Rule 15 (last visited Jan 21 2016)

[32] Summons issued by Anita M. Huff, Clerk of the Tribal Court on January 12, 2016 and served on January 17, 2016.

*Exhibit 14 - Page 11 of 25*

7

1    *"Montana*'s list of cases fitting within the first exception, see 450 U. S., at

2    565-566, indicates the type of activities the Court had in mind: *Williams* v.

3    *Lee*, 358 U.S. 217, 223 (1959) (declaring tribal jurisdiction exclusive over

4    lawsuit arising out of on reservation sales transaction between

5    nonmember plaintiff and member defendants); *Morris* v. *Hitchcock*, 194

6    U.S. 384 (1904) (upholding tribal permit tax on nonmember owned

7    livestock within boundaries of the Chickasaw Nation); *Buster* v. *Wright*,

8    135 F. 947, 950 (CA8 1905) (upholding Tribe's permit tax on nonmembers

9    for the privilege of conducting business within Tribe's borders; court

10   characterized as "inherent" the Tribe's "authority . . . to prescribe the terms

11   upon which noncitizens may transact business within its borders"); *Colville*,

12   447 U. S., at 152-154 (tribal authority to tax on reservation cigarette sales to

13   nonmembers "is a fundamental attribute of sovereignty which the tribes

14   retain unless divested of it by federal law or necessary implication of their

15   dependent status")."

16

17   Of these four cases, only *Williams* could be read as germane to the current issue

18   with Acres.  However, the specific facts in *Williams* can be summarized as

19   follows:

20

21   i)      a General Store entered into a consensual relationship with the

22           Navajo Nation,

23   ii)     in order to sell goods on the Navajo Reservation, and;

24   iii)    the Operator of the General Store was not an Indian, and;

*Exhibit 14 - Page 12 of 25*

8

1        iv)    the Operator of the General Store extended goods on credit from

2              the General Store to Indians resident on the reservation, and;

3        v)    the Operator subsequently sought to collect payment for the goods

4              through an action in the Superior Court of Arizona.

5

6    The facts underlying *Williams* differ significantly from those in the matter

7    between Acres and the Casino. In *Williams* a non-Indian in a consensual

8    relationship and transacting business purely on Indian land sought to compel an

9    Indian to conform to Arizona civil law, without respect to the civil laws of the

10   Navajo Nation. Such an outcome would clearly compromise the rights of the

11   Navajo Nation to regulate and control Navajo Indians and their personal

12   property on Navajo land. However in the present case, the Casino asks the

13   Tribal Court to extend its jurisdiction over Acres, who is not an Indian, and who

14   is not even alleged to have entered into a consensual relationship with the

15   Tribe[33], for conduct occurring outside the Rancheria territory[34], and over

16   property allegedly possessed by a third party[35] that is not also not within

17   Rancheria territory.[36]

18

---

[33] Paragraph 6 of Plaintiff's Complaint (Compl. P. 2 Beginning at Line 6) alleges that ABI entered into an agreement with Casino. Plaintiff does not allege that Acres entered into an agreement with Casino.

[34] Paragraph 10 of Plaintiff's Complaint (Compl. P. 3 Beginning at Line 10) contains the heart of the alleged misconduct raised in the Complaint. Given that Talo, Inc. is a Nevada entity, and ABI's role in the iSlot Agreement was to act as Distributor for Talo, Inc. to the Casino, then the conduct discussed in Paragraph 10 must necessarily have had its geographic locus within the State of Nevada.

[35] It is never alleged that ABI transferred the money to Acres

[36] The Complaint does not allege that the $249,250 the Casino transferred to ABI is held by ABI within the confines of the Tribe's Rancheria.

*Exhibit 14 - Page 13 of 25*

9

1    Assertion of personal jurisdiction over the conduct or property of one who is not

2    a member of the Tribe, that did not take place within a consensual relationship

3    with the Tribe, and that is also not on the Rancheria does not fall within the first

4    exception created by *Montana*.

5

6    The second exception to *Montana*'s general rule concerns conduct that "threatens

7    or has some direct effect on the political integrity, the economic security, or the

8    health or welfare of the tribe." 450 U. S., at 566.

9

10   Justice Ginsburg writing for the majority in *Strate* provided this guidance

11   interpreting this second exception:

12

13        "Read in isolation, the *Montana* rule's second exception can be

14        misperceived. Key to its proper application, however, is the Court's

15        preface: "Indian tribes retain their inherent power [to punish tribal

16        offenders,] to determine tribal membership, to regulate domestic relations

17        among members, and to prescribe rules of inheritance for members. . . .

18        But [a tribe's inherent power does not reach] beyond what is necessary to

19        protect tribal self government or to control internal relations." 450 U. S., at

20        564."

21

22   Personal Jurisdiction over Acres in Case Number C-15-1215LJM, or any other

23   suit arising from the iSlot Agreement, is not required to preserve "the right of

24   reservation Indians to make their own laws and be ruled by them." *Williams*, 358

*Exhibit 14 - Page 14 of 25*

10

1   U. S., at 220. The *Montana* rule, therefore, and not its exceptions, applies to this

2   case and all potential similar cases.

3

4   The lack of Personal Jurisdiction necessitates dismissing the current case, and

5   provides ample reason to issue an Injunction against future litigation arising

6   from the iSlot Agreement.

7

8   Finally, it bears repeating that the lack of a consensual agreement between Acres

9   and the Tribe is fatal to any attempt by the Tribal Court to assert personal

10   jurisdiction over Acres.

11

12   **THE TRIBAL COURT CANNOT PROVIDE ACRES DUE PROCESS**

13   *Summary of Issues Concerning Due Process*

14   The issues discussed below concerning due process can be summarized in six

15   categories:

16   1)  All judges on the Tribal Court have been placed there by persons and

17       processes that have significant interests adverse to those of Acres

18       (**Subsection A, below**), and;

19   2)  The Tribal Court can only provide a jury pool entirely comprised of

20       individuals who have significant interests adverse to those of Acres

21       (**Subsection B, below**), and;

22   3)  the Tribal Court's Code of Procedure was created by persons and

23       processes that have significant interests adverse to those of Acres

24       (**Subsection C, below**), and;

25   4)  the nature of the requirements for an attorney to obtain and retain the

*Exhibit 14 - Page 15 of 25*

1   right to practice within the Tribal Court make it impossible for Acres

2   to find timely and adequate representation there (**Subsection D,**

3   **below**), and;

4   5)  the tribal court has imposed a five-day response against Acres which is in

5   and of itself incompatible with due process, and done so in violation of

6   its rules of procedure (**Subsections E and F, below**), and;

7   6)  there is the appearance that the relationship between the Tribal Court and

8   the Casino's attorney's is not an arms length one (**Subsection G,**

9   **below**).

10

11   *A. It is Probable that Any Judge Provided by the Tribal Court will Be Biased*

12   *Against* **Acres**

13

14   In *Caperton v Massey* 566 U.S. 868 (2009) the court held that the standards for

15   implementing due process do not require proof of actual bias in a judge.

16   Rather the question that must be asked is whether "under a realistic appraisal

17   of psychological tendencies and human weakness [there exists] such a risk of

18   actual bias or prejudgment that the practice must be forbidden if the

19   guarantee of due process is to be adequately implemented."

20

21   In *Caperton*, the Supreme Court found that "There is a serious risk of actual

22   bias when a person with a personal stake in a particular case had a significant

23   and disproportionate influence in placing the judge on the case."

24

25   In *Caperton v Massey*, the majority of the court found that the facts that

*Exhibit 14 - Page 16 of 25*

1    Massey i) had a significant financial interest in the outcome of the case, and ii)

2    had provided the bulk of the campaign funds that went towards electing the

3    judge on the case were sufficient in and of themselves to deprive Caperton of

4    due process.

5

6    As described below, the potential for bias against Acres is far worse than the

7    potential for bias which existed in *Caperton*, in that every person responsible

8    for hiring and firing judges in the Tribal Court has significant financial

9    interests adverse to those of Acres in Case Number C-15-1215LJM or any

10   other suit arising from the iSlot Agreement.

11

12        *1: Every Member of Tribe has a Powerful Interest Contrary to Acres's*

13

14   Since the action in question seeks a minimum judgment of $249,250 from Acres,

15   and since there are approximately fifty enrolled members, this means that every

16   member of the Tribe has a powerful interest in the outcome of this action.  Each

17   member of the Tribe stands to be enriched by a minimum of approximately

18   $5,000 by any adverse judgment against Acres.

19

20   It is not necessary that any adverse judgment collected by the Tribe against Acres

21   be distributed to individual members of the Tribe for this interest to exist.  The

22   very fact that the Tribe is small means that any enrichment of the Tribe translates

*Exhibit 14 - Page 17 of 25*

1    into enrichment for individual members of the Tribe.[37]

2

3

4    *2: Judges of Tribal Court Serve at the Pleasure of the Business Council and the Business*

5    *Council has a Powerful Interest Contrary to Acres's*

6

7    The Chief Judge and other Judges of the Tribal Court are hired by the Business

8    Council, and the Business Council may dismiss the Chief Judge and other Judges

9    at any time.  Each member of the Business Council stands to be personally

10   enriched by a judgment against Acres.  This creates a natural motive for the

11   Business Council to exert pressure on Judges of the Tribal Court to rule against

12   Acres.

13

14   *3: Members of the Business Council are elected by the General Council and the General*

15   *Council has a Powerful Interest Contrary to Acres's*

16

17   The Business Council is elected by the General Council, which is also entirely

18   comprised of members of the Tribe.  Each member of the General Council stands

19   to be personally enriched by a judgment against Acres.  This creates a natural

20   motive for the General Council to exert pressure on the Business Council to exert

21   pressure on Judges of the Tribal Court to rule against Acres.

22

---

[37] See Blue Lake Rancheria, Government & Law: Governmental Structure "The governmental structure of the Blue Lake Rancheria Tribe is a true representative Democracy." http://www.bluelakerancheria-nsn.gov/govLaw.html#gs (last visited Jan 22, 2016). The Tribe considers the connection each of Member to Tribe to be "tru[lly]" significant.

*Exhibit 14 - Page 18 of 25*

14

*4: Members of the General Council are Elected by Members of the Tribe, and Each*
*Member of the Tribe has a Powerful Interest Contrary to Acres's*

The General Council is elected by an electorate composed entirely of members of the Tribe. Each member of the Tribe stands to be personally enriched by a judgment against Acres. This creates a natural motive for every member of the Tribe to exert pressure on the General Council to exert pressure on the Business Council to exert pressure on Judges of the Tribal Court to rule against Acres.

*5: Arla Ramsey is a Powerful member of the Tribe, and has Maternal Interests Contrary*
*to Acres's*

Arla Ramsey is an important member of the General Council and the Business Council. Arla Ramsey is also a Judge in the Tribal Court. Her son Eric Ramos is ultimately responsible for the direction of the business enterprises of the Tribe, including the Casino. And so Eric Ramos is ultimately responsible for directing that this case be brought against Acres. The status of Arla Ramsey's son as a legal adversary with respect to Acres gives her further inducement to place pressure on Judges of the Tribal Court.

*B: The Tribal Court Cannot Impanel an Impartial Jury*

As described above, every member of the Tribe has a powerful interest in this matter contrary to Acres's.

*Exhibit 14 - Page 19 of 25*

15

1   Under the presumption that the jury is the decider of questions of fact[38] then no

2   Tribal member may be a juror without violating Acres's right to have triers of

3   fact untainted by "the serious risk of bias" as described in *Caperton*.

4

5   Therefore, there is no possible pool of impartial jurors over which the Tribal

6   Court may have jurisdiction from which to impanel a jury.[39]

7

8   **C: The Tribal Court's Code of Procedure was Developed by the Business**

9   **Council**

10

11   As shown above, each member of the Business Council has a financial interest in

12   the outcome of any monetary award against Acres.  This is equally true of any

13   civil action against any non-Tribal entity that involves a monetary award.  Since

14   the Business Council was involved in adopting the Tribal Court's Code of

15   Procedure, the code itself is liable to a serious risk of partiality against the

16   interests of non-Tribal litigants.

17

18

---

[38] Acres was not able to determine what the role of a jury is within the Tribal Court within the five-days provided to it before the Tribal Court's execution of default judgment against it.  Should the role of the jury be otherwise within the Tribal Court, Acres asks that the Tribal Court explain the jury's role so that Acres may understand how that role relates to Acres's rights to due process.

[39] Acres was not able to determine within the provided timeline if jurors in Tribal Court must be Tribal Members.  However, since the Tribal Court may only compel members of the Tribe to sit on its juries, and since the Tribal Court must guarantee Acres due process, it is not possible for the Tribal Court to guarantee Acres an impartial jury.

*Exhibit 14 - Page 20 of 25*

16

**D: Acres has no Practical Ability to be Represented by Attorneys**

> *1. It is unclear if Acres can find an Attorney admitted to practice by the Tribal Court to represent him*

In order to represent Acres, an attorney must be admitted to practice in the Tribal Court and it is not readily apparent where Acres can find an attorney who has been admitted to practice in the Tribal Court.

While the Tribal Court does publish an Application to Practice in Tribal Court on its website,[40] It is unclear what grounds the Tribal Court uses in determining whether to accept applications, what the timeline involved for acceptance or denial of applicants is, or even if there exists a directory of attorneys approved to practice.

These factors would make it difficult for Acres to retain an attorney within a month.  They may make it impossible under any timeline.  They certainly make it impossible within the five days imposed by the Tribal Court.

> *2. Any admitted attorney Acres found would be intimidated by the probability of retaliation from a court biased against Acres*

Since there exists a serious risk that the Tribal Court is not impartial in the matter facing Acres, and since the Tribal Court may revoke an attorney's admission to

---

[40] Blue Lake Rancheria, Tribal Court Application for Admission to Practice Law, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Application_to_Practice1.pdf (last visited Jan 22 2016)

*Exhibit 14 - Page 21 of 25*
17

1   practice before it or otherwise sanction that attorney,[41] then Acres would have

2   reason to worry that any attorney Acres retained to defend it in Tribal Court

3   might temper their advocacy on Acres's behalf and against Acres's interest from

4   fear of incurring the wrath of the Tribal Court.

5

6   *3. Attorneys must swear to support the constitution of the Blue Lake Rancheria to be*

7   *admitted to practice in the Tribal Court*

8

9   Swearing allegiance to a polity is not a trivial matter.

10

11   Acres recognizes that the Tribe and the Tribal Court have a legitimate interest in

12   requiring that the officers of the Tribal Court support the Tribe's constitution.

13

14   However it is not reasonable to expect that many will be willing, upon serious

15   reflection and consideration, to swear to support the constitution of a polity that

16   one cannot become a member of, and in many cases may have interests that are

17   of an adversarial nature with respect to the polities that one is a member of.

18

19   Thus the Tribal Court is not able to guarantee the provision of a pool of attorneys

20   admitted to its bar large enough to ensure that Acres will be able to retain

21   competent council.

22

23

---

[41] Blue Lake Rancheria, Rules of Admission and Professional Conduct, http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Attorney_Conduct_Rules01.pdf (last visited Jan 22 2016)

*Exhibit 14 - Page 22 of 25*

18

1

2  *E: The Tribal Court has Imposed a Timeline that is Incompatible with Due*

3  *Process*

4

5  Acres has been summoned by the court to respond within five days or suffer

6  default judgment against it.  Such a timeline is incompatible with due process in

7  a way that is prejudicial against Acres.

8

9  *F: The Tribal Court Cannot be Relied Upon to Conduct Proceedings according to*

10  *its own Code of Procedure*

11

12  Section 15 of The Tribal Court's Civil Rules of Procedure for the Tribal

13  Court of the Tribe provide that "Any party served with a complaint, cross-claim

14  or counterclaim shall have the right within thirty (30) days from the date of

15  service of the complaint or other pleading to file a written answer thereto. " By

16  issuing a summons with a twice stated five-day deadline the Tribal Court has

17  violated its own Rules of Procedure and shown it cannot be relied upon to

18  conduct regular proceedings according to published rule in a way that protects

19  due process.

20

21

*Exhibit 14 - Page 23 of 25*

19

1    *G: Casino's Attorneys are Acting as an Arm of the Tribal Court*

2

3    Acres has been:

4

5              "Summoned and required to serve upon plaintiff's attorney ... an

6              answer to the complaint which is herewith served upon [Acres]

7              within five (5) days after service of this summons upon [Acres],

8              exclusive of the day of service.  If [Acres] fail[s] to do so, judgment

9              by default will be taken against [Acres] for the relief demanded in

10             the complaint.  [Acres] must also file [its] answer with the Clerk of

11             the Court within a reasonable period of time after service."

12

13   Since a five-day response period is patently unreasonable, and since under the

14   language of the summons Acres is only required to file a response with Tribal

15   Courts Clerk within a reasonable time, and under the light of all the risks of

16   partiality described above, the Tribal Court appears to be relying upon plaintiff's

17   attorneys as a primary conduit of receiving information from Acres.  This

18   bespeaks a level of intimacy between the plaintiff's attorneys and the Tribal

19   Court that is incompatible with impartiality.

20

21   It bears repeating that in Tribal Court Civil Case C-15-1215LJM, the Judges

22   appear to work for the mother (Vice-Chairwoman, Member of the Business

23   Council and Tribal Judge Arla Ramsey) while the plaintiff's attorneys appear to

24   work for the son (President of Business Operations for the Tribe Eric Ramos).

25

*Exhibit 14 - Page 24 of 25*

1

2   **CONCLUSION**

3

4   For the foregoing reasons, SPECIALLY APPEARING Acres respectfully requests

5   and makes Motions that this court:

6      1)   immediately dismiss its Civil Case Number C-15-1215LJM, and;

7      2)   enjoin the Casino or any other entity of the Tribe from filing any future

8          complaint against Acres regarding the iSlot Agreement in Tribal Court

9          because of the Tribal Court's lack of personal jurisdiction over Acres in the

10         matter, and because of the Tribal Court's incurable inability in such cases

11         to provide due process to litigants such as Acres whose interests are at

12         odds with the interests of members of the Tribe.

13

14  **RESPECTFULLY SUBMITTED THIS** 22ⁿᵈ day of January 2016 by James Acres,

15  who is SPECIALLY APPEARING without benefit of council as necessitated by

16  the circumstances described above.

17

18  Signed:

19

20  James Acres
21
22
23  344 Sylvia
24  Encinitas, CA 92024
25  james@kosumi.com
26  Phone: 541 760 7503

Resigned on Tuesday, January 26th, 2016

*Exhibit 14 - Page 25 of 25*

21

# Exhibit 15

*Summary of a Conversation Between Plaintiff Acres and Defendant Huff*

This is a true and complete copy of

a summary of a phone conversation between James Acres and Anita Huff
as sent via email from James to Anita on February 8th, 2016.

There is one page in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 15 - Title Page*



**From: James Acres** james@acresbonusing.com
**Subject:** Summary of Conversation with Anita Huff Regarding C-15-1215LJM
**Date:** February 8, 2016 at Feb 8 12:44
**To:** courtclerk@bluelakerancheria-nsn.gov
**Cc:** Dan Stouder dstouder@boutinjones.com, Amy O'Neill aoneill@boutinjones.com

Hello Anita,

Thank you for taking time with me on the phone this morning. I am sending this email as a written summary of our conversation. I ask that you please confirm in writing that the summary below matches your recollection of the conversation, or let me know where you believe it differs.

I apologize that I'm constrained to insist on this tediously explicit statement and confirmation of our conversation. But I do believe it is warranted by the unusual circumstances we find ourself in, namely a civil lawsuit in which:

    i) a small group of approximately fifty individuals controls both the Plaintiff and the Court, and

    ii) every member of that controlling group stands to be enriched by thousands of dollars through the lawsuit, and

    iii) the lawsuit began with the Court violating its own procedures to the benefit of the Plaintiff by issuing a Summons with a five-day deadline under pain of default judgement.

With that preamble, here is what I believe to be a full and accurate summary of our conversation:

** We spoke at approximately 11:25 this morning, Monday February 8, for about two minutes.

** You stated that the Special Appearance filings by Acres Bonusing, Inc. and James Acres in C-15-1215LJM had both been accepted, and are considered timely.

** You stated that as of today, no Default Judgements had been entered against Acres Bonusing, Inc. or James Acres.

** You stated that no Default Judgments would be entered in C-15-1215LJM without prior notice to Acres Bonusing, Inc. or James Acres.

** You stated that the Judge has been in and out of the office for the past two weeks, and hasn't had a chance to direct you on how to proceed with respect to the filings.

** You stated that you personally were ill last week (the week of Feb 1st), and thus unable to register receipt of the Special Appearances by the Tribal Court.

** You stated that the entirety of the Tribal Court's rules are available on the website of the Tribal Court.

** You stated that you could not explain why the Summonses issued to Acres Bonusing, Inc. and James Acres were issued with five-day deadlines under penalty of default judgment, in variance to the rules of the Tribal Court posted on its website.

As I requested above, please confirm that this represents a full and accurate summary of our conversation, or let me know where it differs from your recollection.

Thank-you,

-james

James Acres
President, Acres Bonusing, Inc

541 760 7503
james@acresbonusing.com

1106 2nd #123
Encinitas, CA 92024

*Exhibit 15 - Page 1 of 1*

# Exhibit 16

*Defendant Lester J. Marsten's Feb 16 Order*

This is a true and complete copy of

Defendant Judge Lester J. Marsten's Feb 16, Order

as received as an email attachment from Anita Huff on February 16, 2016.

There are seven pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 16 - Title Page*

ENDORSED-FILED

FEB 16 2016

CLERK OF THE TRIBAL COURT
BLUE LAKE RANCHERIA

*Anita Huff*

## IN THE TRIBAL COURT FOR THE BLUE LAKE RANCHERIA

BLUE LAKE CASINO & HOTEL, a tribally
owned entity of Blue Lake Rancheria, a federally
recognized Indian tribe,

                          Plaintiff,

v.

ACRES BONUSING, INC., a Nevada
Corporation, *et al.*,

                          Defendants.

Case No.: C-15-1215 LJM

**ORDER**

The Court, having received and considered defendant, James Acres' MOTION FOR DISMISSAL AND INJUNCTION and memorandum of points and authorities thereon in the above-entitled action, finds as follows:

1.      Pursuant to subsection (B), entitled "Self-representation", of Section 11.1.1.080, entitled "Appearances", of the Tribal Court Ordinance, while any "individual party may appear and represent himself . . . in any proceeding before the Tribal Court", parties representing themselves "shall be held to the same strict standards of conduct as are required of legal counsel."

2.      On or about January 22, 2016, Mr. Acres submitted a pleading entitled Special Appearance, which was accompanied by a Table of Authorities, Motions for Dismissal and Injunction ("Motion"), and Memorandum in Support of Motions ("Memorandum"). In an e-mail transmitting the Special Appearance to the Clerk of this Court and in his Memorandum, Mr. Acres indicates that it is

*Exhibit 16 - Page 1 of 7*

1    impossible for him to find an attorney and that he will be representing himself only to show that this

2    Court lacks jurisdiction over him as an individual defendant.

3           3.     Subsection (a) of Rule 12 of this Court's Rules of Pleading, Practice and Procedure

4    ("PP&Ps"), states that the Clerk of this Court shall refuse to file any paper which is not in substantial

5    conformity with Rule 12.

6           4.     Subsection (d), entitled "Caption and Title", of Rule 12 of this Court's PP&Ps, states

7    that the first page of each paper filed with this Court shall contain: (1) the title of the Court, (2) the title

8    of the action or proceeding, (3) the file number of the action or proceeding followed by the initials of

9    the judge to whom it is currently assigned and (4) the title of the document (e.g. "Complaint",

10   "Defendants Motion for Summary Judgment", etc.).

11          5.     None of the pleadings submitted as part of the Special Appearance documents include

12   the title of the action or proceeding. Neither the Motion nor the Memorandum includes the title of the

13   Court, title of the action or proceeding, or the file number of the action or proceeding.

14          6.     Subsection (f), entitled "Paragraphs; Separate Statements", of Rule 12 of this Court's

15   PP&Ps states that all allegations of a claim or defense shall be made in numbered paragraphs, the

16   contents of each of which shall be limited as far as practicable to a statement of a single set of

17   circumstances, and that each claim founded upon a separate transaction or occurrence and each defense

18   other than denials shall be stated in a separate count or defense whenever a separation facilitates the

19   clear presentation of the matters set forth.

20          7.     Because of these defects, Mr. Acres' Motion and Memorandum are not in substantial

21   conformity with Rule 12 and the Clerk of this Court must refuse to file these pleadings.

22          8.     Subsection (d), entitled "Proof of Service" of Rule 14 of this Court's PP&Ps, entitled

23   "Process", states that whenever any pleading or other paper presented for filing, it shall bear or have

24   attached to it either an acknowledgment of service by the person served, or proof of service and the

*Exhibit 16 - Page 2 of 7*

names of the persons served, certified by the person who made service. The proof of service shall also contain the day and manner of service, and the method of service employed. Failure to comply with this rule shall not be a ground for a refusal to file a paper or pleading but shall be cured promptly after filing.

9.     The Special Appearance documents filed by Mr. Acres are not accompanied by a proof of service, certified by him or another individual who served the appropriate parties, setting forth the names of the parties served, day and manner of service, and method of service employed. However, as set forth *supra*, Rule 14(b) does allow Mr. Acres to correct this defect after filing and the omission of the proof of service is not, in itself, sufficient reason to refuse the filing.

10.     Subsection (b), entitled "Notice and Supporting Papers", of Rule 18 of this Court's PP&Ps, entitled "Motion Practice", indicates that "all motions, except those made in the course of a trial or hearing, shall be noticed in writing on the motion calendar of the assigned judge for hearing not less than 28 days after service." Rule 18(b) also states that the noticed hearing date and time must appear on the cover page of each motion in the space opposite the caption below the file number.

11.     Neither the Motion nor the Memorandum, nor any other document submitted in the Special Appearance documents indicates the noticed hearing date and time. At the time of issuance of this Order, Mr. Acres had not requested to set a date for the motion on this Court's motion calendar.

12.     Rule 18(b) of this Court's PP&Ps also states a notice of motion shall be accompanied by separately captioned affidavits or declarations under penalty of perjury sufficient to support any material factual contentions, by an appropriate memorandum or brief and by a copy of a proposed form of order.

13.     Mr. Acres makes a number of material factual contentions that are not supported by affidavit or declaration under penalty of perjury. This is a pleading defect that must be cured before the Motion and Memorandum may be filed with this Court.

*Exhibit 16 - Page 3 of 7*

14.    In addition, Mr. Acres has not submitted a proposed form of order to accompany his Motion, as required by Rule 18(b). Mr. Acres must submit a proposed order for this court.

15.    Subsection (d), entitled "Briefs and Memorandum", of Rule 18 of this Court's PP&Ps, states that briefs and memorandum shall contain an accurate statement of the questions to be decided, set forth concisely the relevant facts and the argument of the party with citation to relevant legal authorities, and not exceed 25 pages in length.

16.    Rule 18(d) further states that any brief or memorandum exceeding 10 pages shall have a table of contents, legal authorities cited and a brief statement of the issues to be decided.

17.    Mr. Acres' Memorandum does not contain a brief statement of the issues to be decided. While the Special Appearance documents do include a table of the legal authorities cited, this table of authorities is inadequate because, unlike the table of contents, it does not include the page numbers on which each legal authority appears.

18.    Subsection (e), entitled "Affidavits and Declarations", of Rule 18 of this Court's PP&Ps requires that factual contentions in support of or in opposition to any motion shall be supported by affidavits or declarations and appropriate references to the record.

19.    As stated *supra* in Paragraph 13 of these findings, the factual contentions offered in support of Mr. Acres' motion are not supported by affidavits or declarations or references to the record before this Court. Instead, Mr. Acres offers a list of facts about the Tribe, officials of the Tribe, and members of the Tribe, states that each enumerated fact is judicially noticeable, cites to a Ninth Circuit case in support of his contention that facts on publicly accessible government websites are considered judicially noticeable and claims that all enumerated facts were derived from the Tribe's website.

20.    Pursuant to Subsection A, entitled "Civil Procedures", of Section 11.1.1.060, entitled "Court Procedures", of the Tribal Court Ordinance, the Chief Judge of this Court shall develop court

*Exhibit 16 - Page 4 of 7*

procedures in consultation with legal counsel designated by the Business Council, and subject to approval by the Business Council.

21.     Section 11.1.1.060(A) also states that, when choosing what law applies, this Court shall apply the law of the Tribe; in the absence of applicable tribal law, the Court shall use as guidance the laws of the State of California, the laws of other federally recognized Tribes and federal law, but shall follow federal and state laws, if required by tribal or federal law.

22.     The Chief Judge of this Court, in consultation with the Business Council, has promulgated the Court's Rules of Evidence which shall govern and be applicable to any and all proceedings of this Court and shall apply to every action before this Court.

23.     Because this Court has promulgated Rules of Evidence that shall apply to every action before this Court, this Court must apply these Rules of Evidence to this proceeding and shall use state or federal law as guidance in the absence of applicable law regarding evidence.

24.     Rule 34 of the Tribe's Rules of Evidence states that judicial notice may be taken only as authorized by the Rules of Evidence and that judicial notice may not be taken of any matter unless authorized or required by the Rules.

25.     Rule 35 of the Tribe's Rules of Evidence set forth matters that this Court must judicially notice.

26.     Rule 36 of the Tribe's Rules of Evidence set forth matters that this Court may judicially notice to the extent that they are not embraced by those matters enumerated in Rule 35.

27.     Rule 37 of the Tribe's Rules of Evidence, entitled "Compulsory judicial notice upon request", states this Court shall take judicial notice of any matter specified in Rule 36 if a party requests it and: (a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter.

*Exhibit 16 - Page 5 of 7*

28.     Pursuant to Rule 37 of the Tribe's Rules of Evidence, for any matters that are embraced by Rule 36, Mr. Acres must file a request that this Court take judicial notice, provide sufficient information for each factual contention to enable the Court to take judicial notice, and give the plaintiffs sufficient notice of his request. Mr. Acres request for judicial notice did not meet these requirements in conformity with Rule 36 and 37.

Based upon the forgoing findings of fact and conclusions of law, and good cause appearing therefore, IT IS HEREBY ORDERED that:

1.     The Clerk of this Court shall reject the Special Appearance documents filed by Mr. Acres and shall not file said documents.

2.     Mr. Acres or his legal counsel shall correct and resubmit his Special Appearance documents in accordance with the requirements of this Court's Rules of Pleading, Practice and Procedure and Rules of Evidence.

3.     If Mr. Acres continues to represent himself in this matter, as he is held to the same strict standards of conduct as are legal counsel before this Court, should Mr. Acres continue to flout this Court's rules, he may be subject to sanctions.

4.     Pursuant to Rule 30 of this Court's Rules of Pleading, Practice & Procedure, Mr. Acres must, within 30 days of the issuance of this Order, file an answer or other responsive pleading to the Complaint.

DATED: February 16, 2016

HON. LESTER J. MARSTON, Chief Judge
Tribal Court for the Blue Lake Rancheria

6
ORDER

*Exhibit 16 - Page 6 of 7*

1

**PROOF OF SERVICE**

2  I declare that:  I am a resident of the County of Humboldt, in the State of California.  I am over the age of eighteen

3  years and not a party to the within entitled cause; my business address is; 428 Chartin Road, P.O. Box 426, Blue

Lake, CA  95525.

4  On February 16, 2016, I served the attached ORDER on the parties or attorneys for the parties in said cause:

5

6  [ ] BY MAIL by placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in

the United States Mail at Blue Lake, California, addressed as shown below;

7  [ ] BY HAND DELIVERY by causing a true copy thereof, enclosed in a sealed envelope, to be delivered by hand

8  to the addresses shown below;

9  [ ] BY FACSIMILE TRANSMISSION by transmitting a true copy thereof by facsimile transmission to the

interested parties to said action at the facsimile number(s) shown below.

10  [ ] BY OVERNIGHT DELIVERY using a commonly-known overnight delivery service with fees thereon fully

11  prepaid, in Blue Lake, California, addressed as shown below.

12  [ X] BY EMAIL by electronically transmitting a true copy to the email addresses listed below.

13  PLANITFF:
BLUE LAKE CASINO & HOTEL

14

Boutin Jones Inc.
15  Daniel S. Strouder
dstouder@boutinjones.com
16  Amy L. O'Neill
aoneill@boutinjones.com
17  555 Capital Mall, Suite 1500
Sacramento, CA 95814-4603
18

DEFENDANT:
19  ACRES BONUSING, INC.
James Acres
20  1106 2nd #123
Encinitas, CA 92024
21  james@acresbonusing.com
james@kosumi.com
22

23  I declare that under penalty of perjury under the laws of the Blue Lake Rancheria and the State of California that the

foregoing is true and correct, and that this declaration was executed on February 16, 2016, at Blue Lake, California.

24

25

26                                                        ANITA HUFF

27

28

*Exhibit 16 - Page 7 of 7*

# Exhibit 17

*Defendant Judge Marsten's Feb 24 Order*

This is a true and complete copy of

Defendant Judge Lester J. Marsten's Feb 14, Order

as received as an email attachment from Anita Huff on February 26, 2016.

There are five pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 17 - Title Page*

1
2
3
4
5
6
7

ENDORSED-FILED

FEB 2 6 2016

CLERK OF THE TRIBAL COURT
BLUE LAKE RANCHERIA

8          **IN THE TRIBAL COURT FOR THE BLUE LAKE RANCHERIA**

9

10    BLUE LAKE CASINO & HOTEL, a tribally           Case No.: C-15-1215 LJM
      owned entity of Blue Lake Rancheria, a federally
11    recognized Indian tribe,

12                       Plaintiff,                  **CASE MANAGEMENT CONFERENCE
                                                     ORDER**
13    v.

14    ACRES BONUSING, INC., a Nevada
      Corporation, and JAMES ACRES, an individual,
15
                         Defendants.
16

17

18          This case has been assigned to the calendar of Chief Judge Lester J. Marston. The

19    responsibility for the progress of litigation in the Tribal Court for the Blue Lake Rancheria falls not

20    only upon the attorneys in the action, but upon the Court, as well. Rules of Pleading, Practice and

21    Procedure, Rule 10(a).[1]

22          The Court, having determined that a Case Management Conference will promote the efficient

23    determination of the factual and legal issues in this case, and good cause appearing therefor,

24          **IT IS HEREBY ORDERED** that:

25          1.    A Case Management Conference shall be held in this case on Monday, April 4, 2016, at

26    1:30 p.m., in the Tribal Court for the Blue Lake Rancheria. The parties shall participate in the Case

27    ---
      [1] In order to secure the just, speedy, and inexpensive determination of every action, all counsel and self-represented parties
      are hereby ordered to familiarize themselves with the Rules of Pleading, Practice and Procedure, the Tribal Court
28    Ordinance, the Rules of Evidence, and such other tribal laws that may be applicable in the above-entitled action.

1  Management Conference by telephone, using the following information: USA Toll-Free Number: 866-
2  528-2256, Access Code: 8627201.

3    2.    Parties shall file with the Court, on or before March 18, 2016, a joint case management
4  statement. If a party is unable to obtain the cooperation of another party for the preparation of a joint
5  statement, despite reasonable efforts, the complying party may file a separate case management
6  statement, accompanied by a declaration describing the conduct of the uncooperative party that
7  prevented the preparation of a joint case management statement.

8    3.    The joint case management statement shall contain the following:

9    a.    A brief description of the events underlying the action;

10    b.    The principal factual issues the parties dispute;

11    c.    The principal legal issues the parties dispute;

12    d.    Additional parties the current parties intend to join;

13    e.    Whether the parties have had any settlement discussions; and

14    f.    Whether the parties believe the settlement discussions would be advanced by the
15    Court holding a mandatory settlement conference.

16    4.    To facilitate the scheduling process, the parties shall complete the Schedule of Pretrial
17  and Trial Dates Form attached as **Exhibit A** to this order and attach it to the joint case management
18  statement. The Court urges the parties to make every effort to agree upon joint dates and deadlines.
19  The entries in the "Time Computation" column reflect what the Court believes are appropriate for most
20  cases and will allow the Court to rule on potentially dispositive motions sufficiently in advance of the
21  final pretrial conference. The form is designed to enable counsel to ask the Court to set different
22  (earlier) last dates by which the key requirements must be completed.

23    5.    The failure to submit a joint case management statement in advance of the Case
24  Management Conference or the failure to attend the Case Management Conference may result in the
25  dismissal of the action, striking of an answer and entering a default, and/or the imposition of sanctions.
26  / / /
27  / / /
28

2

CASE MANAGEMENT CONFERENCE ORDER (Case No. C-15-1215 LJM)

*Exhibit 17 - Page 2 of 5*

6.      A continuance of the Case Management Conference shall be granted only for good cause.

DATED: February 24, 2016

HON. LESTER J. MARSTON, Chief Judge
Tribal Court for the Blue Lake Rancheria

CASE MANAGEMENT CONFERENCE ORDER (Case No. C-15-1215 LJM)

*Exhibit 17 - Page 3 of 5*

1  Chief Judge Lester J. Marston

2  **EXHIBIT A**

3  **SCHEDULE OF PRETRIAL & TRIAL DATES WORKSHEET**

4  Case No.                              Case Name:

5

| MATTER | JOINT REQUESTED DATE OR PLNTF/DEFT REQUESTED DATE | TIME |
|---|---|---|
| **TRIAL** [ ] Court [ ] Jury <br><br> Duration Estimate: | (Monday) | 8:30 a.m. |
| **FINAL PRETRIAL CONFERENCE ("FPTC")** <br><br> 4 wks before trial | (Monday) | 1:30 p.m. |

| MATTER | TIME COMPLETATION | JOINT REQUESTED DATE or PLNTF/DEFT REQUESTED DATE |
|---|---|---|
| Amended Pleadings and Addition of Parties Cut-Off (includes hearing of motions to amend) | 90 days after case management conference | |
| Non-Expert Discovery Cut-Off (includes hearing of discovery motions) | at least 14 wks before FPTC | |
| Motion Cut-Off (filing deadline) | at least 13 wks before FPTC | |
| Initial Expert Disclosure & Report Deadline | at least 9 wks before FPTC | |
| Rebuttal Expert Disclosure & Report Deadline | at least 5 wks before FPTC | |
| Expert Discovery Cut-Off (includes hearing of discovery motions) | at least 3 wks before FPTC | |
| Settlement Conference Completion Date | at least 4 wks before FPTC | |
| Motions in Limine Filing Deadline | at least 3 wks before FPTC | |
| Opposition to Motions In Limine Filing Deadline | at least 2 wks before FPTC | |
| FPTC Statement Filing Deadline | at least 2 wks before FPTC | |
| Other Dates: | | |

4

CASE MANAGEMENT CONFERENCE ORDER (Case No. C-15-1215 LJM)

*Exhibit 17 - Page 4 of 5*

**PROOF OF SERVICE**

I declare that: I am a resident of the County of Humboldt, in the State of California. I am over the age of eighteen years and not a party to the within entitled cause; my business address is; 428 Chartin Road, P.O. Box 426, Blue Lake, CA 95525.

On February 26, 2016, I served the attached CASE MANAGEMENT CONFERENCE ORDER on the parties or attorneys for the parties in said cause:

[ ] BY MAIL by placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Blue Lake, California, addressed as shown below;

[ ] BY HAND DELIVERY by causing a true copy thereof, enclosed in a sealed envelope, to be delivered by hand to the addresses shown below;

[ ] BY FACSIMILE TRANSMISSION by transmitting a true copy thereof by facsimile transmission to the interested parties to said action at the facsimile number(s) shown below.

[ ] BY OVERNIGHT DELIVERY using a commonly-known overnight delivery service with fees thereon fully prepaid, in Blue Lake, California, addressed as shown below.

[X] BY EMAIL by electronically transmitting a true copy to the email addresses listed below.

PLANITFF:
BLUE LAKE CASINO & HOTEL

Boutin Jones Inc.
Daniel S. Strouder
dstouder@boutinjones.com
Amy L. O'Neill
aoneill@boutinjones.com
555 Capital Mall, Suite 1500
Sacramento, CA 95814-4603

DEFENDANT:
ACRES BONUSING, INC.
James Acres
1106 2nd #123
Encinitas, CA 92024
james@acresbonusing.com
james@kosumi.com

I declare that under penalty of perjury under the laws of the Blue Lake Rancheria and the State of California that the foregoing is true and correct, and that this declaration was executed on February 26, 2016, at Blue Lake, California.

_____
ANITA HUFF

*Exhibit 17 - Page 5 of 5*

# Exhibit 18

*Feb 23 Docket in Underlying Tribal Action*

This is a true and complete copy of

the Docket in the Underlying Tribal Action

as emailed to James Acres by Anita Huff on Feb 23, 2016.

There are two pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 18 - Title Page*

**From:** **Anita Huff** AHuff@bluelakerancheria-nsn.gov 📎
**Subject:** RE: Second Attempt: Docket for Case # C-15-1215LJM
**Date:** February 23, 2016 at Feb 23 08:39
**To:** James Acres james@acresbonusing.com



Mr. Acres,
Please find attached the docket in the above named case as requested.
Thank you,

Anita Huff
Tribal Court Clerk
Blue Lake Rancheria Tribal Court
P.O. Box 426
Blue Lake, CA  95525-0426
Phone (707) 668-5101 x 1032
FAX  (707) 668-4272
ahuff@bluelakerancheria-nsn.gov

CONFIDENTIALITY NOTICE: This e-mail and attachment(s), if any, is for the sole use of the intended recipient(s) and may contain confidential business information protected by the trade secret privilege, the Electronic Communications Privacy Act (ECPA), and/or other legal bases as may apply. If you are not an intended recipient, please take notice that disclosure of the information contained herein is inadvertent, expressly lacks the consent of the sender, and your receipt of this e-mail does not constitute a waiver of any applicable privilege(s). In this event, please notify the sender immediately, do not disseminate any of the information contained herein to any third party, and cause all electronic and/or paper copies of this e-mail to be promptly destroyed. Thank you.


-----Original Message-----
From: James Acres [mailto:james@acresbonusing.com]
Sent: Monday, February 22, 2016 5:52 PM
To: Anita Huff
Subject: Second Attempt: Docket for Case # C-15-1215LJM

Hello,

Would you please forward a copy of the Docket for Case # C-15-1215LJM.  I would like to ensure that all relevant documents have been communicated and received.

Specifically, while the ORDER of February 16, 2016 was sent to both james@acresbonusing.com and james@kosumi.com, it was only received at the second address.  So we know that not all the court's communications are being successfully transmitted.  Diligence requires that I compare the communications that have been received with the actual docket of the case, to ensure that nothing critical is missing.

Thank you,

James Acres
President, Acres Bonusing, Inc

541 760 7503
james@acresbonusing.com

1106 2nd #123
Encinitas, CA 92024


## TABLE OF CONTENTS

### C-15-1215 LJM

| Tab # | Description of entry | File Date |
|---|---|---|
| 1 | Summons | 01/12/2016 |
| 2 | Complaint: Breach of Contract | 01/13/2016 |
| 3 | ORDER | 02/16/2016 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Exhibit 18 - Page 1 of 2*

*Exhibit 18 - Page 2 of 2*

# Exhibit 19

*Blue Lake Rancheria Constitution*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/BLR_Constitution.pdf

as retrieved on January 19, 2016.

There are 23 pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 19 - Title Page*

# CONSTITUTION

## OF THE

# BLUE LAKE RANCHERIA

Exhibit 19 - Page 1 of 23



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Northern California Agency
P.O. Box 494879
Redding, California 96049-4879

IN REPLY REFER TO:
**Tribal Operations**

MAR 11 1994

Sylvia Daniels, Chairperson
Blue Lake Rancheria
P.O. Box 428
Blue Lake, California   95525

Dear Ms. Daniels:

Enclosed for your records is a copy of letter dated March 7, 1994 from the Acting Deputy Commissioner of Indian Affairs and the approved original Constitution and Bylaws of the Blue Lake Rancheria adopted on February 11, 1994.  We have also enclosed at your request, copies of the Secretarial Election packet for your information.

If we can be of further assistance, please contact Barbara Norris in the Branch of Tribal Operations.

Sincerely,

Dr. Virgil Akins
Superintendent

Enclosures

RECEIVED MAR 1 4 1994

*Exhibit 19 - Page 2 of 23*



# United States Department of the Interior

RECEIVED
CALIFORNIA



TAKE
PRIDE IN
AMERICA

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

94. MAR 10 P12:56

IN REPLY REFER TO:
Tribal Government Services - TR
2611 MS/MIB

MAR 0 7 1994

A 3-10-94
SUPT.
ADMIN. _____ ony
ROUTE _____ 10 #729
RESPONSE REQUIRED
DUE DATE 5-24-94
MEMO _____ LTR
TELE _____ OTHER

3325

THROUGH:   SACRAMENTO AREA DIRECTOR

Dr. Virgil Akins
Superintendent, Northern California Agency
Bureau of Indian Affairs
P. O. Box 494879
Redding, California  96049-4879

Dear Dr. Akins:

We have received the results of the election held on February 11, 1994, by
the qualified voters of the Blue Lake Rancheria of California (Rancheria).
The election was called in accordance with an order issued on November 12,
1993, which permitted the qualified voters of the Rancheria to vote on the
adoption or rejection of a proposed revised Constitution of the Blue Lake
Rancheria.

As evidenced by the completed Certificate of Results of Election, the
proposed Constitution and Bylaws of the Blue Lake Rancheria was duly adopted
on February 11, 1994, by a vote of 13 for and 0 against in an election in
which at least thirty percent (30%) of the 19 members registered and entitled
to vote cast their ballots.

The Constitution and Bylaws of the Blue Lake Rancheria, as adopted on
February 11, 1994, is hereby approved pursuant to the authority delegated to
the Secretary of the Interior by the Act of June 18, 1934 (48 Stat. 984), as
amended, and delegated to me by 230 D.M. 2.4. Please deliver the enclosed
approved original document to the Rancheria.

Sincerely,

Acting Deputy Commissioner of Indian Affairs

Enclosure

*Exhibit 19 - Page 3 of 23*

# CONSTITUTION

## of the

# BLUE LAKE RANCHERIA

### PREAMBLE

We, the Indians of the Blue Lake Rancheria, located near the town of Blue Lake, Humboldt County, California, in order to form a recognized representative organization to manage all tribal affairs, and to preserve and make secure our rancheria homeland heritage and identity; to safeguard our interests and general welfare; to improve the economic conditions of ourselves and our rancheria; do hereby adopt this constitution.

This Constitution shall supersede the Constitution of the Blue Lake Rancheria adopted February 2, 1989, and approved by the Deputy to the Assistant Secretary - Indian Affairs on March 22, 1989, and shall govern the Blue Lake Rancheria from its effective date.

### ARTICLE I - PURPOSE

The Indians of the Blue Lake Rancheria, hereinafter referred to as the "tribe" pursuant to the Act of June 18, 1934, and the judgment entered in Hardwick v. United States of America, U. S. District Court for the Northern District of California, No. C-79-1710-SW, adopt this constitution which shall henceforth constitute the governing document of the tribe, for the purpose of governing ourselves and to promote and protect the interest of the tribe and to enhance peaceful and cooperative relations with other tribal, Federal, state and local governments and entities.

### ARTICLE II - TERRITORY AND JURISDICTION

Section 1. Territory and Jurisdiction. The jurisdiction of the tribe, its general council and business council, and its tribal courts shall extend to the following:

    (a)  All lands which are held in trust or restricted status, water and other resources within the exterior boundaries of the Blue Lake Rancheria as established in Hardwick v. United States of America, U.S. District Court, Northern District of California, No. C-79-1710-SW;

*Exhibit 19 - Page 4 of 23*

(b) All other lands, water and resources as may be hereafter acquired by the tribe, whether within or without said boundary lines, under any grant, transfer, purchase, adjudication, treaty, Executive Order, Act of Congress, or other acquisition, subject to Federal law;

(c) All persons within any territory under the jurisdiction of the tribe; and

(d) All tribal members, wherever located, to the fullest extent permitted by applicable Federal law.

## ARTICLE III - MEMBERSHIP

Section 1. Membership.   The following persons shall be members of the Blue Lake Rancheria:

(a) All Indian persons whose names are listed as distributees on the document entitled "Plan for the Distribution of the Assets of the Blue Lake Rancheria", according to the provisions of Public Law 85-671, approved August 18, 1958, together with Indian persons listed as dependent children of said distributees.

(b) All Indian persons living on the effective date of this constitution who are lineal descendants of any person designated in subsection (a).

(c) All Indian persons living on the effective date of this constitution who currently reside on the rancheria and who can establish to the satisfaction of the Secretary of the Interior their Indian descent.

(d) All children born after the effective date of this constitution to any member who is a resident of the rancheria at the time of the birth of said child.

(e) The business council may by an affirmative vote of two-thirds (2/3) adopt as members any person of Indian blood who is a permanent resident of the rancheria.

Section 2. Enrollment Restriction.   Any person who falls within any of the following categories shall not be eligible for membership with the Blue Lake Rancheria.

1. Who was a member of any other tribe or band of Indians when its trust relationship with the Federal Government was terminated.

- 2 -

*Exhibit 19 - Page 5 of 23*

2. Who has been allotted on another reservation or on the public domain.

3. Who has relinquished in writing their right to membership on the Blue Lake Rancheria.

4. Who is officially enrolled with or is recognized as a member of any other federally recognized tribal entity or who is an Indian of another reservation.

Section 3.  Enrollment Abandonment.

1. No person shall be a member of the Blue Lake Rancheria who accepts or has accepted benefits as a member of another tribe or as an Indian of another reservation or rancheria.

Section 4.  "Residents" Defined.  For purposes of this constitution, "resident" shall mean that place of domicile where a person physically resides on the Blue Lake Rancheria with the present intention of making a permanent home, Provided, That temporary absence from the rancheria due to such matters as school attendance, military service, and employment shall not deprive a person otherwise qualified from membership.

Section 5. Enrollment.  The business council shall have the power to regulate the enrollment of tribal members through the adoption of an enrollment ordinance consistent with this constitution and subject to the approval of the Secretary of the Interior governing future membership, loss of membership, and the adoption of members.

## ARTICLE IV - RIGHTS OF MEMBERS

Subject to the limitations imposed by this constitution, all members of the tribe shall enjoy equal political rights and opportunities to participate in the tribal government, tribal economic resources, tribal assets, and all the rights that are conferred upon a tribal citizen, and no member shall be denied freedom of speech, religion, the right to peaceful assembly, or other rights guaranteed by applicable Federal law, nor shall any member be denied the right to petition the business council, general council, or the tribal courts for redress of grievances against the tribe, or otherwise be deprived of life, liberty or property without notice and an opportunity to be heard. The Blue Lake Rancheria in exercising its powers of self-government shall guarantee to all persons the protections set forth in Title II of the Indian Civil Rights Act of April 11, 1968 (82 Stat. 77).

- 3 -

*Exhibit 19 - Page 6 of 23*

## ARTICLE V – GOVERNING BODY

Section 1.  Electorate.   All duly enrolled tribal members eighteen (18) years of age or older and who are residents on the Blue Lake Rancheria shall be members of the general council of the Blue Lake Rancheria and shall be eligible to vote in all tribal elections, referendums, recalls, repeals and at all meetings of the general council.   For general council meetings a quorum shall be thirty (30) percent of the eligible general membership.

Section 2.  General Council Meetings.   A regular meeting of the general council shall be held once every year on the second Saturday of October.   The place and time shall be posted one (1) week prior to the date of the meeting.

Special meetings of the general council may be called by a vote of a majority of the business council or upon written request of a majority of eligible voting members of the rancheria submitted to the business council.  The meeting shall be held within thirty (30) days of the request and notice in regard to any special meeting shall be mailed out at least seven (7) days prior to the meeting and shall specify the purpose of the meeting.

Section 3.  General Council Reservation of Powers.   The following powers shall be exclusively reserved to the general council.  No exercise of these powers by the business council or by any other agency or office of the tribe shall be effective unless the general council has given its consent to such action by a two-thirds vote of eligible members.

   a.  The power to elect tribal officers;

   b.  The power of initiative, referendum and recall;

   c.  The power to veto business council approval or disapproval of adoptions of new members;  Provided,  That such veto power is exercised within three (3) months of the subject business council action;

   d.  The power to sell or relinquish land owned by the tribe or land held in trust for the tribe by the United States of America;

   e.  The power to terminate the Blue Lake Rancheria;

   f.  The power to sell or relinquish any tribal jurisdiction to any other government, agency, organization, association or person.

   g.  The power to sell or relinquish any tribal hunting or fishing rights;

   h.  The power to waive the tribe's immunity from suit.

- 4 -

Exhibit 19 - Page 7 of 23

Section 4.  Business Council.   The governing body of the Blue Lake Rancheria shall be a council known as the Blue Lake Rancheria Business Council.  It shall be the duties of the business council to govern all people, resources, land and water reserved to the tribe in accordance with this constitution, such laws as may hereinafter be adopted by the business council and such limitations as may lawfully be imposed by the statutes or the Constitution of the United States.

Section 5.  Laws.   The business council shall have the power to enact laws for the welfare, health and safety of the members of the Blue Lake Rancheria, Provided, That such laws are not in conflict with this constitution, and Provided, Further, That such laws shall not adversely affect vested rights of any resident of the Blue Lake Rancheria, member or nonmember, absent notice, an opportunity to be heard and just compensation.

Section 6.  Enumerated Powers.  The business council shall have the following powers, to be exercised consistent with Federal law, this constitution, and the applicable laws of the Blue Lake Rancheria:

(a)  On behalf of the tribe, to consult, negotiate, contract or conclude agreements with Federal, state, local and tribal governments and with private persons and organizations;

(b)  To employ legal counsel the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior so long as such approval is required by Federal law;

(c)  To make recommendations to the Secretary of the Interior, or to his authorized representative, with regard to all appropriation estimates for all projects which are for the benefit of members of the tribe, prior to the submission of such estimates to the Office of Management and Budget and Congress.

(d)  To borrow money from public and private sources and to pledge, mortgage or assign tribal assets other than real property and tribal assets from which income is derived and which is held in trust by the United States of America;

(e)  To set aside and to spend tribal funds for tribal purposes;

(f)  To levy and collect dues and fees consistent with Federal law upon any and all business activities located or conducted within tribal jurisdiction;

(g)  To regulate by ordinance, the use and development of all tribal lands, whether assigned or unassigned, and to manage, lease or otherwise use all unassigned tribal lands in accordance with applicable law;

- 5 -

*Exhibit 19 - Page 8 of 23*

(h)  To charter and regulate corporations, cooperatives, associa-
tions, special districts, housing authorities, educational and
charitable institutions, political subdivisions and other
entities;

(i)  To license and regulate the conduct of all business activities
within tribal jurisdiction;

(j)  To establish enterprises as branches or agencies of the tribal
government and otherwise to engage in business activities and
projects which promote the economic well-being of the tribe
and its members;

(k)  To purchase and to acquire in other ways land and other
property;

(1)  To manage, develop, protect and regulate the use of water,
minerals and all other natural resources within tribal
jurisdiction;

(m)  To enact laws and codes governing conduct of individuals and
proscribing offenses against the tribe; to maintain order to
protect the safety and welfare of all persons within tribal
jurisdiction; and provide for the enforcement of the laws and
codes of the tribe in accordance with applicable laws;

(n)  To establish tribal courts and administrative tribunals from
time to time as may be required, and provide for the court or
courts jurisdiction, procedures and a method for the selection
of judges;

(o)  To prescribe conditions under which non-members other than
agents of Federal, state or local governments may enter and
remain on the reservation and to establish procedures for the
exclusion of non-members from any land within the tribe's
jurisdiction;

(p)  To assert as a defense to lawsuits against the tribe the
sovereign immunity of the tribe; except that no waiver of
sovereign immunity can be made by the business council without
prior approval of the general council;

(q)  To regulate the domestic relations of members of the tribe; to
provide for the guardianship of minors and incompetent persons
within tribal jurisdiction; to provide services for the
health, education and welfare of all persons within tribal
jurisdiction; to reason jurisdiction and regulate child
dependency proceedings as provided in the Indian Child Welfare
Act of 1978 (P.L. 95-608);

- 6 -

*Exhibit 19 - Page 9 of 23*

(r)   To appoint, direct and set the compensation of a tribal business administrator or manager and other tribal employees and to establish policies and procedures for the employment of tribal personnel;

(s)   Subject to any limitations contained in this constitution to delegate any powers vested in the business council to subordinate tribal officers, tribal employees, or other appropriate persons.

**Section 7. Reserved Powers.**   Any rights and powers heretofore vested in the Blue Lake Rancheria but not expressly referred to in this constitution shall not be lost by reason of their omission but may be exercised by the general council through the adoption of appropriate amendments to this constitution.

## ARTICLE VI – BUSINESS COUNCIL OPERATIONS

**Section 1. Composition.**   The business council shall consist of a chairperson, vice-chairperson, secretary/treasurer, and two (2) other council person elected by secret ballot by the general council. Except as provided in Article VII herein, each business council member shall serve for a term of two (2) years.

**Section 2. Business Council Meetings.**   All meetings of the business council will be open to all tribal members, except in these cases where the matter under discussion would involve confidentiality; in these cases, business will be conducted in a closed session of the business council. Meetings shall be held in accordance with the following provisions:

(a)   Regular Meetings.   Regular meetings of the business council shall be held on the Blue Lake Rancheria quarterly within the first thirty (30) days of each quarter. The business council may set more frequent regular meetings as necessary, _Provided_, That it shall cause to be published the schedule of all such meetings;

(b)   Quorum.   A majority of the voting members of the business council shall constitute a quorum at all council meetings;

(c)   Proxy Votes.   A proxy vote may be approved by the business council for absences caused only by illness, military service, hospitalization or approved tribal business. Request to the business council to vote by proxy shall be in writing, stating the reason for absence and signed by the requesting council member;

- 7 -

_Exhibit 19 - Page 10 of 23_

(d) Absences.   Absences from regular meetings must be excused by a majority vote of the business council members present.  Three or more unexcused absences not approved by a majority vote of the business council shall be cause for removal of a business council member from office;

(e) Special Meetings.   Special meetings of the business council may be called by the chairperson and shall be called when requested by a majority of the business council or upon written request of a majority of the eligible voting members of the rancheria.  The notice in regard to any special meeting shall be given at least seven (7) days prior to the meeting and shall specify the purpose of the meeting.  Emergency meetings may be provided for in a business council resolution;

(f) Voting.   Each member of the business council shall have one (1) vote on all matters, and all matters to be acted on at a business council meeting shall be approved or disapproved by a majority vote of those present and voting, unless provided to the contrary in this constitution;

(g) Statutes, Codes and Resolutions.   Copies of all statutes, codes, resolutions or ordinances adopted by the business council, its committees and subcommittees shall be maintained at the tribal office and shall be available for inspection upon reasonable notice, to all enrolled members of the tribe.

Section 3.  Procedures.   All meetings of the business council shall be conducted in accordance with Robert's Rules of Order.


## ARTICLE VII – ELECTIONS

Section 1.  Business Council Elections.   All elections shall be by secret ballot.  All council members shall hold office for a two (2) year term.  Elections shall be in staggered terms, with three (3) council members terms being on even numbered years, with the other two (2) council members terms being on odd numbered years.  Council members shall hold office for their term or until their successors are elected and installed.

Section 2.  Qualifications.   Any enrolled member eighteen (18) or more years of age who resides on Blue Lake Rancheria shall be eligible for election to the business council.  Any officer moving his or her residence outside the boundaries of the rancheria during his or her term of office shall be considered to have resigned from the business council.

- 8 -

*Exhibit 19 - Page 11 of 23*

Section 3.  Vacancies and Removal from office.   If a council member or official shall die, resign, be removed or recalled from office, or move his or her residence, as set forth in Section 2, Article VII, or be found guilty of a felony or misdemeanor involving dishonesty, the business council shall by a majority vote declare the position vacant and shall appoint a member of the general council to fill the unexpired term.

The business council may by majority vote expel any member for neglect of duty or gross misconduct. Before any vote for expulsion is taken, such member or official shall be given a written statement of the charges against him or her at least five (5) days before the meeting of the business council at which the matter of expulsion is to be decided, and shall be given an opportunity to answer any and all charges at the designated business council meeting.

Section 4.  Election Date.   Elections shall be held each year on the last Saturday of December.   At the first regularly scheduled meeting following elections conducted pursuant to Section 1, above, the business council shall select from among its members a chairperson, vice-chairperson and a secretary/treasurer to serve until their successors are selected as set forth herein.

Section 5.  Statement of Intent.   Any qualified member of the tribe who desires that his or her name be placed on the ballot as a candidate for the business council shall file with the tribal secretary a statement of intent stating his or her name, address and desire to become a candidate. Such statement shall be filed not less than thirty (30) days prior to the next election Provided, However, That if only one or fewer qualified members files a statement of intent of candidacy a special meeting of the general council shall be convened for the purpose of taking nominations from the floor for a candidate.

Section 6.  Form of Ballot, Rules of Election. The business council may enact an ordinance prescribing the form of ballot, rules for calling elections, absentee balloting procedures, selection of election officials, establishment of polling places and other similar matters, such as establishing procedures for resolving election disputes, intra-tribal disputes and establishment of a procedure for petitions and how petitions are to be determined valid.

Section 7.  Referendum, Initiative and Recall.

    (a)   Referendum - The business council shall, upon receipt of a petition signed by thirty percent (30%) of the qualified voters, submit any enacted or proposed tribal legislation to a referendum of the eligible voters. The decision of a majority (51%) of the voters voting in the referendum shall be final, Provided, That thirty percent (30%) of the qualified voters voted. The business council shall call the referendum within thirty (30) days from the date of the receipt of a valid petition. The vote shall be by secret ballot.

*Exhibit 19 - Page 12 of 23*

(b)   Initiative - The qualified voters of the tribe reserve the power to independently propose tribal legislation. Any proposed initiative measure shall be presented to the business council accompanied by a petition signed by not less than thirty percent (30%) of the eligible voters of the general council. Upon receipt of such a petition, the business council shall call a special election for the purpose of allowing the members of the tribe to vote on the initiative measure. The election shall be held within thirty (30) days from the date a valid petition is presented. The decision of a majority (51%) of the voters voting in the initiative shall be final, _Provided_, That thirty percent (30%) of the qualified voters voted.

(c)   Recall - Upon receipt of a petition signed by at least thirty percent (30%) of the qualified voters of the tribe demanding a recall of any member of the business council, it shall be the duty of the business council to call a special election on the question of the recall of the valid petition. The election shall be held in a manner prescribed in a duly adopted election ordinance. The decision of a majority (51%) of the voters voting in the recall shall be final, _Provided_, That at least thirty percent (30%) of the qualified voters voted. Any vacancies created through recall shall be filled in accordance with Article VII, Section 3.

Section 8.  Bonding.  The business council may require all responsible tribal officials and employees to be bonded. The person responsible for the costs of such bonds shall be determined by the business council.

ARTICLE VIII - DUTIES OF OFFICERS

Section 1.  Chairperson.  The chairperson shall exercise the following powers as the chief executive officer of the tribe:

(a)   To preside over and vote at all meetings of the business council;

(b)   Subject to the approval of the business council, to appoint all non-elected officials and employees of the tribal government and direct them in their work, subject only to applicable restrictions embodied in this constitution or in enactments of the business council establishing personnel policies or government personnel management;

- 10 -

_Exhibit 19 - Page 13 of 23_

(c)   Subject to the approval of the business council, to establish such boards, committees, or subcommittees as the business of the business council may require, and to serve as an ex-officio member of all such committees and boards;

(d)   Subject to the approval of all contracts by the business council, to serve as a contracting officer or agent for the tribe, including authority to retain legal boards;

(e)   The chairperson shall not hold other tribal office or engage in private remunerative employment which may pose a conflict of interest with the tribe's enterprises or business activities during his or her term of office.

**Section 2. Vice-Chairperson.**   The vice-chairperson shall, in the absence of the chairperson, perform all duties and assume all the responsibilities vested in the chairperson. The vice-chairperson shall, upon the request of the chairperson, assist in carrying out the duties of the chairperson. The vice-chairperson shall perform such other duties as the chairperson may direct.

**Section 3. Secretary/Treasurer.**   The secretary/treasurer shall have the following powers and duties:

(a)   To call the roll, handle all official correspondence of the business council, keep the minutes of all regular and special meetings of the business council and general council, certify to the Superintendent of the Bureau of Indian Affairs the duly elected officers of the business council within fifteen (15) days from the date of any election.

(b)   To accept, receipt for, keep and safeguard all funds under the exclusive control of the tribe by depositing them in the bank insured by the agency of the Federal Government, or in any appropriate account or tribal trust account within the Bureau of Indian Affairs, as directed by the business council and shall keep or cause to be kept an accurate record of such funds and shall report on all receipts and expenditures and the amount and nature of all funds in his or her custody to the business council at regular meetings and such other times as requested.   The secretary/treasurer shall not pay or otherwise disburse any funds in the custody of the business council except when properly authorized to do so by the business council.

(c)   The treasurer may be required to give a security bond satisfactory to the business council; and

- 11 -

*Exhibit 19 - Page 14 of 23*

(d) All checks drawn on tribal funds shall be signed and all vouchers shall be approved for payment by the secretary/-treasurer and at least one officer or designated check signer of the tribe in accordance with a written fiscal manual setting forth a procedure approved and adopted by the business council by resolution.

## ARTICLE IX - AMENDMENTS

This constitution may be amended by a majority vote of the qualified voters of the tribe voting in an election called for that purpose by the Secretary of the Interior, _Provided_, That at least fifty-one (51%) of those entitled to vote shall vote but no amendment shall become effective until approved by the Secretary of the Interior so long as such approval is required by Federal law.

It shall be the duty of the Secretary of the Interior to authorize an election on any proposed amendment upon receipt of a resolution of the business council or a petition signed by at least thirty percent (30%) of the eligible voters of the tribe.

## ARTICLE X - SEVERABILITY

If any provision of this constitution shall, in the future, be declared invalid by a court of competent jurisdiction, the invalid provision or provisions shall be severed and the remaining provisions shall continue in full force and effect.

## ARTICLE XI - ADOPTION

This constitution, when adopted by a majority vote of the qualified voters of the Blue Lake Rancheria, voting at a special election called for that purpose by the Secretary of the Interior or his authorized representative, in which at least thirty percent (30%) of those entitled to vote shall vote, shall be submitted to the Secretary of the Interior for his approval and shall be effective from the date of his approval.

- 12 -

_Exhibit 19 - Page 15 of 23_

CERTIFICATE OF RESULTS OF ELECTION

Pursuant to a Secretarial election authorized by the Deputy Commissioner of Indian Affairs on November 12, 1993, the Constitution of the Blue Lake Rancheria of California was submitted to the qualified voters of the Blue Lake Rancheria and was on ___February 11, 1994__, duly adopted/rejected by a vote of ___13__ for, and ___0___ against, and ___1___ cast ballots found spoiled or mutilated, in an election in which at least thirty percent (30%) of the ___19___ members entitled to vote cast their ballots in accordance with Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), as amended.


_____
Chairman, Election Board


_____
Election Board Member


_____
Election Board Member



Date:



- 13 -

*Exhibit 19 - Page 16 of 23*

CERTIFICATE OF APPROVAL

I,    Wyman D. Babby    ACTING Deputy Commissioner of Indian Affairs, by virtue of the authority granted to the Secretary of the Interior by the Act of June 18, 1934 (48 Stat. 984), as amended, and delegated to me by 230 D.M. 2.4, do hereby approve the Constitution of the Blue Lake Rancheria of California. The Constitution is effective as of this date; PROVIDED, That nothing in this approval shall be construed as authorizing any action under this document that would be contrary to Federal law.

Acting Deputy Commissioner of Indian Affairs

Washington, D. C.

Date:  MAR 0 7 1994

- 14 -

*Exhibit 19 - Page 17 of 23*

PROPOSED AMENDMENT
CONSTITUTION OF THE
BLUE LAKE RANCHERIA

RECEIVED

MAY 2 2 2001

BLUE LAKE RANCHERIA

**Proposed Amendment A**

1.   **Territory and Jurisdiction** - Change the Territory and Jurisdiction Article of the Blue Lake Rancheria's Constitution to read as follows:

ARTICLE II - TERRITORY AND JURISDICTION

Section 1.   Territory and Jurisdiction.   The jurisdiction of the tribe, its general council and business council, and its tribal courts shall extend to the following:

a)   All lands, water and other resources within the exterior boundaries of the Blue Lake Rancheria, as established in <u>Hardwick v. United States of America</u>, U.S. District Court, Northern District of California, No. C-79-1710-SW.

b)   All other lands, water and resources as may be hereafter acquired by the tribe, whether within or without said boundary lines, under any grant, transfer, purchase, adjudication, treaty, Executive Order, Act of Congress, or other acquisition, subject to Federal law, and any and all lands, water and other resources which are either now or in the future owned by the United States for the benefit of the Tribe's members;

c)   Affiliated Indian country which is located contiguous to the Blue Lake Rancheria or other lands acquired by or for the tribe;

d)   All persons within any territory under the jurisdiction of the tribe; and

e)   All tribal members, wherever located, to the fullest extent permitted by applicable Federal Law.

<u>Numerical Designation</u>

Having been duly adopted and approved, Proposed Amendment A is hereby designated as Amendment No.   **I**   to the Constitution of the Blue Lake Rancheria.

**CERTIFICATE OF APPROVAL**

Amendment I to the Constitution of the Blue Lake Rancheria, which was adopted by the qualified voters of the Tribe on April 20, 2001, is hereby approved pursuant to the authority delegated to the Secretary of the Interior by the Act of June 18, 1934 (48 Stat. 984), as amended and delegated to the Deputy Commissioner of Indian Affairs by 230 D.M. 2.4 and redelegated to me by Memorandum of Agreement dated August 16, 1994.

_____
Regional Director

MAY - 4 2001

_____
Date

*Exhibit 19 - Page 18 of 23*

United States Department of the Interior 41-29-01

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California  95825

IN REPLY REFER TO:

**RECEIVED**

JAN 2 9 2001

**NORTHERN CAL. AGENCY**

SUPT. _____
ADMIN. 1/29/01 EBD
ROUTE  T/c ELEC  TO/SEC.
RESPONSE REQUIRED _____
DUE DATE _____
MEMO _____ LTR _____
TELE _____ OTHER  GEG

JAN 2 5 2001

RECEIVED

JAN 2 9 2001

TRIBAL OPERATIONS

Dr. Virgil Akins, Superintendent
Bureau of Indian Affairs
Northern California Agency
1900 Churn Creek, Suite 300
Redding, CA 96002-0292

Dear Dr. Akins:

By your memorandum dated June 5, 2000, you transmitted to us the Blue Lake Rancheria's Tribal Resolution No. 00-16, and the final version of their proposed amendments to **Article II-Territory and Jurisdiction** of the Tribe's Constitution. The correspondence requested authorization for a Secretarial election to permit the qualified voters of the Tribe to adopt or reject the three proposed amendments to their Constitution.

We have completed our review of the Tribe's proposed Amendments to their Constitution and will authorize an election on the enclosed versions. Exercising the discretionary authority of the Secretary to disapprove any proposal that conflicts with Federal Law may be necessary, however.

Pursuant to the authority of the Secretary redelegated to me by 10 BIAM 3.1, you are hereby authorized to call and conduct the requested election on the **enclosed** version (Attachment A) of the proposed Amendments to the Constitution of the Blue Lake Rancheria. Voting will be in accordance with Title 25 of the Code of Federal Regulations, Part 81.

We call your attention to C.F.R. Sections 81.11; 81.12; 81.13; and 81.14 regarding the need to develop a list of persons eligible and registered to vote and the deadlines entailed. The registration list must be posted at least 20 days prior to the election which does not include the dates of posting and election day. The date of the election will be set by you in cooperation with tribal officials and will not be less than 30 days or more than 60 days from the date for posting notices of the election.

Section 81. 8 provides for an Election Board comprising you, as Chairman, and representatives of the Tribe. The Election Board will furnish suitable ballots and supervise the conduct of the election.

*Exhibit 19 - Page 19 of 23*

RECEIVED

MAY 2 2 2001

BLUE LAKE RANCHERIA

Once an authorization has been granted by the Secretary, **no modification**, including typographical corrections, deletions or retyping of the authorized version of the proposed amendment to the Constitution, including the Certificate of Results of Election, will be made by the Northern California Agency office. Should any modifications be necessary, please contact this office.

In accordance with 25 CFR 81.5(f), this authorization, unless acted upon within 90 days from the date of issuance, will be null and void.

The election results will be sent to the office of the Regional Director, Pacific Region, as soon as they become known. If adopted, the original of the attached proposed amendment to the Constitution, the original complete Certificate of the Results of Election, the Eligible Voter's List, the Voters Packet, and copies of the Ballots should follow by return mail for approval action. The proposed amendment to the Constitution will not become effective until approved by the Secretary or his authorized representative, who in this case will be the Regional Director, Pacific Region. We remind you that you must act promptly to decide any protests and forward the results immediately to the Pacific Regional Office. The Secretary or his authorized representative has only 45 days from the date of the election to either approve or disapprove the Constitution. All protests must be decided within that time.

If you have any questions, please contact Dorson Zunie, Regional Tribal Operations Officer, at (916) 978-6063, or Fred Doka Jr., Regional Tribal Operations Specialist, at (916) 978-6067.

Sincerely,

Regional Director

Enclosures
    Blue Lake Rancheria Resolution No. 00-16
    Authorized Version (Attachment A)
    Proposed Amendment A
    Sample Ballot for Amendment
    The Certificate of Results of Election for Amendments

cc: Chairperson, Blue Lake Rancheria
    Assistant Regional Solicitor

*Exhibit 19 - Page 20 of 23*

PROPOSED AMENDMENT
CONSTITUTION OF THE
BLUE LAKE RANCHERIA

Proposed Amendment A

Article II - TERRITORY AND JURISDICTION shall be amended to read as follows:

Section 1.  Territory and Jurisdiction.  The jurisdiction of the Tribe, its General Council and Business Council, and its Tribal Courts shall extend to the following:

a) All lands, water and other resources within the exterior boundaries of the Blue Lake Rancheria, as established in Hardwick v. United States of America, U.S. District Court, Northern District of California, No. C-79-1710-SW.

b) All other lands, water and resources as may be hereafter acquired by the Tribe, whether within or without said boundary lines, under any grant, transfer, purchase, adjudication, treaty, Executive Order, Act of Congress, or other acquisition, subject to Federal law, and any and all lands, water and other resources which are either now or in the future owned by the United States for the benefit of the Tribe's members.

c) Affiliated Indian country which is located contiguous to the Blue Lake Rancheria or other lands acquired by or for the Tribe.

d) All persons within any territory under the jurisdiction of the Tribe; and

e) All Tribal members, wherever located, to the fullest extent permitted by applicable Federal law.

Numerical Designation

Having been duly adopted and approved, Proposed Amendment A is hereby designated as Amendment No.___1___ to the Constitution of the Blue Lake Rancheria.

*Exhibit 19 - Page 21 of 23*

Proposed Amendment A

Constitution of the Blue Lake Rancheria

SAMPLE BALLOT

Shall Article II TERRITORY AND JURISDICTION be amended to read as follows:

Section 1.  Territory and Jurisdiction.  The jurisdiction of the Tribe, its General Council and Business Council, and its Tribal Courts shall extend to the following:

> a) All lands, water and other resources within the exterior boundaries of the Blue Lake Rancheria, as established in Hardwick v. United States of America, U.S. District Court, Northern District of California, No. C-79-1710-SW.

> b) All other lands, waters and resources as may be hereafter acquired by the Tribe, whether within or without said boundary lines, under any grant, transfer, purchase, adjudication, treaty, Executive Order, Act of Congress, or other acquisition, subject to Federal law, and any and all lands, water and other resources which are either now or in the future owned by the United States for the benefit of the Tribe's members.

> c) Affiliated Indian country which is located contiguous to the Blue Lake Rancheria or other lands acquired by or for the Tribe.

> d) All persons within any territory under the jurisdiction of the Tribe; and

> e) All Tribal members, wherever located, to the fullest extent permitted by applicable Federal law.

---

**SAMPLE BALLOT**

---

| YES | NO |
|-----|-----|

Place an "X" on one of the boxes to indicate your choice.

*Exhibit 19 - Page 22 of 23*



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Northern California Agency
1900 Churn Creek Road, Suite 300
Redding, California 96002-0292

IN REPLY REFER TO:

## Proposed Amendment

## Certificate of Results of Election

Pursuant to an election authorized by the Regional Director, Pacific Region, Bureau of Indian

Affairs on January 25, 2001, the attached Proposed Amendment to the Constitution of the

Blue Lake Rancheria, was submitted to the qualified voters of the Tribe and was on April 20,

2001, duly **adopted** by a vote of ___17___ "for" and ___2___ "against," and ___0___ cast

ballots found to be spoiled or mutilated, in an election in which at least thirty percent (30%) of

the ___26___ entitled to vote cast their votes; in accordance with Section 16 of the Indian

Reorganization Act of June 18, 1934, (48 Stat. 984), as amended by the Act of June 15, 1935,

(49 Stat 378).

**4.23.01**
Date

_____
Chairman, Election Board

_____
Election Board Member

_____
Election Board Member

_____
Election Board Member

_____
Election Board Member

*Exhibit 19 - Page 23 of 23*

FILE

# Exhibit 20

*Blue Lake Tribal Court Ordinance*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/BLR_Tribal_Court_Ordinance.pdf

as retrieved on January 19, 2016.

There are twenty one pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 20 - Title Page*

# ORDINANCE NO.

## AN ORDINANCE OF THE BUSINESS COUNCIL OF THE BLUE LAKE RANCHERIA ESTABLISHING A TRIBAL COURT

The Business Council of the Blue Lake Rancheria does hereby ordain as follows:

Section 1. Findings and Declaration. The Business Council of the Blue Lake Rancheria ("Tribe") finds and declares that:

1.       Public Law 280, 28 U.S.C. §1360, did not divest the Tribe of its inherent sovereign authority to establish and operate its own judicial system.

2.       The Courts of the State of California lack jurisdiction over many civil disputes and criminal acts that occur on the Tribe's Reservation.

3.       The establishment of a Tribal Court which can exercise jurisdiction, as specified below, including over civil disputes and criminal acts occurring on the Tribe's Reservation, and those disputes and acts over which the courts of the State of California lack jurisdiction, is necessary to maintain peace and order on the Blue Lake Rancheria ("Reservation").

4.       The adoption of this ordinance promotes the health and safety of the members of the Tribe, is in the best interests of the members of the Tribe and furthers the Tribe's administration of justice.

Section 2. Prior Inconsistent Codes and Ordinances Repealed:  Any and all codes and ordinances of the Blue Lake Rancheria adopted prior to or which conflicts in any way with the provisions of this Tribal Court Ordinance, are hereby repealed.

Section 3. Adoption of New Tribal Court Ordinance.  A new Ordinance entitled "Tribal Court Ordinance" is hereby added to Title 11, Article 1, Chapter 1 of the Blue Lake Rancheria Tribal Code and shall provide as follows:

S:\LJM\Docs08\BlueLkTrblCt\TribalCourtOrd.wpd

*Exhibit 20 - Page 1 of 21*

# TITLE 11. COURTS

## ARTICLE 1. TRIBAL COURTS

### CHAPTER 1. TRIBAL COURT ORDINANCE

Section:

11..1.1.010      Definition

11.1.1.020      Establishment of Court and Peace Making Panel

11.1.1.030      Jurisdiction and Powers

11.1.1.040      Judges

11.1.1.050      Court Clerk

11.1.1.060      Court Procedures

11.1.1.070      Appeals

11.1.1.080      Appearances

11.1.1.090      Records

11.1.1.100      Peace Making Panel

11.1.1.010 Definitions.  For the purpose of this ordinance the following words and phrases shall have the following meanings:

A.      "Attorney" or "Counsel" shall mean any person admitted to a bar of any state.

B.      "Immediate Family" shall mean a person's natural father, natural mother, adoptive mother, adoptive father, daughter, son, spouse, person in a spousal relationship, brother, sister, stepbrother, and stepsister.

C.      "Peacemaker" shall mean a mediator who is a tribal member appointed to the Peace Making Panel by the Chief Judge of the Tribal Court.

S:\LJM\Docs08\BlueLkTrblCt\TribalCourtOrd.wpd

*Exhibit 20 - Page 2 of 21*

D.      "Reservation" shall mean all lands within the exterior boundaries of the Blue Lake
Rancheria.

E.      "Spokesperson" shall mean any person not admitted to a bar of any state who is a
tribal member or a relative of a party and speaks for a party in a case filed in the Tribal Court.

F.      "Tribal Court" shall mean the court of the Blue Lake Rancheria unless the context
indicates that another Tribe's court is intended.

G.      "Tribe" shall mean the Blue Lake Rancheria of California, a federally recognized
Indian tribe.

11.1.1.020  Establishment of Court.  There is established for the Tribe, a court to be
known as the Blue Lake Rancheria Tribal Court.  The Tribal Court shall be empowered to
exercise the judicial authority of the Tribe as delegated herein and shall consist of two divisions,
the Trial Court and the Court of Appeals.

A.      The Court of Appeals shall consist of three judges, none of whom handled the
matter at the trial court level.

B.      The Trial Court shall consist of one (1) Chief Judge and such associate judges as
the Business Council may appoint.  The Tribal Court is empowered to create such specialized
divisions as necessary to hear matters as defined in the Tribe's Ordinances.

C.      In addition to the Trial Court and the Court of Appeal, there may be established a
Peace Making Panel to arbitrate disputes between parties before trying the case in the Trial
Court. The Peace Making Panel is an optional forum for peacefully resolving disputes and can
be used only with the consent of all parties.  Availability of the Peace Making Panel shall be
authorized by the Chief Judge by referring the case to the Peace Making Panel after an action is

S:\LJM\Docs08\BlueLkTrblCt\TribalCourtOrd.wpd

*Exhibit 20 - Page 3 of 21*

filed in the Trial Court and the consent of the parties has been obtained by the Chief Judge.

Parties utilizing the Peace Making Panel are not prohibited from continuing their case in the Trial

Court should the Peace Making Panel fail to resolve the dispute the satisfaction of all parties.

11.1.1.030 Jurisdiction and Powers.

A.  Civil Jurisdiction.

1.  Subject Matter Jurisdiction.

The Tribal Court shall have civil jurisdiction over all matters in law or in

equity which the Business Council expressly authorizes by ordinance.

The Tribal Court may decline to exercise its jurisdiction if it finds any of

the following to exist:

(a)  Another court has the jurisdiction to hear the case and would be more

convenient for the parties than the Tribal Court;

(b)  One or more of the parties is not a person over which the Tribal Court

can exercise its authority; or

(c)  The case is of such a nature that the Tribal Court should not hear it.

2.  Territorial Jurisdiction:

The Tribal Court shall exercise civil jurisdiction as stated in subsection (1)

over all causes of action that arise (1) on lands within the exterior boundaries of the Reservation

and (2) on all lands owned by the United States of America in trust for the Tribe.  Causes of

action against the Tribe or tribally owned legal entities established under tribal law with their

principal place of business or agent for service of process located on such lands shall be deemed

to arise on such land, regardless of the location of the occurrence or transaction out of which the

cause of action arises or the location of the party asserting the cause of action.

    3.    Personal Jurisdiction:

    The scope of the Tribal Court's civil jurisdiction shall extend to the following:

    (a)    The Tribe;

    (b)    Legal entities owned by the Tribe;

    (c)    Persons or entities employed by the Tribe or its wholly owned legal entities;

    (d)    Persons or legal entities who have entered contracts with the Tribe or its wholly owned legal entities;

    (e)    Persons or entities doing business within the territorial jurisdiction of the Tribal Court;

    (f)    Tribal members;

    (g)    Anyone the Tribe formally recognizes as Indian;

    (h)    Other Indians;

    (i)    Anyone who consents to Tribal Court jurisdiction;

    (j)    Other individuals or entitles whose conduct affects the ability of the Tribe to govern itself;

    (k)    all other individuals whose conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the Tribe.

    4.    Concurrent Jurisdiction:

S:\LJM\Docs08\BlueLkTrblCt\TribalCourtOrd.wpd

*Exhibit 20 - Page 5 of 21*

(a)      The Business Council recognizes that Public Law 83-280 granted concurrent jurisdiction to the State of California over some criminal and civil matters on the Reservation.  The Tribal Court shall exercise its jurisdiction in all areas to the extent delegated by Tribal ordinance.

(b)      Criminal Jurisdiction.

(i) The Tribal Court shall have jurisdiction over all offenses set forth in the Tribe's Law and Order Ordinance when committed by an Indian within the exterior boundaries of the Reservation or on any land owned by the United States of America in trust for the Tribe.

(ii) For purposes of this subsection (b), an Indian shall be any person of Indian decent who is a member of any federally recognized Indian Tribe.

(c)      Powers.

The Tribal Court is granted all the powers necessary to exercise its jurisdiction in accordance with the procedures set forth in this Ordinance.  Additionally, the Tribal Court may exercise its jurisdiction in accordance with any suitable procedures where specific procedures are not set forth in this Ordinance, so long a such procedures are in accordance with the Tribe's Constitution.  The Chief Judge, in consultation with the Business Council, shall promulgate such rules of procedure as are necessary for the efficient prosecution or processing of cases through the Tribal and Appellate Courts.

(d)      Full Faith and Credit.

The Tribal Court shall give full faith and credit to the orders and

6

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 6 of 21*

judgments of the courts of other tribes, states, and local governments unless:

> (i)    The Court in question does not recognize the orders and
judgments of the Tribal Court;

> (ii)   The Court in question did not have jurisdiction over the
case or a party or parties to it;

> (iii)  The order or judgment was based on fraud;

> (iv)   Giving full faith and credit to the judgment of the court in
question would violate the public policy of the Tribe or would be likely to harm the culture,
traditions, or sovereignty of the Tribe; or

> (v)    The order or judgment is on appeal or being contested in
another jurisdiction.

> 11.1.1.040 Judges.

A. Qualifications.

> 1. Chief Judge:  The Chief Judge and any person appointed to the Court of
Appeals shall be a graduate of an accredited law school who is an attorney at law licensed to
practice law in any state, tribal or federal court with not less than seven (7) years experience
practicing law, including as a judge, with demonstrated knowledge of federal Indian law.

> 2.    Associate Judge:  The Associate Judge shall have the same qualifications
as the Chief Judge, but with not less than three (3) years experience.

No persons shall serve as Judge of the Trial Court or Court of Appeal who has been
convicted of: (1) a felony at anytime or (2) misdemeanor involving a crime of moral turpitude

7

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 7 of 21*

within the last three years.  No person shall serve as a Judge of the Trial Court or Court of

Appeal until a bond has been posted, at tribal expense, in an amount determined by the Business

Council or, until the person is covered by a blanket bond provided for all tribal employees.  No

person shall serve as a Judge of the Trial Court or the Court of Appeal who holds any elective

office of the Tribe.

      B.      Appointment and Term of Service.

After advertisement and interviewing by the Business Council, the Business

Council will select the most qualified applicant for the position of Chief Judge and Judges to the

Court of Appeal.  Preference will be given to Tribal members first and Indians of other federally

recognized tribes second.  The terms of offices will be two (2) years and will include a six (6)

month probationary period.

      C.      Duties.

          1.    Chief Judge.

The Chief Judge will be responsible for:

      (a)     Developing rules of civil procedure and evidence for the efficient

operation of the Tribal Court, subject to approval by the Business Council;

      (b)     Hearing all matters delegated to the Court by ordinance;

      (c)     Development and maintenance of a list of Acting Judges to be

called upon to hear cases in the event of disqualification of a judge or as deemed necessary.  The

list shall always contain three qualified acting judges;

      (d)     Development and maintenance, with the assistance of the Clerk of

8

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 8 of 21*

the Court, of a system for record keeping and a docket system;

        (e)    Maintenance of legal research resources;

        (f)    Preparation of the Court's annual plan and budget;

        (g)    Issuing receipts for any monies collected or paid out by the Tribal Court;

        (h)    Depositing all receipts into the Tribal accounting system earmarked for inclusion in the Tribal Court's annual plan and budget, and

        (i)    Supervising and coordinating training of Court personnel and peacemakers.

    2.    Associate Judge.

The Associate Judge will be responsible for hearing all cases as are assigned by the Chief Judge and other duties as assigned by the Chief Judge.

    3.    Judges to the Court of Appeal.

The Judges to the Court of Appeal shall perform those duties set forth in a separate Ordinance adopted by the Business Council for that purpose.

    D.    Removal.

During the tenure of his or her appointment, any Judge may be suspended, dismissed, or removed for cause by the Business Council by a three fourths (3/4) vote of the Business Council. The Tribal Chairperson or his/her designate shall make available copies of a written statement setting out the facts and reasons for the proposed action to the Judge in question, the other Judges, and to members of the Business Council at least fourteen (14)

9

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 9 of 21*

calendar days before the next regularly scheduled meeting of the Business Council at which the charges shall be presented. The Secretary of the Business Council shall give notice of the hearing to the Judge by personal service and to the Tribal Membership by posting a notice of the date, place and time of the hearing at the Business Council office and at, at least, two other conspicuous places on the Reservation. The meeting shall be a public hearing where the accused Judge shall be given an adequate opportunity to answer any and all charges. Causes deemed sufficient for such action shall directly relate to the performance of the duties of the judge as set forth in this Ordinance, the rules governing judicial conduct adopted by the Court, and other applicable tribal ordinances or rules of the Court. Such causes may include but are not limited to: excessive use of intoxicants or legal drugs, use of any illegal drug, conviction of any felony or other offense involving moral turpitude, use of official position for personal gain, or failure to perform judicial duties adequately in accordance with the terms of this ordinance. No Judge shall be removed from office for exercising his/her discretion or for making a particular decision in a case. The decision of the Business Council shall be final, unless a Court of Appeal is established in which case, the Business Council decision may be appealed by filing a notice of appeal not later than 30 days after the decision has been served on the judge. The Court of Appeal shall determine whether the removal was based on proper grounds as set forth herein and whether the decision is supported by substantial evidence in light of the whole record before the Business Council. The appeal shall be conducted in accordance with procedures set forth in an appropriate ordinance or rules adopted in compliance with this Ordinance.

      E.       Disqualification.

10

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 10 of 21*

1.  Conflict of Interest.

No Judge shall be qualified to hear any case where (1) she/he has any direct interest, (2) any party involved in the case includes a relative by marriage or blood in the first or second degree, (3) for any other reason the judge cannot be impartial; or (4) the judge finds that a reasonable person would believe that he or she could not be impartial. A Judge may be disqualified upon his/her own motion or by application by any party in the proceeding upon filing a verified motion in writing.

2.  Bias or Prejudice.

Upon the filing of an affidavit by a party setting forth facts establishing that by reason of bias or prejudice of the Judge to whom the case is assigned, the party cannot have a fair trial, the Judge shall disqualify himself/herself. Such affidavit must be filed not less than five days prior to the first hearing in the case in which the Judge may be required to make a ruling or decision. Each party shall be entitled to only one (1) preemptory challenge to disqualify a judge under this section in each case and waives that right, if the affidavit is not filed within the time required herein.

F.  Acting Judges.

In the event that there is no qualified Judge or there are an insufficient number of Judges available to hear a particular case, the Chief Judge shall appoint the Acting Judge or Acting Judges selected by random drawing from the Temporary Judge list, with the full powers of a regularly-appointed Tribal Judge to hear and dispose of the case. The qualifications for Temporary Judges must meet the minimum qualification of Associate Judges. Such appointment

11

TribalCourtREC.doc
January 23, 2008

11

*Exhibit 20 - Page 11 of 21*

shall be only for the period of time necessary to dispose of the case in question..

G.     Compensation.

The Chief Judge, Judges of the Court of Appeal and Associate Judges shall be compensated at a rate and under such terms and conditions as the Business Council shall from time to time establish by resolution adopted pursuant to this Ordinance.

11.1.1.050 Court Clerk.

A.     Appointment.

The Court Clerk shall be appointed as provided by a Tribal Court Personnel Policies and Procedures Manual which shall be adopted by the Chief Judge and approved by the Business Council.

B.     Qualifications.

The Court Clerk shall have a high school diploma or the equivalent thereof; have a minimum of two years experience as a paid secretary or paid Clerk; be eligible to become a registered notary and shall not have been convicted of a felony or any other crime involving dishonesty within the last three (3) years.  There shall be preference in hiring Tribal members first and members of other federally recognized tribes second.  There will be a three (3) month probationary period after hiring.

C.     Duties.

The Court Clerk shall not give legal advice to any person but shall:

1.     In accordance with court rules and applicable ordinances of the Tribe, file all documents presented to the Court for filing,  and maintain court records;

12

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 12 of 21*

2.      Attend all sessions of the Trial Court;

3.      Keep a record of all proceedings of the Trial Court;

4.      Administer oaths to witnesses;

5.      Collect all fines and deposit them as directed by the Chief Judge pursuant to this Ordinance;

6.      Pay out all fees ordered and accounted for pursuant to this Ordinance;

7.      Account for all monies handled through the Trial Court; and

8. Any other duties as directed by the Chief Judge.

D.      Bond.

The Clerk shall be bonded, at Tribal expense, in an amount determined by the Chief Judge.

E.      Seal.

The Court Clerk shall have an official seal which shall be impressed upon the original of each complaint or other paper filed with the Tribal Court, along with a notation of the day and time of filing.

F.      Clerk of the Court of Appeals.

The Clerk of the Tribal Court shall act as the Clerk of the Court of Appeals unless otherwise provided by the Business Council by separate ordinance. The duties of the Clerk of the Court of Appeals shall be set forth in a separate ordinance adopted by the Business Council for that purpose.

Section 11.1.1.060  Court Procedures.

13

TribalCourtREC.doc
January 23, 2008

*Exhibit 20 - Page 13 of 21*

A.       Civil Procedures

Trial Court and Court of Appeal procedures will be developed by the Chief Judge, in consultation with legal counsel designated by the Business Council, and subject to approval by the Business Council.

When choosing what law applies, the Tribal Court shall apply the law of the Tribe. In the absence of applicable tribal law, the Court shall use as guidance the laws of the State of California, the laws of other federally recognized Tribes and federal law, but shall follow federal and state laws, if required by tribal or federal law.

B.       Criminal Procedures. [Reserved.]

Section 11.1.1.070 Appeals.

A.       Court of Appeals.  The Business Council may by separate ordinance establish a Court of Appeal consistent with the provisions of this Ordinance. Until the Business Council adopts a separate Ordinance establishing a Court of Appeal and providing for its scope of review, the decisions of the Trial Court shall be final and non-appealable.

B.       Jurisdiction.  Upon the adoption of an ordinance, as described in subsection A, above, the Court of Appeal shall have jurisdiction to review final orders, commitments, and judgments of the Trial Court; provided that the "one final judgment" rule applies.  An appeal will only lie from a judgment, order or decree that finally disposes of all claims and defenses in the case.  On appeal, the record and decision of the Trial Court shall be reviewed for error. The Court of Appeals may affirm, modify, or reverse any judgment, decree, or order of the Trial Court; may remand the case and order for new trial; may direct the entry of an appropriate judgment, decree or order; or require such other action or further proceedings as may be just in the circumstance.

14

s:\djr\ords06\bluelk\tribal court
January 23, 2008

*Exhibit 20 - Page 14 of 21*

A decision must be by a majority of the judges hearing the appeal.

C. Right to Appeal. Any party who is aggrieved by the final order, commitment, or judgment of the Trial Court may appeal.

D.     Notice of Appeal. Within thirty (30) days from the entry of the judgment or order appealed from, the aggrieved party must file a written notice of appeal with the Trial Court. No extension of the thirty day period shall be granted. Bond or assurance must be posted in accordance with Section 1.070(E) and any filing fee required by Court Rules must be paid in order for the filing of the notice to be effective.

E.     Bond. Upon filing the notice of appeal, the appellant must post bond, deposit cash, or give other assurance as will in the judgment of the Trial Court judge give adequate assurance of the performance of the judgment, or payment of the fine or judgment in the event the case appealed is affirmed. The Trial Court judge has discretion to waive bond, if it would be an undue hardship to the appellant and frustrate the interests of justice or is not required to assure performance of the judgment.

F.     Stay of Enforcement.

In any case where a party has perfected his/her right to appeal in accordance with the rules set forth in this Ordinance, or the Rules of Court, the final order, commitment or judgment of the Trial Court shall be stayed pending the appeal.

G.     Appellate Procedure

Within ninety (90) days of the date written notice of appeal is filed with the Trial Court, the Court of Appeal shall convene to hear the case on appeal at such place as may be designated. The Court's procedure shall be as provided in the Rules of Court developed and

15

s:\djr\ords06\bluelk\tribal court
January 23, 2008

15

*Exhibit 20 - Page 15 of 21*

approved by the Chief Judge for that purpose.

H.     Finality.

The decision of the Court of Appeal shall be final.

The provision for disqualification of Judges at Section 1.040(E) shall apply to appellate judges for purposes of this Section 1.070.

Section 11.1.1.080 Appearances.

A.     Counsel or Spokesperson.

1.     Counsel

Any party has a right to assistance of counsel at the party's expense.  Such assistance shall be arranged by the party.  If Counsel is required to pay a fine as a result of being held in contempt of court, and fails to pay the fine within the time provided in a court order, his or her license to practice before the Court shall be suspended and he or she may not thereafter practice in or appear before the Court, until the fine, and any applicable penalties and interest, are paid in full.

2.     Spokesperson.

Any party has a right to assistance of a spokesperson at the party's expense.  The spokesperson shall be required to comply with all Ordinances and Rules adopted by the Trial Court for the processing of cases.

The Court shall not appoint counsel or a spokesperson for any party at the Tribe's expense.

B.     Self-representation.

Any individual party may appear and represent himself or herself in any

16

*Exhibit 20 - Page 16 of 21*

proceeding before the Tribal Court. Judges of the Tribal Court shall insure that all parties have equal opportunity to present their case and cross-examine opposing witnesses. Parties representing themselves shall be held to the same strict standards of conduct as are required of legal counsel.

    C.    Witnesses.

        1.    Summons to Appear.

On motion by any party to the case, or on the Trial Court's own motion, the Trial Court shall issue a summons to compel the attendance of witnesses, or the production of books, records, documents, paper and things necessary to the determination of the cause. Failure to comply with a summons shall constitute contempt of court.

        2.    Fees for Witnesses.

Each party shall be responsible for his/her own witnesses. The Tribe shall pay witnesses summoned on its behalf at a rate established by the Court.

Section 11.1.1.090 Records.

    A.    Docket.

The Court Clerk shall keep a docket which shall contain the names of and contact information for each party in any civil or criminal proceeding, the type of proceeding, and the date and nature of each filing, order or proceeding in the case, the date and the amount of any judgment, appeal, and all other proceedings and documents as directed by the Chief Judge. The Court docket shall be posted in a public place, including a website, if established by the Court.

    B.    Copies of proceedings.

Any party may obtain a certified copy of proceedings in the Tribal Court at their

17

s:\djr\ords06\bluelk\tribal court
January 23, 2008

*Exhibit 20 - Page 17 of 21*

own expense; the seal of the Court Clerk shall be applied to all copies so certified.  The preceding shall not apply to matters or records sealed or expunged by the Tribal Court as permitted by this Ordinance or Federal law.

      C.     Copies of Laws.

      The Tribal Court shall obtain copies of this Ordinance and copies of tribal ordinances, federal, and state laws and regulations as are deemed by the Tribal Court to be necessary, helpful, and proper to secure the rights and privileges of persons subject to the jurisdiction of the Tribal Court and its judicial powers and responsibilities.  Copies of same shall be available for review by the public.

      <u>Section 11.1.1.100 Peace Making Panel.</u>

      A.     Purpose.

      The purpose of the Tribe's Peace Making Panel is to provide a non-adversarial way to resolve disputes.  The Panel is intended to reflect the Tribe's tradition of using respected members of the community to heal conflicts among its members.

      B.     Appointment.

      The Business Council, with the advice of the Chief Judge, may appoint one or more peacemakers to carry out the duties and responsibilities set forth in this Ordinance and refer a case to the Peace Making panel.

      C.     Qualifications.

      Peacemakers shall be members of the Tribe, and known and respected in the community.  No peacemaker shall serve who has been convicted of a misdemeanor involving violence or of a felony within the last three (3) years, unless the felony resulted from the failure

18

s:\djr\ords06\bluelk\tribal court
January 23, 2008

*Exhibit 20 - Page 18 of 21*

to register for the selective service or as the result of a violation of the California Vehicle Code and did not result in the injury or death of a third person.

      D.     Duties.

          Peacemakers shall work to resolve disputes between family members and neighbors and any others provided for by Tribal ordinances.  To do this, peacemakers shall, as needed, do the following:

          1.     Conduct informal conferences.

          2.     Insure in each conference that all relevant facts are presented and that all parties have an opportunity to speak.

          3.     Encourage the parties to reach an agreement that is acceptable to all of them.

          4.     Attend training at Tribal Court expense as requested by the Chief Judge.

      E.     Procedure.

          1.     Any party to a case filed with the Tribal Court who wishes to have a peacemaker conference shall file and serve on all parties a request for conferences with the Court Clerk.  Within ten (10) days of the date of filing of the request, if no party has filed an objection to the request, the Tribal Court Judge shall refer the case to the peacemaking panel for settlement.

          2.     A peacemaker shall then contact the parties to schedule a peacemaker conference and explain the basic rules of the conference.  If a party after hearing said explanation, objects to holding a conference, the peacemaker shall not hold it.  If the parties do not agree on a peacemaker, the Chief Judge shall designate a peacemaker.

19

s:\djr\ords06\bluelk\tribal court
January 23, 2008

*Exhibit 20 - Page 19 of 21*

3.      If the nonmoving party agrees to a conference, the peacemaker shall send written notice of it to the parties.  The notice shall contain:

a.      The names of the parties.

b.      The date, time, and place of the conference.

c.      The allegation(s) and a brief statement of the alleged facts on which it is based.

d.      a brief description of how the peacemaker conference works.

e.      If there is no agreement on a peacemaker among the parties, the Chief Judge shall designate a peacemaker.

F.      Representation.

No party to a peacemaking conference may be represented by counsel.  A party may only be represented by a spokesperson to the extent necessary for the party to understand the nature of the proceedings.

G.      Appeal.

A party aggrieved by the decision of the peacemaker may appeal to the Trial Court.  The Tribal Court shall hear the case as if it were initiated in the Trial Court, provided, however, that it shall take notice of the peacemaker's decision.

Section 3.  Effective Date.  This Ordinance shall become effective immediately upon passage.

**CERTIFICATION**

The foregoing ordinance was adopted at a regular meeting of the Business Council of the Blue Lake Rancheria held on _____, 200_, by the following vote:

20

s:\djr\ords06\bluelk\tribal court
January 23, 2008

20

*Exhibit 20 - Page 20 of 21*

AYES:
NOES:
ABSTAIN:
ABSENT:


_____
Claudia Brundin, Chairperson

ATTESTED TO:


_____
Tribal Secretary

21

s:\djr\ords06\bluelk\tribal court
January 23, 2008

*Exhibit 20 - Page 21 of 21*

# Exhibit 21

*Clerk's Default Against UCIC*

This is a true and complete copy of

Two Consecutive pages extracted from a copy of Complaint in CV11-10161
"United Contractors Insurance Company v Blue Lake Tribal Court"

which was filed in the Central District Court of California on Dec 7 2011

There are two pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 21 - Title Page*



November 4, 2011

Michelle C. Edborg
Bonetati & Kincaid, Inc.
2020 North Tustin Ave.
Santa Ana, CA 92705

RE: Case number C-09-0612LJM

Dear Ms. Edborg:

I am returning your pleadings since a Clerks Default was entered with the Tribal Court on
October 28, 2011.

In conclusion I would like to direct your attention to **Rule 34** from the **Pleading,
Practice and Procedure for the Blue Lake Rancheria Tribal Court;**

## Rule 34. Default Judgment.

(a) <u>Entry.</u> When a party against whom a judgment for affirmative relief is sought has failed to plead or
otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise,
the clerk shall enter his/her default.

(b) <u>Judgment.</u> Judgment by default may be entered as follows:

(1) <u>By the Clerk</u>. When the plaintiff's claims against a defendant is for a sum certain or for a sum which
can by computation be made certain, the clerk upon request of the plaintiff and upon affidavit of the
amount due shall enter judgment for that amount and costs against the defendant, if he/she has been
defaulted for failure to appear and if he/she is not an infant or incompetent person.

(2) <u>By the Court.</u> In all other cases, the party entitled to a judgment by default shall apply to the court
thereof; but no judgment by default shall be entered against an infant or incompetent person unless
represented in the action by a general guardian, conservator, or other such representative who has
appeared therein. If the party against whom judgment by default is sought has appeared in the action,
he/she (or if appearing by representative, his/her representative) shall be served with written notice of
the application for judgment at least 3 days prior to the hearing, if any, on such application. If, in order
to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to
determine the amount of damages or to establish the truth of any allegation by evidence or to make an
investigation of any other matter, the court may conduct such hearings or order such references as it
deems necessary and proper.

(c) <u>Setting Aside Default.</u> For good cause shown by any party the court may set aside an
entry of default and, if a judgment by default has been entered, may likewise set it aside in
accordance with these rules.

Phone: (707) 668-5101      Fax: (707) 668-4272
Mailing Address: P.O. Box 426      Physical Address: 428 Chartin Road
Blue Lake, CA 95525

www.bluelakerancheria-nsn.gov

*Exhibit 21 - Page 1 of 2*

Please feel free to contact me if you require further information in this regard.

Sincerely,

Anita M. Huff
Tribal Court Clerk
amhuff@bluelakerancheria-nsn.gov

*Exhibit 21 - Page 2 of 2*

2

# Exhibit 22

*Tribal Complaint Against UCIC*

This is a true and complete copy of

Five consecutive pages extracted from a copy of Complaint in CV11-10161
"United Contractors Insurance Company v Blue Lake Tribal Court"

which was filed in the Central District Court of California on Dec 7 2011

There are five pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 22 - Title Page*

1  ERIC F. HARTMAN, ESQ. (SB # 083571)
   LAW OFFICE OF ERIC F. HARTMAN
2  300 S. FIRST STREET, #210
   SAN JOSE, CA. 95113
3  (408) 297-7254 / Fax (408) 297-0608

4  Attorney for Cross-Complainant, Wood's Roofing Inc., a California Corporation

5

6                                    ENDORSED-FILED

7                                    SEP 07 2011
                                     CLERK OF THE TRIBAL COURT
8                                    BLUE LAKE RANCHERIA

           IN THE TRIBAL COURT OF

9              BLUE LAKE RANCHERIA

10

11

12

13  MAINSTAY BUSINESS SOLUTIONS,        )   CASE NO.  C-09-0612-LJM
                                        )             C-09-0612A-LJM
14                                      )
                     Plaintiff,         )
15                                      )   CROSS-COMPLAINT FOR DAMAGES
                                        )   FOR BREACH OF IMPLIED COVENANT
16  vs.                                 )   OF GOOD FAITH AND FAIR DEALING
                                        )   REFUSAL OF INSURER TO DEFEND
17  WOOD'S ROOFING INC., a California    )   ACTION AGAINST INSURED AND
    Corporation, DOES 1-10.             )   INDEMNIFY AND TO WRONGFULLY
18                                      )   REFUSAL TO SETTLE
                                        )
19                   Defendants.        )
                                        )
20  WOOD'S ROOFING INC., a California    )
    Corporation;                        )
21                                      )
                                        )
22               Cross-Complainant,     )
                                        )
23  vs.                                 )
                                        )
24  UNITED CONTRACTORS INSURANCE        )
    COMPANY INC.;  ADMIRAL              )
25  INSURANCE COMPANY; ROES 1-100.      )
                                        )
26               Cross-Defendants.      )
                                        )
27  _____ )

                                            *Exhibit 22 - Page 1 of 5*
28
    Cross-Complaint                                        -1-

Cross-Complainant Wood's Roofing Inc. (hereinafter **"Wood's Roofing"**) alleges:

1.    Cross-Defendant **United Contractors Insurance Company Inc.** was and is a corporation organized and existing under the laws of the State of California with its principal place of business in this State located at 45-110 Club Drive, Suite D&E, Indian Wells, California 92210 and authorized to transact business in this State as an insurer.

2.    Cross-Defendant **Admiral Insurance Company** was and is a corporation organized and existing under the laws of the State of California with its principal place of business in this State located at 1255 Caldwell Road, Cherry Point, New Jersey 08034 and authorized to transact business in this State as an insurer.

3.    On or about September 28, 2008 for a period of 3 years to September 28, 2011 Cross-Defendant **United Contractors Insurance Company Group** (hereinafter "United **Contractors**") insured a policy of liability insurance - Policy No. GL-CA010804 to its insured Cross-Complainant Wood's Roofing.  On/about November 10, 2008 the insured's hired temporary employee for Plaintiff Mainstay Business Solutions to assist in Wood's Roofing's work was injured during the course and scope of their roofing work (Sergio Flores).

4.    On or about September 28, 2007 for a period of one year to September 28, 2008 Cross-Defendant **Admiral Insurance Company** (hereinafter **"Admiral"**) insured a policy of liability insurance - Policy No. CA00000104306 to its insured Wood's Roofing. On or about October 24, 2007 the insured's hired temporary employee from Plaintiff Mainstay Business Solutions to assist in Wood's roofing work was injured during the course and scope of their roofing work (Daniel Flores).

5.    On or about the above dates in consideration of the payments of periodic full premiums, Cross-Defendants insurance companies delivered to Cross-Complainant Woods' Roofing policies of insurance in which Cross-Defendants would and did insure Cross-Complainant Wood's Roofing Inc. against any and all liability and agreed to pay on behalf of the insured Cross-Complainant Wood's Roofing Inc. All sums which their insured Cross-

*Exhibit 22 - Page 2 of 5*

Cross-Complaint

-2-

1  Complainant Wood's Roofing shall become obligated to be to a maximum of $1,000,000 -

2  $2,000,000 per occurrence during the policy period. At all times Cross-Complainant Woods'

3  Roofing had a reasonable expectation of full coverage, indemnification and without dispute.

4  The policies further provided that Cross-Defendants insurance companies **"shall defend any**

5  **action against the insured cross-complainant Wood's Roofing"** alleging such damages,

6  property damages, bodily injury and other covered damages even if any such actions is

7  groundless, false, or fraudulent or meritless. The policies took effect as see forth above and

8  remained in full force and effect and all times hereinafter mentioned.  The policies are

9  attached as **Exhibit #A** and **Exhibit #B.**

10      6.      On/about July 12, 2009 a written Complaint was filed by plaintiff Mainstay

11  Business Solutions against Defendant Wood's Roofing Inc. alleging that defendant Wood's

12  Roofing Inc. caused harm and injury to Plaintiff Mainstay Business Solutions' employees

13  while doing roofing work caused by allegedly Wood's Roofing negligence.

14      7.      On/about June 12, 2009 Defendant Woods' Roofing was served with a

15  Complaint for damages and First Amended Complaint on June 23, 2011 to include causes

16  of action for negligence by Wood's Roofing Inc. causing Plaintiff Mainstay Business

17  Solutions to proximately suffer damages.

18      8.      Cross-Complainant Wood's Roofing Inc. at all times herein mentioned had and

19  has performed all of the terms of the policies on its part to be performed.

20      9.      Notwithstanding Cross-Complainant Wood's Roofing Inc. requests all Cross-

21  Defendants denied all liability and refused to undertake the defense of the  action against

22  Defendant Wood's Roofing Inc. by Plaintiff Mainstay Business Solutions and refused to

23  indemnify and pay any reasonable settlement as set forth in **Exhibit #C** and **Exhibit #D.**

24      10.     Prior to Cross-Defendants' refusal to defend and indemnify cross-complainant

25  in the Plaintiff Mainstay Business Solutions /Defendant Wood's Roofing action and at all

26  relevant times Cross-Defendants insurance companies failed to undertake a complete and

27  adequate investigation of the claim.  Specifically, Cross-Defendants insurance companies

28

*Exhibit 22 - Page 3 of 5*

1   failed to undertake an adequate investigation of the claim. Specifically cross-defendants'

2   asserted in their denial of coverage and indemnification letters that the losses were excluded

3   under the policy but failed to, inter alia, specify which legally correct policy premiums

4   excluded the losses. Despite repeated attempts by Defendant/Cross-Complainant Wood's

5   Roofing Inc. to insurance companies as to ascertain the grounds for its assertions, the cross-

6   defendants insurance companies failed and refused to communicate with cross-complainant

7   Wood's Roofing Inc. to answer Woods' Roofing Inc.'s inquiries.

8       11.     On/about August 2009 Plaintiff Mainstay Business Solutions communicated

9   a reasonable settlement offer of $100,000 which amount is within the policy limits to

10   Defendant/Cross-Complainant Wood's Roofing Inc. At all times and that time and at all

11   relevant, Cross-Defendants insurance companies refused to consider or accept the offer.

12       12.     As a proximate result of Cross-Defendants insurance companies in their

13   refusal to defend, indemnify and settle as herein alleged, Defendant/Cross-Complainant

14   Wood's Roofing was compelled to engage counsel to defend in the action Plaintiff Mainstay

15   Business Solutions vs. Defendant Woods' Roofing Inc. and is incurring fees and costs in its

16   defense in a sum to be ascertain.

17       13.     As a proximate result of the tortious conduct of Cross-Defendants insurance

18   companies, Cross-Complainant Woods' Roofing has suffered other damages including

19   emotional distress and loss of business.

20       14.     In committing the acts described set forth above of this Cross-Complaint,

21   Cross-Defendant insurance companies acted in conscious disregard of the rights of Cross-

22   Complainant Wood's Roofing Inc. and was guilty of malice or oppression or fraud. The

23   conduct of Cross-Defendants insurance companies warrants an assessment of punitive

24   damages in an amount appropriate to punish Cross-Defendants insurance companies and

25   deter others from engaging in similar wrongful conduct.

26       WHEREFORE, Cross-Complainant prays judgment from Cross-Defendants jointly

27   and severally as follows:

28

*Exhibit 22 - Page 4 of 5*

Cross-Complaint

-4-

1.   For the sum of $500,000 as attorney's fees and the sum of $100,000 as costs and expenses incurred by this cross-complainant in defending the action against it.

2.   For the sum of $200,000 as reimbursement of the amount to be paid by this Cross-Complainant in settlement of the Plaintiff Mainstay Business Solutions action or satisfaction of the judgment in favor of Plaintiff Mainstay Business Solutions and against this Cross-Complainant Wood's Roofing Inc.

3.   For general damages in excess of $1,000,000 according to proof.

4.   For exemplary and punitive damages.

5.   For reasonable attorney fees and cots.

6.   For costs of suit herein incurred.

7.   For such other and further relief as the court may deem proper.

Dated: September 6, 2011          By: _____
                                        Eric F. Hartman
                                        Attorney for Cross-Complainant
                                        Wood's Roofing Inc.

*Exhibit 22 - Page 5 of 5*

# Exhibit 23

*UCIC's Special Appearance in Tribal Court*

This is a true and complete copy of

Eleven consecutive pages extracted from a copy of Complaint in CV11-10161
"United Contractors Insurance Company v Blue Lake Tribal Court"

which was filed in the Central District Court of California on Dec 7 2011

There are eleven pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 23 - Title Page*

**BONETATI**
**&**
**KINCAID,**
*Inc.*

Attorneys At Law

Bonetati Law Building
2020 North Tustin Avenue
Santa Ana, California 92705
Telephone (714) 466-6600
Toll Free (866) 291-0517
Facsimile (714) 466-6601
www.bonetatilaw.com

MARILYN L. BONETATI
MARK L. KINCAID
MARC S. SOBLE
MICHELLE C. EDBORG
COLLEEN E. HEMINGWAY
SHMUEL A. STEINBERG
STACY MOORE
LAKESHA ROBINSON
ROBERT GREENAWALT

OF COUNSEL
EUGENE R. GRACE

October 26, 2011

**Via Federal Express**

Clerk of the Court
Blue Lake Rancheria Tribal Court
428 Chartin Road
Blue Lake, CA 95525

Re:   Mainstay Business Solutions v. Wood's Roofing, Inc., et al.
      *Tribal Court of Blue Lake Rancheria Case No.: C-09-0612-LJM*
      Our Client:   United Contractors Insurance Company, Inc., A Risk Retention Group
      Our File No.:  4819

Dear Clerk of the Court:

Enclosed please find the following documents:

1. Attorney Application for Admission to Practice Law in the Blue Lake Rancheria Tribal Court;
2. Check in the amount of $100 for the application/admission fee;
3. Our Motion to Dismiss in the above referenced matter (four copies); and
4. Self-addressed stamped envelope.

Please process my attorney application for admission to practice law in your court. In addition, I am providing our Motion to Dismiss while my attorney application is pending. Given that the application is pending, I request that the motion be filed if allowed. Otherwise, I request that you please hold the motion until the application is processed and then file it.

I have enclosed four copies of the Motion to Dismiss, one is the original, two copies to be filed with the original, and one copy is for conforming. Once the motion is filed, please return the conformed copy in the enclosed self-addressed stamped envelope.

If you have any questions, please contact me at your convenience at (714) 466-6600. If I am not available, please ask to speak with my assistant, Kirsten Florentino at the same phone number.

*Exhibit 23 - Page 1 of 11*

Clerk of the Court – Blue Lake Rancheria Tribal Court
Mainstay Business Solutions v. Wood's Roofing, Inc., et al.
October 26, 2011
Page 2


Thank you for your courtesy in this regard.

Very truly yours,

BONETATI & KINCAID, INC.

MICHELLE C. EDBORG, ESQ.
MCE:kf

Enclosures: As Noted Above

*Exhibit 23 - Page 2 of 11*

1 | MICHELLE C.L. EDBORG, ESQ., SBN: 220019
BONETATI & KINCAID, INC.
2 | 2020 North Tustin Avenue
Santa Ana, California 92705
3 | (714) 466-6600 phone
(714) 466-6601 fax
4
5 | Attorneys for Specially Appearing Cross-Defendant
United Contractors Insurance Company, Inc. A Risk Retention Group
6
7
8 | # IN THE TRIBAL COURT OF
# BLUE LAKE RANCHERIA
9
10
11 | MAINSTAY BUSINESS SOLUTIONS,                ) CASE NO.:   C-09-0612-LJM
                                                )                  C-09-0612A-LJM
12 |                    Plaintiff,               )
                                                )
13 | vs.                                         )
                                                ) **NOTICE OF MOTION AND MOTION TO**
14 | WOOD'S ROOFING, INC., a California          ) **DISMISS FOR LACK OF PERSONAL**
Corporation, and DOES 1 through 10,            ) **JURISDICTION**
15 |                                             )
                   Defendants.                  )
16 | _____    ) **Date:**
                                                ) **Time:**
17 | WOOD'S ROOFING, INC., a California          ) **Dept.:**
Corporation,                                   )
18 |                                             )
                   Cross-Defendant,             )
19 |                                             )
vs.                                            )
20 |                                             )
UNITED CONTRACTORS INSURANCE                   )
21 | COMPANY, INC.; ADMIRAL INSURANCE           )
COMPANY; and ROES 1-100,                       )
22 |                                             )
                   Cross-Defendants.            )
23 | _____    )
24
25 |        TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:
26 |        NOTICE IS HEREBY GIVEN that on _____, at _____ a.m., or as soon
27 | thereafter as the matter may be heard, in Department _____ of the Tribal Court of Blue Lake
28 | Rancheria, located at _____, California, United Contractors Insurance Company, Inc. A

1

*Exhibit 23 - Page 3 of 11*

1  Risk Retention Group ("UCIC"), will appear *specially* and move the Court for an order
2  Dismissing the Cross-Complaint of Wood's Roofing, Inc. against UCIC.

3          This Motion is made under F.R.C.P. 12(b)(2) as well as Blue Lake Rancheria
4  Ordinance, Title 11, Article 1, section 11.1.1.030 on the grounds that this court lacks personal
5  jurisdiction over UCIC as UCIC is not a tribal member, is not owned by the tribe and has not
6  entered into a contract with or done business with a tribe member.

7          This Motion will be based on this Notice, the attached Memorandum of Authorities,
8  the pleadings, documents, records and files in this action and upon such other oral and
9  documentary evidence as may be presented at the hearing.

10

11  Dated: October 26, 2011                     BONETATI & KINCAID, INC.

12
                                         By: _____
13                                            Michelle C.L. Edborg, Esq.
                                              Attorneys for Specially Appearing Defendant
14                                            United Contractors Insurance Company, Inc. A
                                              Risk Retention Group
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            2

*Exhibit 23 - Page 4 of 11*

# MEMORANDUM OF AUTHORITIES

## I.   STATEMENT OF FACTS

Cross-defendant, UCIC is not and has never been a member of the Blue Lake Rancheria Indian Tribe (the "Tribe"). Further, UCIC has not done business with the Tribe, did not enter into a contractual relationship with Mainstay and did not sell an insurance policy to Mainstay. UCIC has no affiliation with the Tribe, and therefore, is not subject to the tribal court's jurisdiction.

The underlying Complaint filed herein is a dispute between an Indian tribal entity, Mainstay Business Solutions ("Mainstay") and a non-Indian contractor, Wood's Roofing, Inc. ("Wood's") with which Mainstay did business. In particular, Wood's provided roofing services to Mainstay pursuant to contracts dated June 2007 and June 2008. As part of those agreements, Wood's agreed to submit to the jurisdiction of the Blue Lake Rancheria Tribal Court.

Wood's purchased three Commercial General Liability Insurance Policies from UCIC that had effective dates of September 28, 2008 to September 28, 2009; September 28, 2009 to September 2010; and September 28, 2010 to September 28, 2011. *UCIC is not a tribal entity and is not a tribal member.* Further, as UCIC's insurance policies are only with Wood's and not with Mainstay, the policies do not afford coverage to a tribe member. In fact, there is no connection between UCIC and the Blue Lake Rancheria tribe.

Nevertheless, pursuant to the underlying Complaint, Mainstay seeks recovery for benefits it paid to workers who were injured during roofing operations performed by Wood's. Wood's submitted this claim to its general liability insurer, UCIC. However, UCIC declined coverage under the policies for a variety of reasons, the primary basis being that the policies contain an exclusion for matters involving injured workers or that arise out of workers' compensation claims. Indeed, general liability policies do not provide benefits for injured workers, since such coverage would be within the ambit of a workers' compensation policy. UCIC also cited other bases for declination, including but not limited to the fact that two of the injuries occurred prior to the inception of the policies.

*Exhibit 23 - Page 5 of 11*

1   Ultimately, the injured workers were provided workers compensation benefits through

2   Mainstay.  However, Mainstay seeks recovery of the benefits paid to the workers from

3   Wood's.  In turn, Wood's now seeks recovery from UCIC, its general liability carrier, since

4   Wood's failed to maintain workers' compensation coverage.

5   Nevertheless, there is no connection between UCIC and the Tribe.  UCIC did not sell

6   the subject policies to the Tribe or to any Tribal member.  Further, UCIC has not consented to

7   the jurisdiction of the Tribal Court.  There is no basis for maintaining the cross-complaint in

8   the Tribal Court.  Furthermore, UCIC is in the process of preparing a Declaratory Relief action

9   to be filed in the United States Federal District Court to determine its rights under the

10   insurance policies issued to Wood's.

11   II.    ARGUMENT

12       a.  Indian Tribal Sovereignty Does Not Extend to Non-Members

13   The Courts have made clear that tribal sovereignty is limited, just as a state's

14   sovereignty is limited by the U.S. Constitution.  Tribal sovereignty allows Indian tribes to

15   regulate their own members as well as those who consent to the jurisdiction of the tribe.  In

16   *Montana v. United States* (1980) 450 U.S. 544, the U.S. Supreme court noted that the Indian

17   tribal sovereignty was limited as follows:

18       A tribe may regulate, through taxation, licensing, or other means, the

19       activities of nonmembers who enter consensual relationships with the

20       tribe or its members, through commercial dealing, contracts, leases or

21       other arrangements. ... A tribe may also retain inherent power to

22       exercise civil authority over the conduct of non-Indians on fee lands

23       within its reservation when that conduct threatens or has some direct

24       effect on the political integrity, the economic security, or the health or

25       welfare of the tribe.

26   *Montana, supra* 450 U.S. at 566.

27   / / /

28   / / /

_4_

*Exhibit 23 - Page 6 of 11*

1     The U.S. Supreme court further explained this position in *Strate v. A-1 Contractors*
2 (1997) 520 U.S. 438 when it stated as follows:

3               Indian tribes lack civil authority over the conduct of nonmembers on
4               non-Indian land within a reservation, subject to two exceptions:  The
5               first  exception  relates  to  nonmembers  who  enter  consensual
6               relationships  with  the  tribe  or  its  members;  the  second  concerns
7               activity  that  directly  affects  the  tribe's  political  integrity,  economic
8               security, health or welfare.

9 *Strate, supra* 520 U.S. at 466.

10     It is clear that an Indian tribe has jurisdiction over the conduct of its own members.
11 However, in order to obtain jurisdiction over a nonmember, the tribe must show that either (1)
12 the nonmember consented to jurisdiction or that (2) the activity directly affects the tribe's
13 political integrity, economic security, health or welfare.  Neither condition exists here.  Here,
14 UCIC is not a tribal member and did not insure a tribal entity or a tribal member.  As UCIC is
15 merely the insurer of a company that happened to do business with a tribal member, there is no
16 basis for jurisdiction over UCIC.

17     **b.  The Tribe's Own Jurisdiction Rules Preclude Jurisdiction Over UCIC**

18     Tribal Ordinance number 07-01 signed on February 26, 2007 sets civil jurisdictional
19 powers as follows:

20         3.  Personal Jurisdiction:
21             The  scope  of  the  Tribal  Court's  civil  jurisdiction  shall  extend  to  the
22             following:
23                 (a) The Tribe;
24                 (b) Legal entities owned by the Tribe;
25                 (c) Persons or entities employed by the Tribe or its wholly owned
26                     legal entities;
27                 (d) Persons or legal entities who have entered contracts with the Tribe
28                     or its wholly owned legal entities;

*Exhibit 23 - Page 7 of 11*

NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

1     (e) Persons or entities doing business within the territorial jurisdiction

2        of the Tribal Court;

3     (f) Tribal members;

4     (g) Anyone the Tribe formally recognizes as Indian;

5     (h) Other Indians;

6     (i) Anyone who consents to Tribal Court jurisdiction;

7     (j) Other individuals or entities whose conduct affects the ability of

8        the Tribe to govern itself;

9     (k) All other individuals whose conduct threatens or has some direct

10        effect on the political integrity, the economic security, or the health

11        and welfare of the Tribe.

12     As set forth above, UCIC is merely the insurer of a nonmember of the Tribe.  The

13 nonmember (Wood's) may be subject to the jurisdiction of the court as a result of a consensual

14 agreement that it entered into with a tribal entity.  However, that agreement does not extend to

15 Wood's insurer.  UCIC has not entered into any agreement with the Tribe or its member,

16 Mainstay, and has not consented to the jurisdiction of the Tribal Court.  As such, there is no

17 basis for any exercise of jurisdiction over UCIC by the Tribal Court.

18 III.    **CONCLUSION**

19     UCIC is not a member of the Tribe and has not consented to the Tribal Court

20 jurisdiction.  Further, there is no basis for the exercise of Tribal court jurisdiction over UCIC or

21 the cross-complaint of Wood's against UCIC.  In addition, UCIC is in the process of preparing

22 a declaratory relief action against Wood's, which will be filed in the U.S. District Court so as

23 to obtain a judicial determination of coverage.  If necessary, UCIC will also seek injunctive

24 relief and/or declaratory relief pertaining to any jurisdictional issue.

25 ///

26 ///

27 ///

28 ///

*Exhibit 23 - Page 8 of 11*

1    Based on the foregoing, it is requested that this Court dismiss this action as against

2  UCIC for lack of personal jurisdiction.

3

4  Dated: October 26, 2011                    BONETATI & KINCAID, INC.

5                                             By

6                                                Michelle C.L. Edborg, Esq.
                                                 Attorneys for Specially Appearing Defendant
7                                                United Contractors Insurance Company, Inc. A
                                                 Risk Retention Group
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF ORANGE

3

4

     I am employed in the County of Orange, State of California.  I am over the age of eighteen years and not a party to the within entitled action; my business address is 2020 North Tustin Avenue, Santa Ana, California 92705.

5

6

     On October 26, 2011, I caused to be served the foregoing document described as **NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** on the interested parties as follows:

7

8

### SEE ATTACHED SERVICE LIST

9

[X]  **(BY MAIL)** - By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona.  I deposited such envelope in the mail at Santa Ana, California, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

10

11

12

13

[ ]  **(BY PERSONAL DELIVERY)** - By placing [ ] the original [ ] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona. I caused such envelope to be delivered to the addressee.

14

15

[ ]  **(BY FEDERAL EXPRESS NEXT-DAY DELIVERY)** - By placing [ ] the original [x] a true copy thereof enclosed in a sealed envelope(s) addressed as to the above-named counsel of record or parties in propria persona.  I caused such envelope to be deposited in the Federal Express box located at 2120 E. 17th Street, Santa Ana, California, which is regularly maintained by Federal Express, with delivery fees pre-paid and provided for, addressed to the person on who said document is to be served.

16

17

18

19

[ ]  **(BY FACSIMILE)** - I caused said document, along with an signed copy of this Declaration, to be transmitted to a facsimile machine telephone number as last given by said counsel or party in propria persona as noted above.

20

21

[X]  **(STATE)** - I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

22

23

Dated: October 26, 2011

24

Kirsten Florentino

25

26

27

28

*Exhibit 23 - Page 10 of 11*

8

NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

1

### SERVICE LIST

2

**Mainstay Business Solutions v. Wood's Roofing, Inc., et al.**

3     In the Tribal Court of Blue Lake Rancheria - Case Nos. C-09-0612-LJM & C-09-0612A-LJM
Our File No. 4819

4

5

| Counsel | Phone / Fax | Party Represented |
|---|---|---|
| Michael A. Peart, Esq.<br>Mainstay Business Solutions<br>13389 Folsom Blvd., #300-189<br>Folsom, CA 95630 | (916) 223-0657 | Plaintiff, Mainstay Business Solutions |
| Eric F. Hartman, Esq.<br>Law Office of Eric F. Hartman<br>300 S. First Street, #210<br>San Jose, CA 95113 | (408) 297-7254<br>(408) 297-0608 | Cross-Complainant, Wood's Roofing, Inc. |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

*Exhibit 23 - Page 11 of 11*

NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

# Exhibit 24

*Blue Lake Rancheria Org Chart*

This Exhibit is an Organizational Chart of the Blue Lake Rancheria

The Exhibit consists of two pages, not including this one.

The first page is an Org Chart created by James Acres on March 7th, 2016 and is true to the best of his knowledge.

The second page gives sources for information in the chart.

*Exhibit 24 - Title Page*

# Blue Lake Rancheria Org Chart

## 53 Members of the Tribe, Including:

- Arla Ramsey, and her son,
- Eric Ramos, and,
- Claudia Brundin and
- Art Ramsey

*the Tribe does elect*

## The Five Members of The Business Council, Which Does Include:

- Arla Ramsey, its Vice-Chair and "Overseer",
- Claudia Brundin, its Chair,
- Art Ramsey, its Secretary/Treasurer
- Defendant Anita Huff, who gives the Business Council her assistance "as needed," and
- Robert Pollard is IT Director for the Tribe

*The Business Council Oversees*

## The Tribal Court, Where:

- Defendant Judge Lester J. Marsten presides, and
- Defendant Anita Huff is Court Clerk, and
- Robert Pollard provides IT Support

## The Economic Dev Corp, Where:

- Arla Ramsey provides oversight, and her son
- Eric Ramos serves as President and
- Robert Pollard provides IT Support

*The Econ Dev Corp Manages*

## The Blue Lake Casino, Where:

- Arla built the Hotel,
- Claudia is Housekeeping Manager,
- Art is Groundskeeping Manager, and
- Robert is IT Director

*Exhibit 24 - Page 1 of 2*

Information about Arla Ramsey and Eric Ramos is drawn from Exhibit 4

Information about Claudia Brundin and Art Ramsey is drawn from Exhibit 26

Information about Defendant Anita Huff is drawn from Exhibit 3

Information about Defendant Lester Marsten is drawn from Exhibit 2

Information about the Organizational Structure is drawn from Exhibits 4 and 19

Information about Robert Pollard is from James Acres's personal conversations with Robert Pollard between 2010 and 2012

...ation about the family relationship of Eric Ramos and Arla Ramsey is from James Acres conversations with Robert Pollard, Eric Ramos, and Arla Ramsey between 2010 and 2012

Exhibit 24
page 2 of 2

# Exhibit 25

*Tribal Court Map*

This is a true and complete copy of

maps.google.com directions from "Blue Lake Tribal Court" to "Blue Lake Casino"

as retrieved on March 7, 2016.

There is one page in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 25 - Title Page*

**Google** Maps    Blue Lake Rancheria Tribal Government Office to Blue   Walk 0.2 mile, 3 min
                   Lake Casino & Hotel



Imagery ©2016 DigitalGlobe, USDA Farm Service Agency, Map data ©2016 Google    200 ft

🚶    via Casino Way                                    3 min
                                                                 0.2 mile

Google Maps

*Exhibit 25 - Page 1 of 1*

# Exhibit 26

*Blue Lake Elected Officials*

This is a true and complete copy of

http://www.bluelakerancheria-nsn.gov/govLawElectedOfficials.html

as retrieved on January 19, 2016.

There are four pages in this exhibit, not including this cover page.

The only changes made to the pages in the Exhibit are
i) the addition of the Exhibit number, and
ii) the addition of page numbers

at the bottom of each page.

*Exhibit 26 - Title Page*



# BLUE LAKE RANCHERIA

HOME | FACTS | GOVERNMENT & LAW | PROGRAMS | BUSINESS OPERATIONS | GIVING & COMMUNITY | TRIBAL MEMBERSHIP | CONTACT US
GOVERNMENT & LAW > ELECTED OFFICIALS

FACTS

GOVERNMENT & LAW
  Elected Officials
  Tribal Court
  Regulatory Agencies
  Gaming Commission
  Environmental Programs
  Energy and Technologies
  Cultural Affairs
  Air Quality
  Water Quality
  Waste & Recycling
  Grants & Contracts

PROGRAMS

BUSINESS OPERATIONS

GIVING & COMMUNITY

TRIBAL MEMBERSHIP

CONTACT US

## GOVERNMENT & LAW:
## ELECTED OFFICIALS

GENERAL INQUIRIES
[T] 707-668-5101
[F] 707-668-4272
**Email for Info**

PRESS INQUIRIES
**Email for Press**

Dating back to its formation in 1908, the Blue Lake Rancheria Tribe has been fortunate to have consistently strong and stable leadership - highly educated, community-minded, internationally diplomatic, financially responsible and socially progressive.

Chairperson             **Claudia Brundin**
Vice-Chairperson     **Arla Ramsey**
Secretary | Treasurer   **Art Ramsey**
Member-At-Large      **Diane Holliday**
Member-At-Large      **Dorothy McKinnon**

### Claudia Brundin  |  Chairperson

Claudia Brundin is the Chairperson of the Blue Lake Rancheria Tribe, providing strong, balanced leadership that has spanned three decades. Her father, Oscar E. Brundin, also served as Chairperson in his day. Claudia provides leadership and counsel to the Tribe, and steers the Tribe and the Tribal Council in the course of fulfilling all governmental responsibilities. Passionate about effective, modern era Tribal leadership and operations, Claudia sits on the Tribal Government Consultation Committee and the California Rural Indian Health Board, and partners with many other outstanding organizations to achieve self-sufficiency and protect self-government in Indian Country.

In addition to her role as Chairperson, Claudia works full-time managing Housekeeping Operations for the Blue Lake Casino and the Blue Lake Rancheria Tribal Offices, upholding the Tribe's values of individual contribution and an uncompromising work ethic. Prior to serving the Tribe full-time, Claudia worked at St. Joseph's Hospital for over 30 years in housekeeping and administration. Claudia has been a life-long resident of Humboldt County and grew up in Blue Lake. Claudia attended Arcata High School and then Humboldt Business College. She has spent the majority of her life on the Blue Lake Rancheria's Tribal lands.

### Arla Ramsey  |  Vice Chairperson

Arla Ramsey currently serves the Blue Lake Rancheria Tribe as its Vice-Chairperson and Tribal Administrator. Her duties include oversight of the Business Council and the Blue Lake Rancheria Economic Development Corporation. Prior to assuming Tribal Government work full-time, Arla worked for the U.S. Forest Service for over nine years as a nature guide, fire-fighter, and heavy-equipment operator, among other responsibilities. Before entering the Forest Service, Arla spent several years reorganizing the Tribe and serving as HUD Grant Coordinator following the Tribe's federal reinstatement. And prior to this reorganization work, for eight years Arla owned and operated a children's daycare business for Tribal and Blue Lake community residents. In addition to these positions, Arla and former Chairperson Sylvia Daniels led the twenty-five year political and legal fight for successful reinstatement in 1983 of Blue Lake Rancheria as a federally-recognized Tribe.

Arla has served as project manager for the following Tribal economic development initiatives: a 55,000 Sq. Ft. Casino (with 800+ slot machines), 100-Room Hotel/Pool Complex, Fuel/Grocery/Diner Facility, 8,000 Sq. Ft. Event Center, Residential Homes, 3 Restaurants, Infrastructure/ Roads/Parking/Lighting, Wells, Gravel Extraction, Environmental

*Exhibit 26 - Page 1 of 4*

and willful endangerment to Tribal and/or many other assets and/or development projects.

Arla has lived on the Blue Lake Rancheria since 1958. She attended Blue Lake schools, Arcata High and Humboldt State University. Arla holds a variety of professional certifications, including: Pepperdine University, The Graziadio School of Business and Management: Transit/Paratransit Management Program; College of the Redwoods Center: Penal 832 / Firearms, and Tribal Court Law and Justice; The Falmouth Institute: Contracting Officer's Representative, Record Management, Tribal Self-Governance, Law for the Tribal Council, NAHASDA Training; Council Lodge Institute: Basic Indian Law; Training Services Association: Housing Construction Inspection and Cost Estimating; National Environmental Training Center for Small Communities: Assessing Wastewater Options; Bill Helmich Associates: Grants and Contracts Law and Management, Drug and Alcohol Testing, OMB Circulars: A-102, A-87, A133, Environmental Law for Tribes, Employee Rights and Labor Laws; Three Feathers Associates: Title VI Training and Technical Assistance, Management, Nutrition, Supportive Services; California Rural Indian Health Board, Inc.: Final rules for P.L. 93-638; California Specialized Training Institute: Hazardous Materials Course, First Responder Awareness; Rural Community Assistance Corp.: Creative Solutions: Moving Rural Communities into the 21st Century; Johnson Associates: Design and Development of Indirect Cost Proposals for Tribal Organizations; Pesticide Applicators Assoc.: Pesticide Applications; I.H.A. Management Systems: NAHASDA Grant Implementation (HUD); Development Consultants: Tribal Environment, Health, Safety & Natural Resources' Damages Issues; ICF Consulting, Sponsored by HUD: (Office of Native American Programs Training Institute Course) Native Economic Development Guidance and Empowerment. Arla is also a certified Tribal Judge, and experienced in mediation, arbitration, and interpretation of Tribal laws, contracts, ordinances and resolutions.

Instrumental in promoting Indian Country improvements through her involvement with regional and national Tribal committees, Arla has also worked steadily to improve the lives of children and underserved adults in the greater community. Arla has held a seat on the Humboldt County Workforce Investment Board and supports the Council on Adoptable Children. With a unique combination of practical experience, diplomacy and compassion, Arla has helped the Tribe reorganize and build steadily toward economic stability. Her good will has made possible the productive community and government-to-government relationships the Tribe enjoys today.

## Art Ramsey | Secretary/Treasurer

Art Ramsey currently serves the Blue Lake Rancheria Tribe as Secretary/Treasurer. His duties include ensuring compliance with all required meetings, documentation of Tribal business operations and oversight of the Tribe's fiscal processes and operations. Further responsibilities include: handling all official correspondence, ensuring proper meeting minutes, election certification, accept, document and safeguard all funds under the Tribe's control, approve all draws on Tribal funds, act as primary check signatory and ensure compliance with all applicable laws and regulations.

In addition to his role as Secretary/Treasurer, Art manages Groundskeeping Operations for the Blue Lake Casino and the Blue Lake Rancheria Tribal Offices. Prior to serving the Tribe full-time, Art worked for Simpson Timber Company as a logger and hook tender. Upon retirement after 30 years with Simpson, Art accepted the position as Groundskeeping Manager with the Casino. Art has been a life-long resident of Humboldt County and grew up in Blue Lake. He attended Blue Lake primary schools and Arcata High School. After graduation, Art enlisted in the U.S. Navy, where he served as a submariner. Art was honorably discharged from service in 1964. Prior to embarking upon his 30 year timber career with Simpson, Art worked as a logger in the wilds of the islands off the Alaskan coastline. An avid fisherman, Art has spent the majority of his life on the Blue Lake Rancheria's Tribal lands.

## Diane Holliday | Member-At-Large

Diane Holliday currently serves the Blue Lake Rancheria Tribe as a Member-At-Large. Diane has accumulated a wealth of experience in Native American services delivery and Tribal governance, and has worked for the Tribe since 1992. In addition to her responsibilities as Tribal Council Member, Diane

*Exhibit 26 - Page 2 of 4*

appointed to many different board and committees positions, including the Community Health Advisory Board (CHAB) to Mad River Community Hospital, California Tribal Advisory Board (CTAB) to Indian Health Services (an elected position voted on by Northern California Tribes, Diane is honored to have been chosen for a second two-year term), the Northern California Indian Development Council (NCIDC – also an elected position, and Diane has been voted in for subsequent terms), and the Board of Directors for United Indian Health Services – where she also sits on multiple subcommittees including: Planning, Self-Determination, Governing Documents, Audit (which she chairs), Executive Governance (voted in annually for the last 3 years) and Corporate Compliance. In addition, Diane is the domestic violence delegate for the Inter-Tribal Council.

Further, Diane represents the Tribe and works diligently toward its many long term goals by attending meetings and proceedings relative to: Indian Child Welfare Act, Tribal Appeals Board, Child Advocate Services Team (CAST), Fee-to-Trust, California Rural Indian Health Board and many others. Diane is also the Blue Lake Rancheria's domestic violence delegate to the Inter-Tribal Council. And in an effort to promote understanding and education in Indian culture and history, Diane serves on the American Indian Advisory Board to Humboldt State University. Prior to assuming her position with the Tribe, Diane spent over 37 years working for several local community hospitals. Her duties have included hospital administration at all levels and pharmacy operations. Diane completed her pharmacy technician license in 1976. She has lived in Humboldt County for most of her life. Diane ensures the Tribe remains at the forefront of service sophistication and education, and in 2005 received an award from both the U.S. Department of Health and Human Services and Indian Health Services for her distinguished service on the California Tribal Advisory Board, and her tireless activism for improved Indian, and greater community, social services.

### Dorothy McKinnon | Member-At-Large

Dorothy McKinnon is a widely revered and highly respected Tribal Elder who serves on the Tribal Council as Member at Large. Dorothy also serves on the Tribal Gaming Commission and works closely with the Chairman of the Commission to ensure gaming operations are in compliance. Prior to working on Tribal interests, Dorothy began her career in the logging industry, and worked for many years in operations and administration. Dorothy is a highly-skilled traditional basketry artist, and also contributes to the Blue Lake Rancheria Tribe's preservation of this art form by teaching her skills to others.

Dorothy has served on the Tribal Council for over a decade, and has lived on Tribal lands most of her life. In addition to her regulatory and cultural duties, Dorothy is directly involved in the development and maintenance of Elderly Health & Welfare initiatives and Cultural Affairs education and acts as a cultural ambassador and goodwill representative for the Tribe at various Tribal Government proceedings and events.

Copyright © 2007 Blue Lake Rancheria. All Rights Reserved. | Privacy & Security Policy | Site Map

*Exhibit 26 - Page 3 of 4*

*Exhibit 26 - Page 4 of 4*